**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS,
HOUSTON DIVISION**

| | |
|---|---|
| ACA INTERNATIONAL<br><br>and<br><br>SPECIALIZED COLLECTION<br>SERVICES, INC.,<br><br>          Plaintiffs,<br><br>v.<br><br>CONSUMER FINANCIAL PROTECTION<br>BUREAU; and ROHIT CHOPRA, in his<br>official capacity as Director of the Consumer<br>Financial Protection Bureau,<br><br>          Defendants. | Case No. _____ |

**COMPLAINT**

Americans are frustrated by medical bills. But frustration does not justify lawlessness. Here, a federal agency with no healthcare experience is exploiting this frustration by making a politically-motivated regulation that prevents credit reporting agencies from showing accurate medical debts on credit reports. No agency has the power to do that.

The Final Rule challenged in this case will suppress medical debts from credit reports and is projected to hide from creditors over $49 billion in currently-reported funds that are owed to American doctors, nurses, nursing homes, hospitals, ambulances, health clinics and other medical services providers throughout the U.S. This rule will hurt patients more than it helps. Timely payment of medical bills directly supports our providers—the doctors, nurses, and hospitals that devote

1

themselves to our health and care. Consumer reports (colloquially known as "credit reports") that convey information about medical bills are a critical part of the process to ensure that providers are fairly paid for their services. The economic consequences of unpaid medical bills impact the market for physicians, available services, whether services can be provided before payment in full, the speed of insurance payments, and the ability of small non-corporate providers to stay in business—which is essential to ensure that rural areas have healthcare.

Transparency regarding unpaid medical bills also helps creditors accurately assess a person's ability to repay other debts or take on new debt. The credit economy relies on that transparency and efficiency to make loans based on credit bureau reports. Unreported debt can be collected by any legal means or drive a person to bankruptcy. Erasing a massive swath of debt information from the credit reporting system (estimated at 57 percent of all reported accounts) will make credit reports less useful and reliable and could lead to flawed underwriting, similar to that which caused the 2007 Financial Crisis.

The Consumer Financial Protection Bureau ("CFPB" or the "Bureau"), an independent agency under the Federal Reserve (*see* 12 U.S.C. § 5491(a)), was created to prevent another financial crisis, not cause one. On January 7, 2025, the Bureau published a notice of its final rule concerning healthcare payment policy that data shows will make it more difficult for healthcare providers to recoup billions in revenue on a recurring basis. *See* Prohibition on Creditors and Consumer Reporting Agencies Concerning Medical Information (Regulation V) ("Final Rule" or "Rule"),[1] to be published as 12 C.F.R. §§ 1022.3(j); 1022.30; 1022.38. This rule affecting a major swath of the economy was promulgated under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.*, a statute intended to meet the needs of consumer credit for modern commerce in a manner that is "fair and

---

[1] CFPB, *Prohibition on Creditors and Consumer Reporting Agencies Concerning Medical Information* (Regulation V) (released Jan. 7, 2025), https://files.consumerfinance.gov/f/documents/cfpb_med_debt_final_rule_2025-01.pdf (hereinafter "Notice").

equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information . . ." 15 U.S.C. § 1681(b). The Rule at issue, however, mandates that credit reporting agencies ("CRAs") suppress accurate information about consumer obligations and prevent relevant information from transferring between credit report users and credit reporting agencies to be used in credit decisions.

The Final Rule must be enjoined from taking effect for several important legal reasons:

- The CFPB does not have the statutory authority to issue the Final Rule. Under both the FCRA's plain text and the major questions doctrine the Bureau has exceeded its lawfully delegated power.

- Because the Rule is not narrowly tailored, content-based, and prevents the communication of accurate information without a legitimate state interest, it violates the First Amendment.

- The Final Rule is not based on reasoned decision-making, but rather political ideology. Defendants ignored many better and more recent studies that showed the importance of medical debt information for creditors to make safe loans—including from FICO and CRAs. Simultaneously, the CFPB disregarded comments about the Rule's financial and social costs from a wide variety of stakeholders ranging from lenders to healthcare providers, in addition to the collections industry.

- Finally, the CFPB is operating unconstitutionally because for several years, the Federal Reserve has not had "earnings" with which it is allowed to fund CFPB activities.

Accordingly, Plaintiffs, ACA International ("ACA") and Specialized Collection Systems, Inc. ("SCS") bring this action for declaratory and equitable relief against Defendants, the CFPB and Rohit Chopra in his official capacity as Director of the CFPB.

## I.
## NATURE OF THE CASE

1.    When, in 2003, Congress passed the Fair and Accurate Credit Transaction Act ("FACTA"), Pub. L. No. 108-159, 117 Stat. 1952, codified to 15 U.S.C. §§ 1681-1681x, which included provisions that expressly protected the content and use of medical information in credit

reports, it balanced those consumer protections with the need to support and protect the credit reporting system. It explained that in the preceding 30 years, the availability of non-mortgage credit to households in the lowest quintile of income had increased by nearly 70 percent. American families' ability to buy a home had also increased, with homeownership levels now approaching 70 percent, again with the largest gains achieved by lower income and minority groups. These improvements in the credit and mortgage systems saved consumers nearly $100 billion annually. Importantly, the congressional report explained that:

> "This unprecedented 'democratization' in the availability of credit to low- and moderate-income consumers has been made possible in significant measure by the emergence of a national credit reporting system." Fair and Accurate Transactions Act of 2003, 108 H.R. Rep. 263 at 23 (Sept. 4, 2003).

2.       The CFPB's Rule threatens the usefulness of the national credit reporting system and will hurt ACA members including SCS, as well as healthcare providers, patients, and all those who rely on a transparent and efficient credit reporting system.

## II.
## PARTIES

### A.    ACA International

3.       ACA is a nonprofit corporation based in Minneapolis, Minnesota. Founded in 1939, as the American Collectors Association, ACA is best known for being the largest trade group for the debt collection industry. ACA also has members that are original creditors, asset buyers, attorneys, and vendor affiliates. ACA's members include sole proprietorships and small businesses like furniture stores, community credit unions, and third-party debt collection agencies. Its members include municipalities and state housing authorities. ACA members are also large corporations such as banks and credit unions who, for example, originate mortgages and auto loans and issue credit cards. In addition, ACA's members are creditors that advance services prior to payment, like home security companies, telecommunication firms, and educational institutions. ACA's members are vital

4

to providing equitable and safe access to credit for American consumers.

4.      ACA's debt collector members work with consumers to resolve consumer debt, which saves every American household, on average, more than $700 each year. *Kaulkin Ginsberg*, 2020 State of the Industry Report, ACA International (2020), *available at* bit.ly/3uxMcBC. ACA's members also help keep America's credit-based economy functioning with access to low-cost credit. For example, in 2018 the accounts receivable management (ARM) industry returned more than $90 billion to creditors for goods and services the creditors had provided to customers. *Id.* These collections benefit consumers by lowering costs, particularly at a time when rising prices are hurting consumers throughout the country.

5.      ACA's debt collector members seek to recover unpaid past due amounts for services rendered—including for medical and hospital care. These ACA members acquire from healthcare providers a variety of data and information to document the services provided on the accounts that they collect. ACA members work with their healthcare clients to answer consumers' questions, resolve disputes, and arrive at achievable settlements and payment plans. And many ACA members furnish records to CRAs about consumers' payments on their accounts. These members have performed these activities in the past but will also perform them after the Rule's effective date.

6.      ACA creditor members regularly rely on accurate and complete credit report information when determining whether to extend, renew, or continue credit. These members have performed these activities in the past but will also perform them after the Rule's effective date.

7.      ACA's creditor and collector members have complied with the FCRA's medical information restrictions and its overarching federal credit reporting provisions since its enactment in 1970. In addition, ACA's members have been complying with the provisions of Regulation V, codified at 12 C.F.R. Part 1022, since they were enacted in 2005 and transferred to the CFPB in 2011. Upon the Rule's implementation date, ACA members must also comply with the Rule and

other federal laws that are stymied by this Rule. If they do not comply, they face the risk of regulatory enforcement and plaintiffs asserting a private right of action against them. Furthermore, ACA's creditor members will have their freedom of speech directly affected by this Rule when CRAs are no longer able to communicate medical debt information to creditors.

8.     Plaintiff ACA has associational standing to bring this suit on behalf of their members who are adversely affected by the Final Rule. Those members have standing to sue in their own right, the interests at issue are germane to the organization's missions, and the participation of an individual member is not required.

**B.     Specialized Collection Systems, Inc.**

9.     SCS is a woman-owned, 100-percent female-staffed small collection business specializing in the collection of medical debt. SCS was founded in 1976 by Ken and Diane Akre, and it is now solely owned by their daughter, Megan Hebert. SCS takes a thoughtful approach to healthcare collection communications utilizing an omni channel strategy that incorporates digital platforms, written communications, and credit reporting as a balanced method to foster debt resolution and educational conversations.

10.     SCS's principal place of business is in Harris County, Texas.

11.     SCS is regulated by the CFPB under the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692-1692(p), the FCRA, and the CFPB's implementing regulations of those acts (Regulations F and V), among other laws and regulations. SCS will have its activities affected and restricted by the Rule at issue in this case, and will incur substantial compliance costs in an effort to become compliant by the Rule's effective date.

12.     The Rule will cause SCS to lose an effective communication tool to encourage patients' resolution of unpaid debts, which will harm SCS as well as the healthcare providers owed these debts. SCS will also have its freedom of speech harmed if it is no longer allowed to have its

medical debt information published on credit reports used by creditors.

**C.** **Defendants**

13.    Defendant CFPB is a federal agency in the executive branch and is subject to the Administrative Procedure Act ("APA"). *See* 12 U.S.C. § 5491(a); 5 U.S.C. § 551(1).

14.    Defendant Rohit Chopra, sued in his official capacity, is the current Director of the CFPB.

### III.
### JURISDICTION AND VENUE

15.    This Court has federal-question jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' claims arise under federal law and the U.S. Constitution.

16.    The APA waives sovereign immunity of the United States and its federal agencies by allowing parties who are adversely affected or aggrieved by an agency action to seek judicial review. 5 U.S.C. §§ 702, 704.

17.    This action seeks declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202, and 42 U.S.C. §§ 1983 and 1988.

18.    Venue is proper in this district under 28 U.S.C. § 1391(c). Defendants are an agency and an officer of the United States, Plaintiffs ACA and SCS do business in this district, SCS's principal place of business is in this district, a substantial part of the events or omissions giving rise to the claims occurred in this district, and no real property is involved in this action.

### IV.
### FACTUAL ALLEGATIONS

**A.**    **The FCRA Expressly Legislates Medical Information Credit Reporting**

19.    The relevant medical information provisions in the FCRA were largely enacted in 2003 in the Fair and Accurate Credit Transactions Act of 2003. FACTA was passed by Congress on November 22, 2003, and signed by President George W. Bush on December 4, 2003, as an amendment to the Fair Credit Reporting Act.

(1)     *The FCRA defines "Medical Information".*

20.     The term "medical information" is defined in the FCRA § 603(i) as:

(1) Information or data, whether oral or recorded, in any form or medium, created by or derived from a health care provider or the consumer, that relates to:
> (i) The past, present, or future physical, mental, or behavioral health or condition of an individual;
> (ii) The provision of health care to an individual; or
> (iii) The payment for the provision of health care to an individual.

15 U.S.C. § 1681a(i)(1); 12 CFR 1022.3(k)(1). In addition, the "medical information" definition carves out information about a consumer that does not relate to the physical, mental, or behavioral health or condition of a consumer. 15 U.S.C. § 1681a(i)(2). The regulation at 12 C.F.R. Part 1022 also excludes anonymized information that does not identify a specific consumer. 12 C.F.R. § 1022.3(k)(2)(iv).

(2)     *The FCRA expressly limits the use of medical information.*

21.     The FCRA at Section 1681c(a)(6) provides detailed direction on how CRAs must confidentially treat medical information:

**§1681c. Requirements relating to information contained in consumer reports**

**(a) Information excluded from consumer reports**

Except as authorized under subsection (b), no consumer reporting agency may make any consumer report containing any of the following items of information:

(1) Cases under title 11 or under the Bankruptcy Act that, from the date of entry of the order for relief or the date of adjudication, as the case may be, antedate the report by more than 10 years.

(2) Civil suits, civil judgments, and records of arrest that, from date of entry, antedate the report by more than seven years or until the governing statute of limitations has expired, whichever is the longer period.

(3) Paid tax liens which, from date of payment, antedate the report by more than seven years.

(4) Accounts placed for collection or charged to profit and loss which antedate the report by more than seven years.

(5) Any other adverse item of information, other than records of convictions of crimes which antedates the report by more than seven years.

(6) The name, address, and telephone number of any medical information furnisher that has notified the agency of its status, unless-
> (A) such name, address, and telephone number are restricted or reported using codes that do not identify, or provide information sufficient to infer, the specific provider or the nature of such services, products, or devices to a person other than the consumer; or
> (B) the report is being provided to an insurance company for a purpose relating to engaging in the business of insurance other than property and casualty insurance.

(3)     *The FCRA also expressly allows the use of medical debt information*

22.     And once a CRA complies with Section 1681c(a)(6) by reporting the identity of

medical information furnishers with codes that hide the nature of medical services, products, or devices, several FCRA provisions expressly permit the consideration of medical debt in connection with any determination of the consumer's eligibility, or continued eligibility, for credit. *See* 15 U.S.C. §§ 1681b(g)(1); 1681b(g)(2); 1681b(g)(3).

23.    Specifically, 15 U.S.C. § 1681b(g)(1) provides three exceptions to the general rule that limits providing medical information, denoted below with the highlighted term "unless." The exception relevant to the instant challenge is Section 1681b(g)(1)(C), which excepts information from the general rule if the information pertains solely to transactions, accounts, or balances related to debts arising from the receipt of medical services, products, or devices.

**(g) Protection of medical information**

**(1) Limitation on consumer reporting agencies**

A consumer reporting agency shall not furnish for employment purposes, or in connection with a credit or insurance transaction, a consumer report that contains medical information (other than medical contact information treated in the manner required under section 1681c(a)(6) of this title) about a consumer, unless-

(A) if furnished in connection with an insurance transaction, the consumer affirmatively consents to the furnishing of the report;

(B) if furnished for employment purposes or in connection with a credit transaction-

(i) the information to be furnished is relevant to process or effect the employment or credit transaction; and

(ii) the consumer provides specific written consent for the furnishing of the report that describes in clear and conspicuous language the use for which the information will be furnished; or

(C) the information to be furnished pertains solely to transactions, accounts, or balances relating to debts arising from the receipt of medical services, products, or devises, where such information, other than account status or amounts, is restricted or reported using codes that do not identify, or do not provide information sufficient to infer, the specific provider or the nature of such services, products, or devices, as provided in section 1681a(a)(6) of this title.

**(2) Limitation on creditors**

Except as permitted pursuant to paragraph (3)(C) or regulations prescribed under paragraph (5)(A), a creditor shall not obtain or use medical information (other than medical information treated in the manner required under section 1681c(a)(6) of this title) pertaining to a consumer in connection with any determination of the consumer's eligibility, or continued eligibility, for credit.

24.    Section 1681b(g)(1)(C) clearly contains an exception that allows medical debt reporting. The ordinary, contemporary, and common meaning of "unless" as a conjunction is: *(1) except on the condition that : under any other circumstance than; (2) without the accompanying circumstance or condition that: but that : but.*[2] Likewise, the American Heritage Dictionary defines

---

[2] "Unless." Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/unless. Accessed 7 Jan. 2025.

"unless" as, "*Except on the condition that; except under the circumstances that*;" and as a preposition as, "*Except for; except*."[3]

25.     Likewise, § 1681b(g)(2) contains a parenthetical that uses the phrase "other than," which conveys Congressional intent that the limitation on creditors has an exception for medical debt that complies with the confidentiality requirement at Section 1681c(a)(6). *Supra* ¶ 21. The ordinary, contemporary, and common meaning of the phrase "other than" as a preposition is "*with the exception of : except for, besides*."[4] As a conjunction, "other than" means: "*except, but*."[5] Again, Congress used a term that clearly conveys an exception to the general proposition.

26.     Accordingly, the FCRA allows CRAs to provide medical information on the condition that the information pertains solely to transactions, accounts, or balances relating to debts arising from the receipt of medical services where the information is reported using codes that do not identify the specific provider or the nature of such services. *See* 15 U.S.C. § 1681b(g)(1)(C).

27.     The "medical information" that is the subject of the instant lawsuit relates solely to this statutorily-excepted data that is allowed by Section 1681b(g)(1)(C) and is hereinafter referred to as "medical debt."

(4)     <u>*Legislative history shows that Congress intended medical debt to appear on credit reports.*</u>

28.     The FCRA allows medical debt use on its face; but also, Section 1681b(g)'s legislative history and historical treatment acknowledged that 1681b(g) contemplates creditors considering consumer applicants' medical debt in lending decisions. For example, in 2003, when summarizing the then-proposed amendments in the FACTA to the FCRA's governance of medical information in the financial system, House Report 108-263 explained that medical information may

---

[3] "Unless." The American Heritage Dictionary of the English Language, Fifth Edition. https://ahdictionary.com/word/search.html?q=unless. Accessed 7 Jan. 2025.
[4] Webster's "Other than." Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/other%20than. Accessed 7 Jan. 2025.
[5] Webster's "Other than." Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/other%20than. Accessed 7 Jan. 2025.

be included in a credit report if the information does not identify the provider or nature of services:

> Medical information may be included in a report for employment or credit purposes only where the information is relevant for purposes of processing or approving employment or credit requested by the consumer and the consumer has provided specific written consent, *or if the information meets certain specific requirements and is restricted or reported using codes that do not identify or infer the specific provider or nature of the services, products, or devices to anyone other than the consumer (except for certain insurance purposes).* H.R. Rep. 108-263 (Sept. 4, 2003) (emphasis added).

29.     Similarly, speaking in support of the FACTA, Representative Paul Kanjorski emphasized the regulation's focus on privacy concerns, noting the legislation would "improve the accuracy of and correction process for credit reports and establish strong privacy protections for consumers' sensitive medical information." FACTA, 149 Cong. Rec. H8122-02 (2003) (also explaining that the legislation "contains important provisions to protect medical information that is present in financial services' systems and provides for confidentiality of medical data in all credit reports").

(5)     *The FCRA grants limited rulemaking authority concerning medical information*

30.     The CFPB believes that it has the power to supersede Congressional intent and ban the provision of medical debt on credit reports under three grants of rulemaking authorities: FCRA Sections 1681b(g)(3)(C), 1681b(g)(5)(a), and 1681s(e)(1).

31.     The rulemaking authority under Section 1681b(g)(3)(C) allows the Bureau to determine additional situations where disclosure of medical information is not treated as a consumer report:

**(3) Actions authorized by Federal law, insurance activities and regulatory determinations**

Section 1681a(d)(3) of this title shall not be construed so as to treat information or any communication of information as a consumer report if the information or communication is disclosed-

(A) in connection with the business of insurance or annuities, including the activities described in section 18B of the model Privacy of Consumer Financial and Health Information Regulation issued by the National Association of Insurance Commissioners (as in effect on January 1, 2003);

(B) for any purpose permitted without authorization under the Standards for Individually Identifiable Health Information promulgated by the Department of Health and Human Services pursuant to the Health Insurance Portability and Accountability Act of 1996, or referred to under section 1179 of such Act,[1] or described in section 6802(e) of this title; or

(C) as otherwise determined to be necessary and appropriate, by regulation or order, by the Bureau or the applicable State insurance authority (with respect to any person engaged in providing insurance or annuities).

32.     Thus, the Bureau can expand and contract its list of information "otherwise determined to be necessary and appropriate," but it cannot overwrite the statutory exception.

33.     Likewise, the FCRA Section 1681b(g)(5)(a) grants the Bureau the rulemaking authority to "permit" additional types of transactions where it may be appropriate to obtain or use medical information (other than medical information treated in the manner required under Section 1681c(a)(6) of this title) pertaining to a consumer in connection with any determination of the consumer's eligibility, or continued eligibility, for credit:

**(5) Regulations and effective date for paragraph (2)**

**(A) [2] Regulations required**

The Bureau may, after notice and opportunity for comment, prescribe regulations that permit transactions under paragraph (2) that are determined to be necessary and appropriate to protect legitimate operational, transactional, risk, consumer, and other needs (and which shall include permitting actions necessary for administrative verification purposes), consistent with the intent of paragraph (2) to restrict the use of medical information for inappropriate purposes.

34.     In this provision, "paragraph (2)" refers to the limitation on creditors at Section 1681b(g)(2):

**(2) Limitation on creditors**

Except as permitted pursuant to paragraph (3)(C) or regulations prescribed under paragraph (5)(A), a creditor shall not obtain or use medical information (other than medical information treated in the manner required under section 1681c(a)(6) of this title) pertaining to a consumer in connection with any determination of the consumer's eligibility, or continued eligibility, for credit.

35.     Thus, the CFPB's rulemaking authority is limited to "permitting" transactions that are in addition to those already excepted because the medical information is treated as required. To read otherwise would ignore the phrase "other than" in the statutory text.

36.     Finally, Section 1681s(e)(1) is a general grant of rulemaking authority for the Bureau

12

to "administer and carry out" the purposes and objectives of the FCRA. Under both the major questions doctrine and the plain text, this authority does not allow the agency to limit credit reporting of particular debts.

37.     The CFPB's authority to regulate the medical industry is notably absent from regulations or the Dodd-Frank Act, 12 U.S.C. § 5512. In fact, in prior publications the CFPB has disclaimed authority over medical debt. The CFPB itself has stated that it has authority to regulate the debt collection market because that "is a market for financial products and services under the Act," but that debt arising from medical expenses should be excluded because it is "unrelated to consumer financial products or services." 77 Fed. Reg. 9597 (Feb. 17, 2012).

(6)     <i><u>Congress gave general rulemaking authority concerning medical information to the Department of Health</u></i>

38.     Rather, Congress delegated rulemaking authority over healthcare to the U.S. Department of Health and Human Services ("HHS"), 42 U.S.C. § 3501 *et seq.*, the Department of Labor, 29 U.S.C. § 551 et seq., and the U.S. Treasury, 31 U.S.C. § 301 *et. seq.*, which are tasked with creating laws and regulations surrounding healthcare and health insurance. In fact, Congress recently passed the No Surprises Act to address issues related to medical billing. *See* Consolidated Appropriations Act of 2021, Pub. L. No. 116–260 (2020). Congress empowered HHS to oversee American healthcare services. HHS has 13 operating divisions, including 10 agencies in the U.S. Public Health Service and three human services agencies.[6] Moreover, Congress establishes healthcare policy—including payments policy—through legislation that is typically codified in Title 42 of the U.S. Code. *See* 42 U.S.C. § 27 *et. seq*. Title 42 has 164 separate Chapters, which each set forth Congress' views on public health and welfare.

39.     The CFPB Defendant in this matter, however, is not an HHS agency. Nor does the CFPB have any authorities granted under any chapter in Title 42 or the No Surprises Act. Rather, the

---

[6] HHS, About HHS (visited Nov. 15, 2024) at https://www.hhs.gov/about/index.html.

CFPB is an independent agency under the Federal Reserve. *See* 12 U.S.C. § 5491(a).

**B.    The CFPB Issued this Rule in Record Time with Political Purposes**

40.    The CFPB began its current rulemaking in or about early 2023.

41.    The CFPB convened a Small Business Regulatory Enforcement Fairness Act ("SBREFA") panel on a truncated timeline in October 2023. *See* 89 Fed. Reg. 51682, 51688 (June 18, 2024). During the SBREFA panels and hearings, industry stakeholders identified serious concerns with the Bureau's proposals.

42.    On June 11, 2024, the CFPB published a Notice of Proposed Rulemaking in the Federal Register and sought public comment on the same. 89 Fed. Reg. 51682 (June 18, 2024). On August 12, 2024, the comment period closed. *Id.* The public, healthcare providers, industry stakeholders and many more groups submitted over 74,000 comments regarding the now-final Rule. Notice, p. 24.

43.    Each comment the CFPB received on the Final Rule remains available online and is incorporated herein by reference.[7]

44.    The Small Business Administration Office of Advocacy (the "SBA") participated in the SBREFA Panel. Healthcare has an important contingent of small businesses. As of 2019, there were 487,613 small and medium sized ambulatory health care service businesses. Businesses in this category consist of doctor's offices, laboratory and diagnostic services, blood banks, and other outpatient facilities. According to the U.S. Census Bureau's County Business Patterns, the 907,426 large and small businesses in the Health Care and Social Assistance sector topped all others with 20 million employees and over $1.0 trillion in annual payroll in 2018.

45.    The SBA ultimately commented that it was "concerned" about the proposed rule's

---

[7] CFPB, *Prohibition on Creditors and Consumer Reporting Agencies Concerning Medical Information, Document Comments* (accessed Oct. 24, 2024, 12:02 PM), https://www.regulations.gov/document/CFPB-2024-0023-0001/comment (hereinafter "CFPB Comments").

impact on small entities and recommended the consideration of alternatives. The SBA criticized the rule on several meaningful bases:

> a. The SBA highlighted that the Bureau had not met its obligations to provide a sufficient factual basis to support its conclusion that the proposed rule would not have a significant economic impact on a substantial number of small entities.

> b. Similarly, the SBA contended that the Bureau failed to provide information about the nature of the impact of the proposed rule as required under an initial regulatory flexibility analysis. This information is critical, as the SBA explained, because without it "the public cannot provide, and the CFPB cannot consider, meaningful alternatives."

> c. The SBA also noted that it found concerning the conflict between the proposed rule and various laws and legal requirements, particularly the ability-to-repay requirements under the Truth in Lending Act and Regulation Z. The small entities the SBA represents risk enforcement action by another federal agency if they do not consider a consumer's ability to repay—which is undoubtedly impacted by medical debt.

> d. The SBA's comment said that the proposal may harm consumers—as collecting debts via litigation rather than through incentives is costly—and that it may also be unnecessary. In the last several years, various states and at least one federal agency have enacted policies limiting the inclusion of medical debt on consumer reports. The Bureau has not provided sufficient time to discern whether these new policies are successful.

46.    Ultimately, the SBA asserted, the proposed rule set small business entities on an expensive course that risked the viability of many of these entities.

47.    On or about August 14, 2024, Members of Congress wrote to Director Chopra to express their "serious concerns" regarding the proposed rule, set forth below:

a. The Representatives saw the proposal as presenting "significant negative effects on access and affordability of credit for all consumers, and particularly for low-income borrowers."

b. The Representatives focused their comment on the calculated approach the FCRA and Regulation V take to medical debt credit reporting. The text of FCRA is clear: contrary to contentions that reporting medical debt is a loophole, Congress intended for the federal banking agencies and the National Credit Union Administration to determine the "necessary and appropriate [use of medical information] to protect legitimate operational, transactional, risk, consumer, and other needs … in connect with any determination of the consumer's eligibility or continued eligibility for credit." 15 U.S.C. § 1681b(g).

c. Additionally, like the SBA, Members of Congress voiced concerns that the CFPB failed to use current data to justify the proposal and failed to analyze the economic impact of private sector initiatives taken in recent years.

d. Finally, the Members noted, not only is current information lacking from the proposal, but the substance of the proposal also violates the FCRA. The FCRA requires credit reports to be accurate and complete. Medical debt reporting meets this requirement.

48.    The Members of Congress warned: "The proposed rule will result in critical debt information being withheld from creditors as they consider whether to make a loan to a consumer. The proposed rule will ultimately make health care more expensive particularly for those who need it most."

**C.    The CFPB's Final Rule is a Content-Based Restriction on Free Speech**

49.    The CFPB issued the Final Rule on January 7, 2025, and the Federal Register will publish the Final Rule in Volume 90. The *Unofficial Redline of the Medical Debt Final Rule* was

issued concurrently.[8] However, this version omits 12 C.F.R. § 1022.30(b), which provides the general rule, "A creditor may not obtain or use medical information pertaining to a consumer in connection with any determination of the consumer's eligibility, or continued eligibility, for credit, except at provided in this section."

50.    The old rule contained § 1022.30(d), which provided a financial information exception for obtaining and using medical information. Section 1022.30(d) implemented the exceptions in FCRA Sections 1681b(g)(1)(C) and 1681b(g)(2) for the use of medical debt information.

> (d) *Financial information exception for obtaining and using medical information* —
>
> (1) *In general.* A creditor may obtain and use medical information pertaining to a consumer in connection with any determination of the consumer's eligibility, or continued eligibility, for credit so long as:
>
> (i) The information is the type of information routinely used in making credit eligibility determinations, such as information relating to debts, expenses, income, benefits, assets, collateral, or the purpose of the loan, including the use of proceeds;
>
> (ii) The creditor uses the medical information in a manner and to an extent that is no less favorable than it would use comparable information that is not medical information in a credit transaction; and
>
> (iii) The creditor does not take the consumer's physical, mental, or behavioral health, condition or history, type of treatment, or prognosis into account as part of any such determination.

51.    The Final Rule deletes Section 1022.30(d) in its entirety, thus leaving only the general prohibition and no language to implement the statutory exceptions in FCRA Sections 1681b(g)(1)(C) and 1681b(g)(2).

52.    Furthermore, under the Final Rule, credit reporting agencies may continue to communicate information about other types of accounts, such as mortgages, credit cards, gym memberships, parking tickets, utilities, and housing rental; but CRAs may not provide a credit report

---

[8] CFPB, *Unofficial Redline of the Medical Debt Final Rule* (released Jan. 7, 2025), https://files.consumerfinance.gov/f/documents/cfpb_med-debt-final-rule-unofficial-redline_2025-01.pdf (hereinafter "Final Rule Redline")

with medical debt information if used for credit eligibility. Final Rule Redline § 1022.38(b). Accordingly, the Final Rule is content-based because it "singles out specific subject matter for differential treatment." *Barr v. Am. Ass'n of Political Consultants, Inc*., 591 U.S. 610, 619 (2020).

**D.**    **The Final Rule's Justifications are Logically Insufficient to Justify its Harms and Restrictions of Speech**

53.    The CFPB provides five justifications for its rule. However, commenters during the SBREFA process and in notice and comment rulemaking debunked these justifications as either logically flawed or unsupported by reliable data.

(1)    *Justification One: unexpected and unwanted expense*

54.    The CFPB justifies the Final Rule saying: *Medical debt is an unexpected and unwanted expense that can lead to financial hardships.* Notice, pp. 75–77.

55.    The CFPB says—but cannot prove or show—that for some amount of people medical debt is "unexpected." To the contrary, over 62 million Americans are covered by Medicare insurance and 217 million Americans are covered by private health insurance, which both advertise and disclose deductible and co-pay amounts annually.[9] Under the Affordable Care Act, Americans are told to expect health care costs and pay for health insurance to cover those costs. *See* 26 U.S.C. § 5000A(a). And since January 2021, federal rules from the Centers for Medicare and Medicaid Services ("CMS") on health care price transparency require hospitals to make their prices public in two ways: 1) in a machine-readable file that is useful for researchers and academics, and 2) in "consumer-friendly" format – either a "shoppable services" list or price estimator. 88 Fed. Reg. 81540 (amending 45 C.F.R. Part 180).

56.    Indeed, this "unexpected" nature of medical debt is more predictable than debt arising from property damage or maintenance. Medical debt is certainly an unwanted expense. But many

---

[9] United States Census Bureau, *Health Insurance Coverage in the United States: 2023*, Published September 10, 2024 (*available at* https://www.census.gov/library/publications/2024/demo/p60-284.html.)

other expenses are also unwanted, such as expenses related to auto repairs, home repairs, property-destroying accidents and fires, and other maintenance expenses.

57.     The CFPB's rationale to suppress accurate information about unexpected costs is underinclusive, is not justified by statute or Constitutional authority, is already addressed by CMS regulations, and is not a legitimate state interest.

(2)     *Justification Two: inaccuracies and errors*

58.     The CFPB justifies the Final Rule saying: *Due to the complexity of medical billing, information about medical debt is often plagued with inaccuracies and errors*. *Id.* at 78–79.

59.     First, the CFPB relies on a third-party survey of self-reporting adults that says 43 percent of all adults and 53 percent of adults with health care debt thought they received at one time in their lives a medical or dental bill with an error. This survey, however, did not do any work to determine whether there in fact were any errors.

60.     Likewise, the CFPB asserts that of medical accounts in collections between 2017-2022, 5.7 percent of the accounts were flagged as disputed at some time.[10] But this is the same rate as consumers disputing any type of delinquent tradeline.[11] This is no surprise, since most medical debt is furnished by accounts in collection. Notice, p. 13. Most importantly, this count of *disputes* does not equate to actual *inaccuracies*. Indeed, many "disputes" relate to medical bills for healthcare providers that are supplemental service providers (laboratory, radiology) who work under another healthcare provider (hospital or doctor) in the treatment of the patient; thus disputes are based on the fact that the patient does not recognize the name of the provider.

61.     In sum, the Bureau's evidence fails to support a legitimate state interest in suppressing

---

[10] *Consumer Fin. Prot. Bureau*, Paid and Low-Balance Medical Collections on Consumer Credit Reports (July 27, 2022), https://www.consumerfinance.gov/data-research/research-reports/paid-and-low-balance-medical-collections-on-consumer-credit-reports/.
[11] Consumer Fin. Prot. Bureau, Disputes on Consumer Credit Reports (Nov. 2021), https://files.consumerfinance.gov/f/documents/cfpb_disputes-on-consumer-credit-reports_report_2021-11.pdf n. 8.

the 94.3 percent of undisputed accounts to prevent a minority occurrence that has yet to be properly measured.

62.     Furthermore, suppressing all medical debt information is not narrowly tailored to achieve accuracy. In fact, another statute already addresses this issue. For the small minority of tradelines determined inaccurate, the FCRA gives consumers the right to dispute inaccuracies on their consumer report, and both furnishers and CRAs must investigate and resolve those complaints. 15 U.S.C. § 1681i(a)(1)(A).

63.     Likewise, Regulation F—which implements the FDCPA—also prevents debt collectors from furnishing inaccurate information to CRAs. Regulation F prevents the furnishing of information about a debt *before* the debt collector: (i) speaks to the consumer about the debt in person or by telephone; or (ii) places a letter in the mail or sends an electronic message to the consumer about the debt and waits a reasonable period of time to receive a notice of undeliverability. 12 C.F.R. § 1006.30(a)(1). Thus consumers may dispute the accuracy of an account with the debt collector *before* account information is shared with a CRA. This provision became effective Jan. 19, 2021, therefore any studies that predate this period would not account for changes in practices that address this accuracy concern. See *infra* ¶ 85 (The 2014 study is fatally old).

64.     Thus, even taking the CFPB's posited 5.7 percent dispute rate as presenting a legitimate state interest, Congress and Regulation F already provide a less restrictive means to correct the identified problem. *See Express Oil Change, L.L.C. v. Mississippi Bd. of Licensure for Pro. Eng'rs & Surveyors*, 916 F.3d 483, 493 (5th Cir. 2019) (holding that the regulatory action at issue fails First Amendment scrutiny because the regulator "fails to address why alternative, less-restrictive means…would not accomplish" the regulator's goals).

(3)     *Justification Three: limited predictive value*

65.     The CFPB justifies the Final Rule saying: *Research has shown that medical debt has*

*limited predictive value for credit underwriting purposes*. Notice, pp. 80–83. The CFPB says medical debt may be less predictive of whether a consumer will pay a future loan.

66.     As discussed more below, *infra* ¶¶ 85–86, to defend its pivotal claim that "medical debt information has relatively limited predictive value," the Bureau relies upon outdated data from a poorly constructed study. The 2014 study uses data from 2011 to 2013, thereby inherently failing to account for developments in the industry and relevant legal reform in the intervening decade. The study, and the data underlying it, is also neither peer reviewed nor subject to public scrutiny. Moreover, even the results of the Bureau's own, flawed study show that medical debt has a reasonable amount of predictive value.[12]

(4)     *Justification Four: inconsistent reporting by debt collectors*

67.     The CFPB justifies the Final Rule saying: *the inconsistent nature of medical collection furnishing and medical debt collection practices likely limits the value of such information for credit underwriting*. Notice, p. 83.

68.     First, this is a new justification not discussed in the Notice of Proposed Rulemaking and therefore was not made available for comment. The CFPB initially discussed its belief that credit reporting was used to coerce payment of medical bills that weren't owed. *See* 89 Fed. Reg. 51682, 51692 (June 18, 2024). As discussed above, the CFPB asserts that of medical accounts in collections between 2017-2022, 5.7 percent of the accounts were flagged as disputed at some time. And these are merely disputes—not accounts with demonstrated inaccuracies. Further, Congress and the CFPB have already enacted reasonable and less restrictive means to address collection of invalid accounts. A restriction on speech concerning all accounts—valid and invalid—is unnecessary and not justified

---

[12] *See* Andrew Rodrigo Nigrinis, *Comment Letter on Prohibition on Creditors and Consumer Reporting Agencies Concerning Medical Information (Regulation V)*, at 19 (Aug. 13, 2024), https://www.regulations.gov/comment/CFPB-2024-0023-1019 ("Research by the CFPB indicates that medical debts are less predictive of default—but still predictive. Because medical debts have some predictive value, rules to limit underwriting consideration of medical debts will damage the market.")

by a legitimate state interest. *See Express Oil Change, L.L.C. v. Mississippi Bd. of Licensure for Pro. Eng'rs & Surveyors*, 916 F.3d 483, 493 (5th Cir. 2019); *see also Hines v. Pardue*, 117 F.4th 769, 785 ("the State must show that it doesn't regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals") (citations omitted).

69.    Second, all furnishing of any account type is voluntary and inconsistent. Medical debts are no more unique in this than utility, housing rental, and other services. Further, data provided by credit reporting agencies shows that medical debts are, in fact, predictive of future payment performance. Notice, p. 209 ("One NCRA SBREFA commenter stated that it considers medical collections as predictive of a consumer's repayment willingness and ability and believes that the complete removal of medical collections from consumer reporting would 'degrade the accuracy of consumer reporting.'").

(5)    *Justification Five: Market participants' reduced reliance*

70.    The CFPB justifies the Final Rule saying: *Many industry participants have reduced or stopped their reliance on information about medical debt, casting doubt on its value. Id.* at 84.

71.    Because the market has adapted to recent studies concerning the predictive value of medical debt at certain lower dollar amounts, the benefits of the Final Rule are less than had the market not adapted. In fact, the CFPB's observation here negates any benefit to the Rule, while simultaneously introducing various harms with the Final Rule. When regulations that suppress protected expression fail to advance their stated government interests, they run afoul of the First Amendment. *See Am. Acad. of Implant Dentistry v. Parker*, 860 F.3d 300, 312 (5th Cir. 2017) (holding that review under the First Amendment "is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree") (internal citations omitted).

**E.**    **The Final Rule is Arbitrary and Capricious**

72.    The CFPB in several respects failed to offer a rational connection between facts and its judgment, as required to pass muster under the "arbitrary and capricious" standard.

(1)    *Degrading the Accuracy of Consumer Reporting*

73.    By June 2023, only five percent of consumers with a credit record had a medical collection on their credit records, down from around 14 percent in March 2022, before the reporting changes. Notice, p. 282.

74.    One nationwide CRA commenter stated that it considers medical collections as predictive of a consumer's repayment willingness and ability and believes that the complete removal of medical collections from consumer reporting (amounting to 57 percent of all tradelines reported) would "degrade the accuracy of consumer reporting." Notice, p. 209. This is an important aspect of the problem because the FCRA's purpose is to meet the needs of consumer credit for modern commerce in a manner that is "fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information . . ." 15 U.S.C. § 1681(b).

75.    The CFPB responded to the CRA concern that "some medical collections reflect inaccurate billing practices, and their inconsistent inclusion on consumer reports adds only a noisy signal of consumers' ability to pay." Notice, p. 209. However, elsewhere in the Notice, the CFPB asserts that its primary evidence for this statement about inaccuracies is from consumer complaints. *Id.* at 244. And "the [complaint] database cannot provide an estimate of the share of medical collections that result from inaccurate billing." *Id.*

76.    The CFPB's touchstone of inaccuracies is a farse. "Numerous commenters" disputed the prevalence of inaccurate medical billing; and one CRA commented that medical collections are disputed less frequently than other collections, and when disputed, are verified at higher rates. *Id.* at 243. Moreover, the CFPB's own data states that medical debt disputes are at the same rate as

consumers disputing any type of delinquent tradeline. [13]

(2)   *Revenue Losses to Healthcare Providers cause Many Negative Effects*

77.    Several health care providers, debt collectors, consumers, health care trade associations, the SBA Office of Advocacy, and at least one researcher and one credit union, stated that, with fewer repercussions for medical debt, consumers would not pay their medical debts under the proposed rule. Notice, p. 175. This revenue loss has multiple consequences: price increases, closures of practices with tight margins, and providers asking for prepayment in advance of services.

78.    CFPB dismisses these results as unlikely because "CFPB expects that the reduction in health care provider revenue under the rule would be equal to no more than 2 percent of their total costs." *Id.* at 194. This analysis was not provided in the NPRM.

79.    But the CFPB's determination of a 2 percent increase in "bad debt" costs equates to $97.33 Billion per year. Total Health Consumption Expenditures reported by CMS were $4.866 trillion in 2023.[14] Even if the 2 percent figure were limited to only hospital bad debt, this amounts to $30.39 Billion per year based on 2023 CMS data. This figure is substantial and very likely to impact market behavior.

80.    Moreover, the CFPB contradicts its own analysis in the Notice when elsewhere the CFPB estimated a $900 million reduction in recoverable medical debt over 10 years under the rule. Notice, p.183. Over ten years, a 2 percent increase in bad debt is $973.30 Billion—not even accounting for growth in healthcare costs. In sum, the CFPB has purported to study the costs of the rule to healthcare providers and arrived at figures that vary over ten years by over $972 Billion.

81.    Finally, CFPB's cost analysis disregards the cost to healthcare providers and

---

[13] Consumer Fin. Prot. Bureau, Disputes on Consumer Credit Reports (Nov. 2021), https://files.consumerfinance.gov/f/documents/cfpb_disputes-on-consumer-credit-reports_report_2021-11.pdf , n. 8.
[14] https://www.cms.gov/data-research/statistics-trends-and-reports/national-health-expenditure-data/historical#:~:text=U.S.%20health%20care%20spending%20grew,For%20additional%20information%2C%20see%20below.

collection agencies of using alternative means—such as multiple letters and litigation—to collect on owed amounts. The CFPB fails to account for how costs will be distributed across debt collectors, healthcare providers, and consumers. Finally, the analysis does not consider the economic ripple effects, such as worsening financing terms and reduced consumer welfare. By failing to conduct adequate research, CFPB underestimates the true costs and broader impacts of their proposed rule. ACA's report, despite its limitations, provides the only credible data-driven estimate of these impacts.

(3)    _Benefits to Consumers are Belied by Contradictory Statements_

82.    The CFPB states that "the CFPB expects that more loans would be originated if all medical collections were removed from consumer reports provided to creditors under the rule." Notice, p. 224. And that, "The results in Table 1 provide evidence that creditors will provide more credit to consumers with medical collections under the rule." _Id._ at 225.

83.    But this assertion is contradicted by the CFPB's statements as follows:

a. that "Consumers with medical collections on their consumer reports in June 2023, after the NCRA voluntary reporting changes were fully implemented, had an average credit score of 582, near the deep subprime cutoff." _Id._ at 215.

b. "[C]onsumers who have medical collections generally have fairly low credit scores, which already constrain their access to credit. As such, further reducing scores through the furnishing of medical collections may not have a meaningful impact on access to credit." _Id._ at 177.

84.    The CFPB claims that removing medical debt will improve credit for otherwise creditworthy individuals, but uses the lack of these individuals' creditworthiness to dismiss concerns about other aspects of the Rule. The contradiction evidences a lack of rational connection between facts and the final judgments in the Rule.

**F.**    **The CFPB's Final Rule relies on an outdated data and an unreliable economic model.**

85.    The CFPB defends its Rule based on a limited set of stale data and did not publish its studies for peer review.

(1)    *The 2014 study is fatally old*

86.    The CFPB first relies on a study from 2014.[15] The data in that study are over ten years old, as it evaluated consumer credit records from October 2011 to September 2013. The data does not account for the significant changes made by the nationwide CRAs in how they report medical debt over the last two years. Importantly, the nationwide CRAs no longer report medical debts below $500 or medical debt collections that have been paid, putting the focus on substantial debts that remain unpaid. One study indicated that this caused the number of consumer reports with medical debt on them to be cut in half. Additionally, the nationwide CRAs now delay furnishing medical debt information for one year to account for delays in insurance repayment. This means consumer reports more accurately reflect a consumer's financial obligations. The underlying data was never made available for public scrutiny.

87.    Moreover, the study reached relatively modest conclusions. First, it concluded that non-medical debt was more predictive of delinquency than medical debt. Second, it concluded that consumers with more paid than unpaid medical debt were as likely to be delinquent as consumers with higher credit scores. Nothing in the 2014 study concluded that medical debt lacked predictive value, nor did it consider the effect of eliminating medical debt information from consumer reporting altogether. Simply put: neither of the study's conclusions demonstrate that consumers with medical debt present the same risk of delinquency as those without. Indeed, the CFPB does not even claim that medical debt is not predictive, only that "medical debt collections tradelines . . . are less

---

[15] Kenneth P. Brevoort & Michelle Kambara, *Data point: Medical debt and credit scores*, Consumer Financial Protection Bureau, (May 2014), https://files.consumerfinance.gov/f/201405_cfpb_report_data-point_medical-debt-credit-scores.pdf.

predictive of future consumer credit performance than nonmedical collections." Notice, p. 3. It is unreasonable for the agency to conclude that it is not "necessary and appropriate" for a creditor to consider medical debt when making a credit decision (and thereby command that medical debt be removed from consumer reports) merely because medical debt is less predictive than other forms of debt.

(2)     *The Technical Appendix yields questionable results that were not peer reviewed*

88.     The CFPB supplemented the 2014 study with a Technical Appendix that provided irrelevant data and conclusions. The analysis in the Technical Appendix compares the repayment performance of two groups of borrowers who had the same kind of medical debt and applied for credit: the borrowers in the first group had their debts included on their consumer reports; the other borrowers' debts were not. The Technical Appendix found that those two groups repaid their debt obligations at roughly the same rate. *See* Proposed Rule, 89 Fed. Reg. 51682, 51692 (June 18, 2024).

89.     The Technical Appendix was not released for peer review or public commentary.

90.     The Technical Appendix conclusion runs contrary to actual observed results from states with legislation that suppresses medical debt and evidence submitted by credit scoring and credit reporting agencies like FICO and Equifax.

91.     In 2015, FICO reported that "[o]ur research has consistently found that individuals with unpaid collections are more risky (i.e., less likely to repay loans) than those who do not have unpaid accounts." Thus, "ignoring ALL medical collections, regardless of whether those accounts have been paid, can have an adverse impact on score predictiveness."[16] Further, "it is not accurate to claim that empirical evidence shows that, especially in the current credit environment, medical debt is not predictive of future borrower performance and that it is not necessary and appropriate for

---

[16] Amy Crews Cutts, *Comment Letter on Prohibition on Creditors and Consumer Reporting Agencies Concerning Medical Information (Regulation V)*, at 4 (Aug. 12, 2024), https://www.regulations.gov/comment/CFPB-2024-0023-0973 (reviewing one FICO study and one non-public industry study).

creditors to obtain or consider medical debt information as part of the credit decision process. The opposite is closer to the truth."

92.    Likewise, Equifax, a nationwide CRA, recently concluded from a review of its own national database that delinquency rates were "at least 8% higher for consumers with medical collections." Notice, p. 173.

93.    Equifax also found that adding medical collections to a model without medical collections data increased the model's predictiveness by 34 percent. *Id.* Four researchers also recently found that "debt relief causes a statistically significant and economically meaningful reduction in payment of existing medical bills." *Id.* These studies were made known to the CFPB in the notice and comment process and are referenced in the Notice. *Id.*

94.    The CFPB ignored the advice and analysis of FICO and Equifax—the companies that create the most widely-used credit scores and routinely model underwriting risk. Instead, it continues to rely on the 2014 study and says without a basis, "Based on this research, the CFPB expects that medical collections can be removed from underwriting models without significantly reducing their ability to predict serious delinquency if underwriting models continue to include other variables that are sufficiently predictive of delinquency risk." *Id.* at 174. The CFPB does not identify these "other variables."

**G.    Implementation of the Final Rule Would Cause Irreparable Harm to Multiple Types of Parties**

95.    **Creditors.** "Creditors" affected by the Rule are any person who arranges for or regularly extends, renews, or continues credit and any assignee of an original creditor who participates in the decision to extend, renew, or continue credit.[17] ACA creditor members like banks,

---

[17] 12 C.F.R § 1022.30(b)(2)(ii) (defining "creditor" with reference to Equal Credit Opportunity Act, 15 U.S.C. § 1691a(e), which states "The term "creditor" means any person who regularly extends, renews, or continues credit; any person who regularly arranges for the extension, renewal, or continuation of credit; or any assignee of an original creditor who participates in the decision to extend, renew, or continue credit.").

fintech lenders, and utilities providers regularly review credit information on credit reports to extend, renew, or continue credit. Thus, these lenders, their account servicers, and any party that provides services in advance of payment will have no record from credit reports that a consumer has paid an account or has an amount past due that is owed to a medical service provider.

96.      This rule impedes accurate underwriting and exposes creditors to financial losses on both an individual level but also systemically as the credit system fails due to widespread information gaps over half of tradelines and account data from American credit reports are suddenly hidden.

97.      This rule also impedes accurate underwriting and exposes creditors to legal risk, such as the recent lawsuit Defendant CFPB filed against a creditor who, "did not make a reasonable, good faith determination of the consumer's ability to repay the loan, as the law requires." Compl., *CFPB v. Vanderbilt Mortgage and Fin*., Case No. 3:25-cv-00004 (E.D. Tenn. Jan. 6, 2025) at ¶ 5.

98.      **Healthcare Providers**. If implemented, this Rule will remove about 56.9 percent of tradelines and account data from American credit reports and hide $49 billion in funds that are currently owed to American doctors, nurses, nursing homes, hospitals, ambulances, health clinics and other medical services providers throughout the U.S.[18] Providers will also lose the deterrent effect of the risk of credit reporting to collect another outstanding $ 200 billion. Doctors and hospitals who engage ACA's debt collector members can no longer rely upon the concern about a negative trade line reporting to ensure they are paid for services provided in advance of payment.

99.      Experience from agencies and hospitals show that amounts collected drop when accurate account information is suppressed from credit reports. Data from multiple sources— including the CFPB—shows that amounts collected drop when accurate account information is suppressed from credit reports. The projected economic impact of this Rule is that on average, the

---

[18] Consumer Financial Protection Bureau, *Market Snapshot: An Update on Third-Party Debt Collections Tradelines Reporting*, February 2023 (*available at* https://files.consumerfinance.gov/f/documents/cfpb_market-snapshot-third-party-debt-collections-tradelines-reporting_2023-02.pdf.)

amount of revenue collected for medical services will drop as much as $97.33 Billion, per year, growing 4.6%–7.5% annually. *See supra*, ¶ 79.

100.    **Debt Collectors.** ACA members including SCS that collect medical debt will face significant harm beginning immediately.

101.    First, ACA members have already incurred costs—and will incur more costs—to adjust systems of record, contact campaigns, disclosures, processes, and employee training in reaction to the Final Rule. The rule will require contracts with customers to be revised and renegotiated.

102.    Second, when debt is hidden from credit reports, it is most likely to be collected via contact campaigns and litigation. This requires reprogramming systems of record and collection algorithms to determine the best and appropriate methods to differently collect on outstanding medical debt accounts. Litigation is expensive for businesses and consumers. Both would incur legal costs. For example, an unpaid $600 medical debt resulting in a lawsuit could cost the consumer defendant thousands of dollars in legal fees. It will increase transaction costs for collectors and servicers.[19]

103.    Debt collectors will lose the fees they collect on the current and recurring lost collection income. Some agencies may stop doing business due to this Rule. ACA members who engage in the collection of medical accounts have already experienced significant revenue losses due to CFPB activities regulating this area, and they expect even greater negative impacts from the Final Rule. For example, in the one-year period since an interim $500 medical credit reporting change was made, the dollars collected by one ACA member decreased by $369,637, while the payroll costs for the first quarter of the year increased by 16 percent.[20]

---

[19] Comment submitted by Major L. Clark and Jennifer A. Smith - Office of Advocacy U.S. Small Business Administration (August 5, 2024).
[20] Comment submitted by Major L. Clark and Jennifer A. Smith - Office of Advocacy U.S. Small Business Administration (August 5, 2024).

104.    Furthermore, because some credit information furnishing systems do not allow a debt collector to choose between medical and non-medical accounts for furnishing, debt collectors will stop furnishing many other types of non-medical debt, which will also reduce collections and harm them.

105.    ACA members also would incur substantial costs to adjust consumer-communication and collection methods if medical accounts could no longer appear on credit reports.

106.    Each of these harms is directly traceable to the Final Rule and would be remedied by an order enjoining the rule from taking effect and vacating it.

107.    Finally, upon enactment, ACA creditor members will lose their First Amendment right to receive medical debt information from CRAs. And furnishers lose their right to convey information about medical debt to other creditors and consumers via the CRA channel. This curtailment of rights is irreparable harm.

## V.
## THE FINAL RULE SHOULD BE SET ASIDE BECAUSE THE CFPB IS UNCONSTITUTIONALLY FUNDED

### A.    The Supreme Court's CFPB Decision

108.    On May 16, 2024, the Supreme Court issued its opinion in *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416 (2024). The Supreme Court decided that the CFPB's funding mechanism complied with the Appropriations Clause. *Id.* at 420–21.

109.    The Supreme Court then held that only CFPB's funding from the "combined earnings" of the Federal Reserve complied with the requirements of the Appropriations Clause because the "money [is] otherwise destined for the general fund of the Treasury." *Id.* at 425, 435.

### B.    The CFPB Lacks Funding to Promulgate or Enforce The Final Rule

110.    As the Supreme Court made clear, the CFPB only has constitutional funding from the Federal Reserve's "combined earnings." 12 U.S.C. § 5497(a)(1).

111.    But the Federal Reserve has had no "earnings" since September 2022, when the

Federal Reserve's costs and expenses first exceeded its income, as demonstrated in the chart below. *See generally*, Bd. of Governors of the Fed. Rsrv. Sys., *Federal Reserve Banks Combined Quarterly Financial Report* 2, 25 (Mar. 31, 2024).

112.    Without "earnings," the Federal Reserve's transfers of funds to the CFPB after September 2022 were not in compliance with the statute governing the CFPB's funding. *See* 12 U.S.C. § 5497; *CFSA*, 601 U.S. at 435.

113.    The CFPB lacked constitutionally appropriated funding when it published the Notice of the Final Rule on January 7, 2025, and will lack such funds when the Final Rule is published in the Federal Register. As such, the Final Rule and the CFPB's associated rulemaking violates the Appropriations Clause and must be vacated. *CFSA v. CFPB*, 51 F.4th 616, 642 (5th Cir. 2022) (citation omitted), rev'd and remanded on other grounds, 601 U.S. 416; *Collins v. Yellen*, 594 U.S. 220, 258 (2021); *Seila Law LLC v. CFPB*, 591 U.S. 197, 233 (2020).

## VI.
## RELIEF REQUESTED

114.    Plaintiffs seek an order from this Court enjoining the enactment and enforcement of the Final Rule in its entirety.

115.    The claims and relief requested in this lawsuit do not require participation of individual ACA members because the members who are subject to the Final Rule will benefit from a favorable decision and injunctive relief in this case, as would the healthcare providers and consumers that the ACA members wish to help.

116.    A decision in this case favorable to ACA will redress the injury to ACA and its members because, among other things, it will protect against further APA violations and will relieve ACA's members of the costs imposed by the Final Rule, permitting them to operate in a manner that respects their relationship with each individual consumer and their contracts with their clients.

**VII.**
**CLAIMS FOR RELIEF**

**COUNT I**
**Administrative Procedure Act**
**(Excess of Statutory Jurisdiction, Authority, or**
**Limitations, or Short of Statutory Right &**
**Major Questions Doctrine**)
**5 U.S.C. § 706(2)(C)**

117.     Plaintiffs repeat and incorporate by reference all of the foregoing allegations.

Excess of Statutory Jurisdiction

118.     An administrative agency's power to promulgate legislative regulations is limited to the authority delegated to it by Congress. *VanDerStok v. Garland*, 86 F.4th 179, 187 (5th Cir. 2023) (quoting *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988)). The "core inquiry" of Section 706(2)(C) asks whether the rule in question is a "lawful extension of the statute under which the agency purports to act, or whether the agency has indeed exceeded its 'statutory jurisdiction, authority, or limitations." *Id.* at 188 (quoting 5 U.S.C. § 706(2)(C)).

119.     By interpreting the FCRA in a manner that is inconsistent with the statutory text, the final rule exceeds the Bureau's statutory jurisdiction, authority, or limitations.

Short of Statutory Right

120.     If a regulation is expected to have a "significant economic impact on a substantial number of small entities," the Regulatory Flexibility Act ("RFA"), 5 U.S.C. §§ 601–612, requires the issuing agency to consider regulatory impacts and alternatives, with the goal of minimizing significant economic impacts on small entities.

121.     The "CFPB expects that the reduction in health care provider revenue under the rule would be equal to no more than 2 percent of their total costs." Notice, p. 194. This amounts to $92.554 Billion per year. Nearly half of the healthcare sector is comprised of small businesses.

122.     The CFPB certified that the rule would not have a "significant economic impact on a

substantial number of small entities." 89 Fed. Reg. 51682, 51714-15 (June 18, 2024).

123.    The CFPB's certification was false and is contradicted by CFPB's statements in the Notice. Despite the clear significant economic impact on a substantial number of small entities, CFPB did not comply with the RFA prior to finalizing the rule.

Major Questions Doctrine

124.    Furthermore, the CFPB does not have clear congressional authorization for the power it claims under the Major Questions Doctrine. Here, the Final Rule claims the power over healthcare payments to resolve a matter of great political significance. Congress itself opposed this rule. The Final Rule affects approximately 15 million private agreements between patients and providers. The Final Rule will require healthcare providers to forgo $97.33 Billion, per year, growing 4.6%–7.5% annually. Moreover, the Rule will make credit reports unreliable, a consequence that could cost trillions over the long term.

125.    For each of these reasons, the Final Rule must be set aside under the Administrative Procedure Act, 5 U.S.C. § 706.

**COUNT II**
**Administrative Procedure Act**
**(Arbitrary and Capricious)**
**5 U.S.C. §§ 553, 706(2)(A)**

126.    Plaintiffs repeat and incorporate by reference all of the foregoing allegations.

127.    The CFPB did not reasonably and rationally analyze or explain its decisions, nor did it base those decisions on substantial evidence.

a. The CFPB dismisses the CRAs' warnings about the negative impact of degradation of credit reporting and instead says that medical debt information is "inaccurate" and "noisy." But even the CFPB's best resource says that about 95 percent of medical debt is undisputed and that consumer complaints are not reliable data.

b. The CFPB presents two different studies that arrive at materially different cost

estimates due to collection revenue losses. One study estimates healthcare provider revenue losses of $900 million over 10 years. Another study estimates a 2 percent increase in bad debt, equating to $97.33 Billion annually.

c. The CFPB on one hand says that consumers with medical debt have on average bad credit scores and medical debt is unlikely to constrain access to credit. But it also claims that removing medical debt is likely to increase those same consumers' access to credit.

128.    The CFPB also failed to provide a rational explanation for the change in the government's position from the 2010 Rule with respect to its authority over medical bills. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("[T]he requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it is changing position.").

129.    The CFPB further failed to explain how this rule is consistent with and not counterproductive to regulations at 12 C.F.R. §§ 1026.43(c); 1026.34(a)(4); and 1026.51(a), which require that creditors assess using reliable information a consumers' ability-to-repay an account.

130.    Consequently, the CFPB violated the Administrative Procedure Act by failing to engage in reasoned decision making, failing to explain its reasoning sufficiently, and failing to support its conclusions with substantial evidence. The Final Rule must be set aside. 5 U.S.C. § 706(2)(A).

## COUNT III
## First Amendment
## (Restriction of Speech Based on Content)
## 5 U.S.C. §§ 553, 706(2)(B); U.S. Const. amend. I

131.    Plaintiffs repeat and incorporate by reference the foregoing paragraphs.

132.    The rights enforceable by 5 U.S.C. § 706(2)(B) include, among other rights guaranteed by the United States Constitution, the right to be free from government action that violates

the First Amendment of the United States Constitution. The First Amendment proclaims that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. The CFPB is a federal actor and therefore may not abridge the freedom of speech. The Supreme Court has been clear: "the creation and dissemination of information are speech within the meaning of the First Amendment." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570, quoting *Bartnicki v. Vopper,* 532 U.S. 514, 527 (2001) ("[I]f the acts of 'disclosing' and 'publishing' information do not constitute speech, it is hard to imagine what does fall within that category, as distinct from the category of expressive conduct").

133.    ACA's creditor members are protected by the First Amendment as listeners. Restrictions on protected speech trigger First Amendment scrutiny when either a speaker or a listener is inhibited from speaking or hearing the protected speech. *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 756 (1976) ("where a speaker exists, as is the case here, the protection afforded is to the communication, to its source and to its recipients both"); *see also Davis v. E. Baton Rouge Par. Sch. Bd.*, 78 F.3d 920, 926-7 (5th Cir. 1996) ("the First Amendment protects the news agencies right to *receive* protected speech") (emphasis added).

134.    "Content-based laws—those that target speech on its communicative content—are presumptively unconstitutional." *Reed v. Town of Gilbert, Ariz.,* 576 U.S. 155, 163 (2015). The Supreme Court has rarely, if ever, upheld such a regulation. *See United States v. Playboy Entm't Gr., Inc.*, 529 U.S. 803, 818 (2000) ("It is rare that a regulation restricting speech because of its content will ever be permissible"); *United States v. Marcavage*, 609 F.3d 264, 286 (3d Cir. 2010) ("Because the restrictions…were content-based, they are presumptively invalid"); *Sorrell* 564 U.S. at 571 (2011) ("In the ordinary case it is all but dispositive to conclude that a law is content based and, in practice, viewpoint discriminatory"). The Supreme Court has held that "[c]ommercial speech is no exception" to the First Amendment's prohibition on content, viewpoint, and speaker based speech

restrictions. *Sorrell*, 564 U.S. at 566.

135.    The Final Rule, in preventing the communication of truthful information about consumers' medical debts, discriminates based on the content of messages, saying a "creditor may not obtain or use *medical information* pertaining to a consumer in connection with any determination of the consumer's eligibility, or continued eligibility, for credit, except as provided in [12 C.F.R 1022.30]." (emphasis added). Other types of information, like rental and utility debts, are not targeted. As a result, credit reporting agencies are restricted from speaking and original creditors and collectors who typically make use of medical debt information are restricted from listening.

136.    Additionally, the Final Rule discriminates based on the speaker of the message. Under the Final Rule, consumers, but not credit reporting agencies, may continue to communicate medical debt information to creditors. And CRAs may communicate medical debt information to non-creditors. This *speaker* based regulation reflects the CFPB's broader *content* based goal to suppress factually accurate information regarding consumer medical debt. The Final Rule is both content- and speaker-based and triggers heightened scrutiny. *Sorrell*, 564 U.S. at 566.

137.    "Strict scrutiny requires the [government] to show that the [regulation] is narrowly tailored to further compelling government interests." *Hines*, 117 F.4th at 789 ("the showing the [government] must make is sizeable") (internal citations and quotations omitted); *See Express Oil*, 916 F.3d at 493 ("The record does not support the need for a total ban…"). The Final Rule does not meet strict scrutiny:

        a. The CFPB's justifications for the Final Rule are not supported by reasonable evidence—and in some cases logic; and

        b. the Final Rule does not completely restrict communication about medical debt—it only does so for certain speakers, thus is underinclusive if an interest is attempting to protect privacy interests; and

c. the Final Rule is not narrowly tailored to address inaccurate reporting of medical debt and sweeps accurate information into the total ban.

138.    If the Rule was content neutral (it is not), it would be analyzed—and fail under—*Central Hudson*'s intermediate scrutiny analysis because the Rule restricts lawful speech, does not advance a substantial government purpose by direct means, and sweeps far more broadly than necessary. *See Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N. Y.*, 447 U.S. 557, 566 (1980); *see also Express Oil Change, L.L.C. v. Mississippi Bd. of Licensure for Pro. Eng'rs & Surveyors*, 916 F.3d 483, 492 (5th Cir. 2019) (holding that a licensing scheme that would disallow a business's legal name fails Central Hudson analysis because 'less extensive' restrictions on speech were available to regulators). There is no reasonable evidence that supports the need to suppress accurate medical debt. Moreover, inaccurate medical debt reporting is directly legislated through other means and accurate medical debt information has some beneficial uses.

139.    The enactment of the Final Rule will cause irreparable harm to plaintiffs and plaintiff members.

## COUNT IV
### U.S. Constitution and Administrative Procedure Act
### (Appropriations Clause and Contrary to Constitutional Right)
### 12 U.S.C. § 5497, 5 U.S.C. § 706(2)(A), (B)

140.    Plaintiffs repeat and incorporate by reference all of the foregoing allegations.

141.    The rights enforceable by 42 U.S.C. § 1983 include, among other rights guaranteed by the United States Constitution, the right to be free from ultra vires government regulation.

142.    The United States Supreme Court held in *CFSA* that only CFPB's funding from the "combined earnings" of the Federal Reserve complied with the Appropriations Clause because the "money [is] otherwise destined for the general fund of the Treasury." *CFSA*, 601 U.S. at 421, 425, 435.

143.    The Federal Reserve has had no "combined earnings" since September 2022, when

its expenses first exceeded its revenue. The Federal Reserve may only transfer funds that are "combined earnings" pursuant to 12 U.S.C. § 5497(a)(1).

144.    The CFPB lacks constitutionally appropriated funds to issue and enforce the Final Rule because the Federal Reserve has lacked "combined earnings" since September 2022.

145.    Thus, the CFPB unlawfully promulgated and modified the Final Rule because it lacked constitutionally authorized funding to issue the Final Rule, violating the U.S. Constitution's Appropriation Clause and 12 U.S.C. § 5497(a)(1). As such, the Final Rule must be vacated. *See CFSA*, 601 U.S. at 643.

146.    Moreover, under the APA, agency action must be vacated if it is "not in accordance with law," 5 U.S.C. § 706(2)(A), or "contrary to constitutional right, power, privilege, or immunity." *Id.* § 706(2)(B). Because the Final Rule was promulgated and modified in violation of the U.S. Constitution, it is not in accordance with law and contrary to constitutional right and power and must be set aside. *See CFSA*, 51 F.4th at 642, *rev'd and remanded on other grounds*, 601 U.S. 416.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request that this Court enter judgment in their favor and award the following relief:

147.    A declaration that the CFPB's Final Rule is arbitrary, capricious, or otherwise contrary to law within the meaning of the Administrative Procedure Act, *see* 5 U.S.C. § 706(2)(A);

148.    A declaration that the CFPB's Final Rule is contrary to a constitutional right, power, privilege, or immunity within the meaning of the Administrative Procedure Act, *see* 5 U.S.C. § 706(2)(B);

149.    A declaration that the CFPB's Final Rule is in excess of statutory jurisdiction, authority, or limitations, or short of statutory right within the meaning of the Administrative Procedure Act, *see* 5 U.S.C. § 706(2)(C);

150.    A declaration that the CFPB's Final Rule is without observance of procedure required by law within the meaning of the Administrative Procedure Act, *see* 5 U.S.C. § 706(2)(D);

151.    A declaration that the CFPB's Final Rule is unconstitutional because it was funded in violation of the Appropriations Clause;

152.    An order vacating and setting aside the Final Rule nationwide for all affected persons in its entirety;

153.    An order issuing all process necessary and appropriate to stay the effective date and enjoin the implementation of the Final Rule nationwide for all affected persons pending the conclusion of this case;

154.    To the extent the CFPB's Final Rule is not vacated and enjoined in its entirety, a declaration that the CFPB's provisions at 12 C.F.R. 1022.38 and examples at 12 C.F.R. 1022.30(e)(6) are in violation of the Administrative Procedure Act, *see* 5 U.S.C. § 706, and an order vacating and setting aside those provisions;

155.    To the extent the CFPB's Final Rule is not vacated and enjoined, a declaration that the cost-analysis provisions are arbitrary, capricious, or otherwise contrary to law within the meaning of the Administrative Procedure Act, *see* 5 U.S.C. § 706, and an order vacating and setting aside that provision in its entirety;

156.    To the extent the CFPB's Final Rule is not vacated and enjoined, a declaration that the CFPB's effective date must be revised and an order implementing a proper effective date;

157.    An order awarding Plaintiffs their reasonable costs, including attorneys' fees, incurred in bringing this action; and

158.    Any other relief that the Court deems just and equitable.


Dated: January 8, 2025

Respectfully submitted,


ACA INTERNATIONAL and SPECIALIZED
COLLECTION SERVICES, INC.

By its attorneys,

BROWNSTEIN HYATT FARBER
SCHRECK, LLP


/s/ Sarah J. Auchterlonie_____
Sarah J. Auchterlonie
(attorney in charge)
CO Bar No. 50932, SD Tex. #3872480
675 Fifteenth Street, Suite 2900
Denver, CO 80202
Telephone: 303-223-1100
Facsimile: 303-223-1111
Email: sja@bhfs.com

and

Leah Dempsey
DC Bar. No. 1033593, (pro hac vice pending)
1155 F Street, NW
Washington, DC, 20004
Telephone: 202-296-7353
Facsimile: 202-296-7009
Email: ldempsey@bhfs.com

and

FROST ECHOLS LLC

Cooper M. Walker
TX Bar No. 24098567, SD Tex. #3136096
18383 Preston Road, Suite 350
Dallas, TX 75252
Phone: (817) 290-4356
Email: Cooper.Walker@frostechols.com

and

MARTIN GOLDEN LYONS WATTS
MORGAN PLLC

Eugene Xerxes Martin, IV
TX Bar No. 24078928, SD Tex. #134982737
8750 Northpark Central, Suite 1850
8750 Northpark Central Expressway
Dallas, Texas 75231
Email: xmarin@mgl.law