## IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION

|  |  |
|---|---|
| ACA INTERNATIONAL<br><br>and<br><br>SPECIALIZED COLLECTION SYSTEMS, INC.<br><br>                      Plaintiffs,<br><br>v.<br><br>CONSUMER FINANCIAL PROTECTION BUREAU; and ROHIT CHOPRA, in his official capacity as Director of the Consumer Financial Protection Bureau,<br><br>                      Defendants. | Case No. 4:25-cv-00094 |

## PLAINTIFFS' ACA INTERNATIONAL AND SPECIALIZED COLLECTION SYSTEMS, INC.'S MOTION ON APPLICATION FOR PRELIMINARY INJUNCTION

# **TABLE OF CONTENTS**

**Page**

I.  NATURE AND STAGE OF THE PROCEEDING ........................................................... 1

II.  STATEMENT OF FACTS ........................................................................................... 1

   A.  The Final Rule will Dramatically Impact Healthcare ....................................... 2

   B.  The Final Rule is Politically Motivated and Has no FCRA-authorized Justification ........... 4

   C.  Plaintiffs and ACA's Creditor and Collector Members will Face Irreparable Harm from the Rule. ........................................................................................... 6

III.  STANDARD OF REVIEW ......................................................................................... 8

   A.  Preliminary Injunction .................................................................................... 8

   B.  This Court's review must be on the Administrative Record. ........................... 10

IV.  STATEMENT OF THE ISSUES AND SUMMARY OF ARGUMENT ......................... 10

V.  ARGUMENT ............................................................................................................ 11

   A.  SCS and ACA Have Standing because their Injuries are Traceable to the CFPB and Director Chopra and are Redressable with a Favorable Ruling. ........... 11

   B.  Claim 1 – Excess of Statutory Jurisdiction, Authority, or Limitations, or Short of Statutory Right & Major Questions Doctrine–5 U.S.C. § 706(2)(C). .................. 13

      1.  The statute clearly permits and excepts medical debt reporting. ........... 14

      2.  Congress did not delegate authority to CFPB under the Major Questions Doctrine ........................................................................................... 21

   C.  Claim 2 – Arbitrary and Capricious–5 U.S.C. §§ 553, 706(2)(A). ........................ 23

      1.  The CFPB ignored clear evidence of usefulness of medical debt in underwriting. ................................................................................. 24

      2.  The CFPB advances contradictory measurements of harm to the healthcare system. ........................................................................................... 28

   D.  Claim 3 – Restriction of Speech Based on Content–5 U.S.C. §§ 553, 706(2)(B); U.S. Const. amend. I. ..................................................................................... 29

      1.  The Rule is content based because it singles out particular content (medical debt information), communicated by particular speakers (CRAs). .................. 30

      2.  The Restriction is Not Narrowly Tailored to Further Compelling Governmental Interests ................................................................. 32

      3.  Even if the Rule is evaluated under the *Central Hudson* standard, it still fails First Amendment scrutiny because the restricted communications contain accurate and lawful information regarding consumer medical debts. ........ 34

VI.  RELIEF REQUESTED ............................................................................................. 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allentown Mack Sales & Serv., Inc. v. NLRB*,
    522 U.S. 359 (1998) .................................................................................................. 22

*Am. Stewards of Liberty v. Dep't of the Interior*,
    370 F. Supp. 3d 711 (W.D. Tex. 2019) ................................................................ 26

*American Academy of Implant Dentistry v. Parker*,
    860 F.3d 300 (5th Cir. 2017) ............................................................................ 32, 33

*Aquifer Guardians in Urb. Areas v. Fed. Highway Admin.*,
    779 F. Supp. 2d 542 (W.D. Tex. 2011) ................................................................... 5

*Aztec General Agency v. FDIC*,
    111 F.3d 893 (5th Cir. 1997) .................................................................................... 9

*Barr v. Am. Ass'n of Political Consultants, Inc.*,
    591 U.S. 610 (2020) .................................................................................................. 29

*Barr v. Securities and Exchange Commission*,
    114 F.4th 441 (2024) ................................................................................................ 16

*Batterton v. Francis*,
    432 U.S. 416 (1977) .................................................................................................. 12

*Belt v. EmCare, Inc.*,
    444 F.3d 403 (5th Cir. 2006) .................................................................................. 16

*Biden v. Nebraska*,
    600 U.S. —, 143 S. Ct. 2355 (2023) ..................................................................... 21

*Bolger v. Youngs Drug Prods. Corp.*,
    463 U.S. 60 (1983) .................................................................................................... 29

*Braidwood Mgmt., Inc. v. Becerra*,
    104 F.4th 930 (5th Cir. 2024) ................................................................................. 34

*Byrum v. Landreth*,
    566 F.3d 442 (5th Cir. 2009) .................................................................................... 7

*Camp v. Pitts*,
    411 U.S. 138 (1973) .................................................................................................... 9

*Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N. Y.*,
    447 U.S. 557 (1980) .................................................................................................. 33

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
    401 U.S. 402 (1971) ............................................................................................. 9

*Conn. Nat'l Bank v. Germain,*
    503 U.S. 249 (1992) ........................................................................................... 19

*Def. Distributed v. U.S. Dep't of State,*
    838 F.3d 451 (5th Cir. 2016) ............................................................................. 9

*Denton v. City of El Paso,*
    861 F.App'x 836 (5th Cir. 2021) ....................................................................... 6

*Elrod v. Burns,*
    427 U.S. 347 (1976) ........................................................................................... 6

*Express Oil Change, L.L.C. v. Mississippi Bd. of Licensure for Pro. Eng'rs & Surveyors,*
    916 F.3d 483 (5th Cir. 2019) ..................................................................... 32, 33

*Fla. Audubon Soc'y v. Bentsen,*
    94 F.3d 658 (D.C. Cir. 1996) ........................................................................... 12

*Friends of Animals v. Jewell,*
    828 F.3d 989 (D.C. Cir. 2016) ......................................................................... 11

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,*
    528 U.S. 167 (2000) ......................................................................................... 11

*Hines v. Pardue,*
    117 F.4th 769 (5th Cir. 2024) ................................................................... 31, 33

*Huawei Tech. USA, Inc. v. FCC,*
    2 F.4th 421 (5th Cir. 2021) .............................................................................. 28

*Janvey v. Alguire,*
    647 F.3d 585 (5th Cir. 2011) ......................................................................... 7, 8

*Loper Bright Enters. v. Raimondo*
    603 U.S. 369 (2024) ................................................................................... 12, 13

*Louisiana v. Biden,*
    55 F.4th 1017 (5th Cir. 2022) ........................................................................... 8

*Marbury v. Madison,*
    5 U.S. 137 (1803) ............................................................................................. 12

*McDonald v. Longley,*
    4 F.4th 229 (5th Cir. 2021) .............................................................................. 31

*Mississippi Hosp. Ass'n, Inc. v. Heckler,*
    701 F.2d 511 (5th Cir. 1983) ........................................................................... 22

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.,*
    463 U.S. 29 (1983) ........................................................... 10, 22, 24, 26, 27

*Nat'l Ass'n of Priv. Fund Managers v. SEC*,
    103 F.4th 1097 (5th Cir. 2024) ....................................................................... 15

*Nken v. Holder*,
    556 U.S. 418 (2009) ......................................................................................... 8

*Nuziard v. Minority Bus. Dev. Agency*,
    721 F.Supp.3d 431 (N.D. Tex. 2024) ............................................................... 9

*Oklahoma v. Cardona*,
    2024 WL 3609109 (W.D. Okla. July 31, 2024) ................................................ 7

*Opulent Life Church v. City of Holly Springs*,
    697 F.3d 279 (5th Cir. 2012) ........................................................................... 6

*R.A.V. v. City of St. Paul*,
    505 U.S. 377 (1992) ......................................................................................... 30

*Ryan LLC v. FTC*,
    — F.Supp.3d —, 2024 WL 3297524 (N.D. Tex., July 3, 2024) .............. 23, 28

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011) ..................................................................... 29, 30, 31, 33

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) ......................................................................................... 11

*Sw. Elec. Power Co. v. EPA*,
    920 F.3d 999 (5th Cir. 2019) ..................................................................... 23, 26

*Tex. Ent. Ass'n, Inc. v. Hegar*,
    10 F.4th 495 (5th Cir. 2021) ........................................................................... 10

*Texas v. EPA*,
    389 F.Supp.3d 497 (S.D. Tex. 2019) .......................................................... 25, 27

*Texas v. EPA*,
    829 F.3d 405 (5th Cir. 2016) ............................................................................ 8

*Texas v. Nuclear Regul. Comm'n*,
    78 F.4th 827 (5th Cir. 2023) ............................................................................ 21

*Texas v. United States*,
    555 F.Supp.3d 351 (S.D. Tex. 2021) .......................................................... 22, 28

*United States v. Dickson*,
    40 U.S. 141 (1841) ........................................................................................... 12

*United States v. Lauderdale Cnty., Mississippi*,
    914 F.3d 960 (5th Cir. 2019) ........................................................................... 16

*VanDerStok v. Garland*,
    86 F.4th 179 (5th Cir. 2023), cert. granted, 144 S. Ct. 1390 (2024)................. 18

*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc*.,
    425 U.S. 748 (1976) ........................................................................................ 6, 29

*West Virginia v. EPA*,
    597 U.S. 697 (2022) ...................................................................................... 20, 21

*Wages & White Lion Invs., L.L.C. v. FDA*,
    16 F.4th 1130 (5th Cir. 2021) ............................................................................. 8

**Statutes**

5 U.S.C. § 553 ................................................................................................................ 34

5 U.S.C. § 705 ................................................................................................................. 5

5 U.S.C. § 706 .................................................................................. 9, 12, 13, 22, 28, 34

12 U.S.C. .................................................................................................................. 2, 20

12 U.S.C. § 5491 ............................................................................................................. 1

15 U.S.C. § 1681 ............................................................................................................. 2

15 U.S.C. § 1681a ......................................................................................................... 13

15 U.S.C. §§ 1681b ............................................................................................. 14, 15, 16

42 U.S.C. § 27 *et. seq.* .................................................................................................... 2

42 U.S.C. § 3501 *et seq.* ................................................................................................. 2

Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681 *et seq.* ................................. *passim*

Fair Debt Collection Practices Act ............................................................................. 32

No Surprises Act ...................................................................................................... 2, 21

**Other Authorities**

12 C.F.R. § 1006.30 ...................................................................................................... 32

12 C.F.R. §§ 1022.3 ................................................................................................... 1, 13

12 C.F.R. § 1022.30 ........................................................................................... 13, 19, 20

149 Cong. Rec. H8122-02 (2003) ............................................................................... 18

77 Fed. Reg. 9597 (Feb. 17, 2012) .............................................................................. 20

90 Fed. Reg. 3276-3374 (Jan. 14, 2025) ............................................................... *passim*

American Heritage Dictionary of the English Language, Fifth Edition ....................... 16

CFPB, *Prohibition on Creditors and Consumer Reporting Agencies Concerning Medical Information* ............................................................................................................... 1

Cons. Approp. Act of 2021, Pub. L. No. 116–260 (2020) .......................................................... 2

*Consumer Fin. Prot. Bureau*, Disputes on Consumer Credit Reports (Nov. 2021) ..................................... 5

*Consumer Fin. Prot. Bureau*, Paid and Low-Balance Medical Collections on Consumer Credit Reports (July 27, 2022) ............................................................................... 4

H.R. Rep. 108-263 (Sept. 4, 2003) ............................................................................... 17

Merriam-Webster.com Dictionary, Merriam-Webster ......................................................... 16

U.S. Const. amend. I ........................................................... 6, 8, 10, 11, 28, 29, 30, 31, 32, 33, 34

## **TABLE OF EXHIBITS**

EXHIBIT 1 – DECLARATION OF JENNIFER WHIPPLE

EXHIBIT 2 – DECLARATION OF DR. ANDREW NIGRINIS

        2-A – DR. NIGRINIS SBREFA PANEL COMMENT

        2-B – DR. NIGRINIS NOTICE OF PROPOSED RULEMAKING COMMENT

EXHIBIT 3 – DECLARATION OF ANITA MANGHISI

EXHIBIT 4 – DECLARATION OF MEGAN HEBERT

EXHIBIT 5 – DECLARATION OF SCOTT PURCELL

## I.    NATURE AND STAGE OF THE PROCEEDING

Plaintiffs ACA International (ACA) and Specialized Collection Systems, Inc. (SCS) (collectively, Plaintiffs) bring this action against Defendants Consumer Financial Protection Bureau ("CFPB") and Rohit Chopra, in his official capacity as Director of the CFPB, related to a regulation set to take effect on March 17, 2025. Plaintiffs seek a preliminary injunction and expedited briefing schedule to stay the regulation because it violates the Administrative Procedure Act and the First Amendment of the U.S. Constitution.

## II.    STATEMENT OF FACTS

The CFPB is an independent agency under the Federal Reserve (*see* 12 U.S.C. § 5491(a)), and was created to prevent another financial crisis, not cause one. On January 14, 2025, the CFPB published a final rule that will suppress millions of accurate tradelines on credit reports about owed payments to healthcare providers and will make it more difficult for healthcare providers to secure payment from patients. *See* Prohibition on Creditors and Consumer Reporting Agencies Concerning Medical Information (Regulation V) (Final Rule or Rule).[1] Specifically, the Rule will suppress about 57% of information about unpaid accounts currently reported on credit reports.[2] At 12 C.F.R. § 1022.30, the Rule removes a long-standing limitation that allowed creditors to use medical debt so long as it was treated no differently than other debt; and at 12 C.F.R. § 1022.38, the Rule now forbids credit reporting agencies from displaying medical debts on credit reports given to creditors for underwriting purposes.

---

[1] CFPB, *Prohibition on Creditors and Consumer Reporting Agencies Concerning Medical Information* (Regulation V) (released Jan. 7, 2025), https://files.consumerfinance.gov/f/documents/cfpb_med-debt-final-rule_2025-01.pdf (hereinafter "Notice") also, 90 Fed. Reg. 3276-3374 (Jan. 14, 2025). To be codified as 12 C.F.R. §§ 1022.3(j); 1022.30; 1022.38.
[2] 90 Fed. Reg. 3279 ("The CFPB estimated that medical collections accounted for 57 percent of all collections tradelines in Q1 2022 and 58 percent in Q2 2018.")

1

With fewer repercussions for unpaid medical debt, many patients will no longer pay their providers what is owed. 90 Fed. Reg. 3323. The CFPB's own estimate is that healthcare providers will forgo an estimated $97.33 billion, per year, growing 4.6%–7.5% annually. 90 Fed. Reg. 3322; *accord* Ex. 2, Nigrinis Decl., ¶¶ 24–25. Thus, over ten years, this Rule will cost the healthcare system over $970 billion in revenue. (Ex. 2, ¶ 80.)

This Rule affecting a major swath of the economy was issued under the Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681 *et seq.*, a statute meant to meet the needs of consumer credit in modern commerce that is "fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information . . ." 15 U.S.C. § 1681(b). The Rule, however, mandates that credit reporting agencies (CRAs) *suppress* accurate information about consumer obligations and stops relevant speech about unpaid debts from transferring between CRAs and creditors.

## A.    The Final Rule will Dramatically Impact Healthcare

The CFPB is regulating an area it knows nothing about. Congress delegated rulemaking authority over healthcare to the U.S. Department of Health and Human Services, 42 U.S.C. § 3501 *et seq.*, among others. In fact, Congress recently passed the No Surprises Act to address issues related to medical billing. *See* Cons. Approp. Act of 2021, Pub. L. No. 116–260 (2020); (Compl. ¶ 38.)[3] Moreover, Congress establishes healthcare policy—including payments policy—through legislation that is typically codified in Title

---

[3] The No Surprises Act protects people who are covered under group health plans from surprise medical bills when they receive: Most emergency services; non-emergency items and services from out-of-network providers with respect to patient visits to certain in-network facilities; and services from out-of-network air ambulance service providers. See https://www.cms.gov/files/document/nsa-keyprotections.pdf visited Jan. 21, 2025.

42 of the U.S. Code. *See* 42 U.S.C. § 27 *et. seq.* In contrast, the CFPB is a financial services regulator under Title 12 that wasn't mentioned at all in the No Surprises Act.

Despite CFPB's lack of healthcare mandate, comments in the rulemaking record identified serious impacts to healthcare providers and their ability to provide services to the public if their bills are unpaid—impacts that include *patient deaths*. 90 Fed. Reg. 3344 ("More than one health care provider commenter stated that hospital closures in rural areas will lead to worse health outcomes or more deaths.")[4] Other comments identified that providers will require payment upfront for services, which leads to bad outcomes for patients such as increased prices, health insurance failures, avoiding preventative care, and facility closures.[5] Most saliently, this revenue loss has consequences for Plaintiffs SCS and ACA's collector members: lost collections revenue and closures of their client's practices. (Compl. ¶ 77; Ex. 1, Whipple Decl., ¶ 35; Ex. 2,¶ 22; Ex. 3, Manghisi Decl., ¶ 50–54; Ex. 4, Hebert Decl., ¶ 40–42.) It also removes a vast swath of data for use in creditor's underwriting systems, which directly damages ACA creditor member's ability to confidently underwrite loans and other credit extensions. (Ex. 5, Purcell Decl., ¶¶ 8-12.)

---

[4] E.g., Cmt. CFPB-2024-0023-0524 ("my livelihood is potentially at risk as I depend on the consumers payment of their outstanding medical debt to pay my own bills."); Cmt. CFPB-2024-0023-0732 from a system of care that employs more than 190 physicians and providers, 953 total employees and serves more than 86,000 patients every year across south central Minnesota, stating that "We typically have $4 to $5 million in accounts receivable and $8 to $9 million out with collection agencies. So if patients did not have to pay, we estimate an annual impact of $10 million. Our margins are extremely tight; we will close in 6 months."

[5] E.g., Cmt. CFPB-2024-0023-0368 (Hospitals will be forced to become more aggressive collecting money up-front when a patient is admitted or procedure scheduled.  Insurance companies will suffer massive losses when those paying for medical insurance start canceling policies; why pay expensive insurance premiums if  emergency treatment is guaranteed and non-emergency access is now on a cash basis?  Most health providers offer cash discounts and write off significant amounts of care to charity; that will stop or be reduced at a minimum.  Health providers will lay off staff. Rural health clinics will close.  Prices will be raised to compensate for lost revenues.)

**B.**    **The Final Rule is Politically Motivated and Has no FCRA-authorized Justification**

The Rule was predetermined, politically-motivated, and not based on reasoned decision making or evidence. On June 11, 2024, Vice President Harris and CFPB Director Chopra jointly announced the CFPB's Notice of Proposed Rulemaking (NPRM) for medical debt credit reporting,[6] saying the White House "announced a new action by the CFPB that would remove medical debt from credit reports of more than 15 million Americans." In the press release, the final outcome was a foregone conclusion. Yet despite the seeming predetermined nature of the rule, many commenters objected to its basis, data, and overall wisdom.[7] Of note, the Small Business Office of Advocacy objected to its economic impact, and more than two dozen members of Congress wrote to express their concern that suppressing accurate information about medical accounts will harm the credit reporting system and the healthcare system. (Compl. ¶ 47–48.)

The predetermined outcome that medical debt information was not "necessary and appropriate," to include in credit reports relied on a study from 2014 about medical debt's lesser predictive value than other forms of debt (*e.g.*, auto or mortgage). 90 Fed. Reg. 3345. But the market has known this for years, and already adapted its algorithms and procedures to accommodate the distinction. *Id.* 3276. This Rule therefore has no benefit.

But it has harms. Studies from Fair Isaac Corporation (FICO) and Equifax warn that

---

[6] The White House, FACT SHEET: Vice President Harris Announces Proposal to Prohibit Medical Bills from Being Included on Credit Reports and Calls on States and Localities to Take Further Actions to Reduce Medical Debt, available at: https://www.whitehouse.gov/briefing-room/statements-releases/2024/06/11/fact-sheet-vice-president-harris-announces-proposal-to-prohibit-medical-bills-from-being-included-on-credit-reports-and-calls-on-states-and-localities-to-take-further-actions-to-reduce-medical-debt/
[7] *Supra*, notes 4-5.

suppressing medical debt tradelines in their entirety would make credit reports less reliable. (Compl. ¶ 90–93.) Further, the record dismisses a study by ACA's expert economist based on the CFPB's subjective views of its flaws, but fails to recreate or improve upon the study, therefore leaving our economist's serious concerns unaddressed. *See, e.g.,* 90 Fed. Reg. at 3319; *infra* § VII.C.2.

CFPB further misleads the public when it says the Rule is justified because "information about medical debt is often plagued with inaccuracies and errors." (Compl. ¶ 58.) First, the CFPB's own data says that between 2017–2022, only 5.7 percent of medical accounts in collections were flagged as disputed.[8] (*Id.* at ¶ 60.) This means that 94.3 percent of medical accounts in collections were *not* flagged as disputed. Moreover, the 5.7 percent dispute rate is roughly the same rate as any type of delinquent tradeline, indicating there is nothing unique about medical debt inaccuracies that would justify the Rule.[9] (*Id.*) In addition, counts of *disputes* do not equate to actual inaccuracies. (*Id.*) Industry participants who track actual inaccuracies state the correction rate is less than 1 percent. (Ex. 1, ¶ 25; Ex. 3, ¶ 20; Ex. 4, ¶ 25.) Rather, many "disputes" derive from consumer confusion about medical bills. For example, patients may be unfamiliar with healthcare providers who are not patient-facing (like pathologists or radiologists), and thus dispute the tradeline until they understand better the bill. (Ex. 4, ¶¶ 24, 35.)

---

[8] *Consumer Fin. Prot. Bureau*, Paid and Low-Balance Medical Collections on Consumer Credit Reports (July 27, 2022), https://www.consumerfinance.gov/data-research/research-reports/paid-and-low-balance-medical-collections-on-consumer-credit-reports/.
[9] *Consumer Fin. Prot. Bureau*, Disputes on Consumer Credit Reports (Nov. 2021), https://files.consumerfinance.gov/f/documents/cfpb_disputes-on-consumer-credit-reports_report_2021-11.pdf at n. 8.

**C.**     **Plaintiffs and ACA's Creditor and Collector Members will Face Irreparable Harm from the Rule.**

The Rule must be enjoined "to preserve" Plaintiffs' "status [and] rights pending conclusion of the review proceedings." 5 U.S.C. § 705. In considering whether to grant a preliminary injunction, "the harm considered by the district court is necessarily confined to that which might occur in the interval between the ruling on the preliminary injunction and trial on the merits." *Aquifer Guardians in Urb. Areas v. Fed. Highway Admin*., 779 F. Supp. 2d 542, 573 (W.D. Tex. 2011) (internal citation omitted).The Rule causes immediate harm:

- ACA's creditor members will experience financial harm when they have less information when making credit decisions, and therefore experience inevitable losses from flawed underwriting, which may be as soon as the first missed payment. (Ex. 2, ¶¶ 49–51; Ex. 5, ¶¶ 15-17.) At this moment, creditors are working to adjust underwriting and loan pricing to account for less information and more risk. (Ex. 5, ¶16) But there is no reliable evidence that creditors can, in fact, replace the 57% of lost data from this Rule. *Infra* V.C.1.

- ACA's debt collector members and SCS will be harmed when they must invest in complying with the Rule. Compliance requires them to immediately change disclosures, change how they communicate with consumers about medical debt accounts, and change how they implement new methods of incentivizing consumers to pay medical debts. (Ex. 1, ¶¶ 15, 45–50; Ex. 3, ¶¶ 12, 14, 28–29, 44–57; Ex. 4, ¶¶ 15, 46–52.) Some may wind down their businesses entirely. (Ex. 5, ¶ 17.) Further, if CRAs must rush to comply with the rule, debt collectors may also have medical debt information cut off from their account reviews. <u>Response to Mot. for Prelim. Inj</u>. (Dkt. # 16) at 17-18 (citing ECF No. 9-4 at ¶ 6a; ECF No. 9-6 at ¶ 5a), CDIA v. CFPB, 4:25-cv-00016-SDJ (E.D. Tex. Filed Jan. 23, 2025). They, too, will be unable to view 57% of the total data available about consumers' other debts and obligations.

- ACA debt collector members will also suffer financial harm when they lose healthcare provider clients and the placement of the providers' accounts in collections. (Ex. 2 ¶ 52–53; Ex. 4, ¶¶ 46.) At this moment they are working to convince providers to continue to make placements in the hope that this Rule is enjoined. *Id.* They will likewise suffer financial harm when millions of consumers decide not to pay medical debts because they are misinformed by the CFPB's dangerous press that falsely leads consumers to believe there are

no legal consequences for not paying medical debt. (Ex. 1, ¶ 29; Ex. 2, ¶ 55; Ex. 3, ¶ 27.)

Moreover, the Supreme Court has recognized that the "loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury." *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295 (5th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373, (1976)); *Denton v. City of El Paso*, 861 F.App'x 836, 841 (5th Cir. 2021) (same). ACA creditor members have a First Amendment right to receive protected commercial speech. *Virginia State Bd. of Pharmacy*, 425 U.S. at 756. SCS and ACA collector members have a right to speak through the CRA channel. This right is violated each day that they must expend resources preparing to comply with the Rule. Only by removing the impending curtailment of protected speech will Plaintiffs' constitutional rights be restored. Additionally, the injunction will serve the public interest, as "[i]njunctions protecting First Amendment freedoms are always in the public interest." *Opulent Life Church*, 697 F.3d at 298 (quotation omitted).

Moreover, the constitutional injury to Plaintiffs outweighs any injury to the government Defendants. The balance of the hardships tips strongly in Plaintiffs' favor. The Rule deprives Plaintiffs and Plaintiff members of their constitutional rights. By contrast, enjoining the Rule will not harm the CFPB. Indeed, "[s]ince the current regulations have been in effect for decades, there is little harm in maintaining the status quo through the pendency of this suit." *Oklahoma v. Cardona,* 2024 WL 3609109, at *12 (W.D. Okla. July 31, 2024). The Rule was not necessary in the first place, and if it is enjoined, the CFPB will still have a vast array of relevant enforcement tools and authorities available to it to address any concerns it has. The Fair Debt Collection Practices Act (FDCPA), Regulation F

provisions concerning credit reporting (12 C.F.R. § 1006.30(a)(1)), and the FCRA itself already provide ample tools to ensure that medical accounts are accurate when they appear on credit reports. (Ex. 4, ¶¶ 27–32.)

### III.    STANDARD OF REVIEW

#### A.    Preliminary Injunction

A party seeking a preliminary injunction must establish "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011) (quoting *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009)). "To assess the likelihood of success on the merits, [courts] look to standards provided by the substantive law." *Janvey*, 647 F.3d at 596 (cleaned up). At this stage, [Plaintiffs] need not prove that it will ultimately succeed on its claim. Instead, it need only establish that it is *likely* to succeed. *See Byrum*, 566 F.3d at 446 ("A plaintiff is not required to prove its entitlement to summary judgment in order to establish a substantial likelihood of success on the merits for preliminary injunction purposes." (cleaned up)).

The Court next considers whether Plaintiffs will suffer irreparable harm absent an injunction. "In general, a harm is irreparable where there is no adequate remedy at law, such as monetary damages." *Janvey*, 647 F.3d at 600. Here, economic injuries are unrecoverable, as "federal agencies generally enjoy sovereign immunity for any monetary damages." *Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021).

8

For this reason, "complying with [an agency order] later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs." *Id.* (quoting *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016)). And so long as a plaintiff shows that it is likely to suffer more than *de minimis* harm, "it is not so much the magnitude but the irreparability that counts." *Louisiana v. Biden*, 55 F.4th 1017, 1035 (5th Cir. 2022) (cleaned up). The cost to First Amendment rights, collectors' revenues, and creditors' ability to underwrite loans is significant. Moreover, all parties must expend funds changing practices, underwriting models, and disclosures—given the thousands of collectors and creditors affected, even a small individual expenditure is vastly important nationwide. (*See* Ex. 4, ¶¶ 48, 50 (over $105,000 in direct compliance costs and a loss of 63% of client accounts in indirect effect).) As the Fifth Circuit has explained, unrecoverable harm is irreparable harm. *See Janvey*, 647 F.3d at 600.

The final preliminary injunction considerations—the balance of equities and the public interest—also weigh in favor of enjoining the Final Rule. As the Supreme Court has explained, "[t]hese factors merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). When balancing the equities, the Court "looks to the relative harm to both parties if the injunction is granted or denied." *Nuziard v. Minority Bus. Dev. Agency*, 721 F.Supp.3d 431, 504 (N.D. Tex. 2024) (citing *Def. Distributed v. U.S. Dep't of State*, 838 F.3d 451, 460 (5th Cir. 2016)). And when evaluating public interests, the Court must be particularly mindful of the public consequences of an injunction. *Id.* at 505–506. If the Rule takes effect, it will cost U.S. healthcare providers nearly $ 1 trillion over ten years. The government has no plans to replace those funds. On the other hand, the

market has already adapted to reflect the predictive value of medical debt and as noted in the attached declarations, the CFPB already has regulations to ensure that reported medical debts are accurate. *Supra* II.C.

**B.    This Court's review must be on the Administrative Record.**

When reviewing final agency action, "traditionally, the task of the reviewing court is to apply the appropriate APA standard of review to the agency decision based on the record the agency presents to the reviewing court." *Aztec General Agency v. FDIC*, 111 F.3d 893 (5th Cir. 1997) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971)). "Thus, where an agency's decision is based on an administrative record, the decision should be reviewed in light of that record." *Id.* Typically, the focal point for judicial review should be the administrative record as it stood when the agency acted, not a new record made initially in the reviewing court. *Id.* (citing *Camp v. Pitts*, 411 U.S. 138, 142 (1973). The grounds upon which the agency acted must be clearly disclosed in, and sustained by, the record." *Id.* (citations omitted).

**IV.    STATEMENT OF THE ISSUES AND SUMMARY OF ARGUMENT**

Plaintiffs are entitled to a preliminary injunction because they are likely to prevail on the following four arguments: (1) ACA and SCS have standing; (2) The Final Rule is in excess of the CFPB's statutory jurisdiction based on the FCRA's plain language and legislative history; (3) The CFPB's politically-motivated and prejudged Rule ignores clear evidence and fails to consider critical aspects of the problem under *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins., 463 U.S. 29, 43 (1983)*; (4) And by

suppressing accurate and useful medical debt information, the Final Rule is not narrowly tailored and violates the First Amendment.

## V.    ARGUMENT

### A.    SCS and ACA Have Standing because their Injuries are Traceable to the CFPB and Director Chopra and are Redressable with a Favorable Ruling.

Plaintiff SCS is a Texas debt collection firm that specializes in collecting medical debt. The health of its business fully depends on its ability to incentivize consumers to repay bills owed to healthcare service providers. (Ex. 4, ¶¶ 15–20.) The Rule will make communication and collection with and from consumers more difficult. (*Id.* at ¶ 47.) That will impact SCS's bottom line, resulting in immediate reductions in payroll expenses, including potential layoffs or furloughs. (*Id.*)

An organization like ACA can sue on its members' behalf through "associational standing" when "(a) the association's members would otherwise have standing to sue in their own right; (b) the interests the association seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Tex. Ent. Ass'n, Inc. v. Hegar*, 10 F.4th 495, 504 (5th Cir. 2021) (quotations omitted)). The organization's members would otherwise have standing to sue if they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "The burden of establishing these elements falls on the party invoking federal jurisdiction, and at the pleading stage, a plaintiff must allege facts demonstrating each element." *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016). The plaintiff "must demonstrate

standing separately for each form of relief sought." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000). Here, ACA and SCS only seek injunctive relief to vacate the Rule.

ACA both has debt collector members like SCS and many of the nation's largest lenders as creditor members. (Ex. 5, ¶ 7.) Creditor members can sue in their own right because the Rule directs their conduct and prevents them from receiving truthful and useful information in violation of the First Amendment and their rights under the FCRA. *Supra* at 6. In addition, the curtailment of creditors' rights will hinder their ability to accurately underwrite loans, which will cause financial losses when those loans default. *Id.* ACA debt collector members have standing to sue in their own right because the Rule prevents their communication with creditors via the CRA channels and will cause them financial harm. *Id.* ACA can adequately represent both types of members' interests and the claims and relief requested do not require the participation of individual members as the facts center on the CFPB's administrative record and injunctive relief will resolve all ACA member harms. These same facts also show that ACA and SCS have alleged sufficient injury-in-fact and traceability in both their Complaint and the attached declarations. Absent this Rule, the loss of free speech, income, and incentive effect of credit reporting would not occur.

Finally, the Plaintiffs' claims are redressable. "Redressability examines whether the relief sought, assuming that the court chooses to grant it, will likely alleviate the particularized injury alleged by the plaintiff." *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663–64 (D.C. Cir. 1996) (footnote omitted). Plaintiffs seek one substantive form of relief: an order from this Court vacating and setting aside the Rule nationwide for all affected

persons in its entirety. (Compl. ¶ 152.) The requested relief, if granted, would redress ACA/SCS's alleged injury and preserve the status quo.

**B.**    **Claim 1 – Excess of Statutory Jurisdiction, Authority, or Limitations, or Short of Statutory Right & Major Questions Doctrine–5 U.S.C. § 706(2)(C).**

The Court will "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C), or "without observance of procedure required by law," *id.* § 706(2)(D). In *Loper Bright Enters. v. Raimondo*, the Supreme Court made clear that "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority." 603 U.S. 369, 412 (2024). The exercise of such independent judgment, the Court explained, is rooted in the "solemn duty" imposed on courts under the Constitution to "say what the law is." *Id.* at 385 (citing *United States v. Dickson*, 40 U.S. 141 (1841); *Marbury v. Madison*, 5 U.S. 137, 177 (1803)).

The *Loper Bright* Court recognized that a statute may authorize an agency to exercise a degree of discretion, and "some statutes 'expressly delegate[ ]' to an agency the authority to give meaning to a particular statutory term." *Id.* at 394 (quoting *Batterton v. Francis*, 432 U.S. 416, 425 (1977)). The Court instructed that when a statute delegates discretionary authority to an agency, "the role of the reviewing court under the APA is, as always, to independently interpret the statute and effectuate the will of Congress subject to constitutional limits." *Id.* Courts "fulfill[ ] that role by recognizing constitutional delegations, fix[ing] the boundaries of [the] delegated authority, and ensuring the agency has engaged in 'reasoned decisionmaking' within those boundaries." *Id.* (quotations

omitted). "By doing so, a court upholds the traditional conception of the judicial function that the APA adopts." *Id.* at 395–396.

    1.    <u>The statute clearly permits and excepts medical debt reporting.</u>

        a.    *FCRA's plain language permits medical debt reporting.*

The relevant medical information provisions in the FCRA were largely enacted in 2003 in the Fair and Accurate Credit Transactions Act of 2003.[10] Specifically, the critical parenthetical language in § 1681b(g)(2) was enacted after the original version of 12 C.F.R. § 1022.30 that the Rule rescinds.

The FCRA at Section 1681c(a)(6) provides detailed direction on how CRAs must confidentially treat medical information (relevant provisions highlighted below):

## §1681c. Requirements relating to information contained in consumer reports

**(a) Information excluded from consumer reports**

    Except as authorized under subsection (b), no consumer reporting agency may make any consumer report containing any of the following items of information:

    (1) Cases under title 11 or under the Bankruptcy Act that, from the date of entry of the order for relief or the date of adjudication, as the case may be, antedate the report by more than 10 years.

    (2) Civil suits, civil judgments, and records of arrest that, from date of entry, antedate the report by more than seven years or until the governing statute of limitations has expired, whichever is the longer period.

    (3) Paid tax liens which, from date of payment, antedate the report by more than seven years.

    (4) Accounts placed for collection or charged to profit and loss which antedate the report by more than seven years.

    (5) Any other adverse item of information, other than records of convictions of crimes which antedates the report by more than seven years.

    (6) The name, address, and telephone number of any medical information furnisher that has notified the agency of its status, unless–

        (A) such name, address, and telephone number are restricted or reported using codes that do not identify, or provide information sufficient to infer, the specific provider or the nature of such services, products, or devices to a person other than the consumer; or

        (B) the report is being provided to an insurance company for a purpose relating to engaging in the business of insurance other than property and casualty insurance.

---

[10] The term "medical information" is defined in the FCRA § 603(i) as:

    (1) Information or data, whether oral or recorded, in any form or medium, created by or derived from a health care provider or the consumer, that relates to:

    (i) The past, present, or future physical, mental, or behavioral health or condition of an individual;

    (ii) The provision of health care to an individual; or

    (iii) The payment for the provision of health care to an individual. 15 U.S.C. § 1681a(i)(1); 12 C.F.R. 1022.3(k)(1).

And once a CRA complies with Section 1681c(a)(6) by reporting the identity of medical information furnishers with codes that hide the nature of medical care, several FCRA provisions expressly permit the consideration of medical debt in connection with any determination of the consumer's eligibility, or continued eligibility, for credit. *See* 15 U.S.C. §§ 1681b(g)(1); 1681b(g)(2); 1681b(g)(3).

Specifically, 15 U.S.C. § 1681b(g)(1) provides three exceptions to the general rule that limits providing medical information, denoted below with the highlighted term "unless." The exception relevant to the instant challenge is Section 1681b(g)(1)(C), which excepts information from the general rule if the information pertains solely to transactions, accounts, or balances related to debts arising from the receipt of medical services, products, or devices.

**(g) Protection of medical information**

**(1) Limitation on consumer reporting agencies**

A consumer reporting agency shall not furnish for employment purposes, or in connection with a credit or insurance transaction, a consumer report that contains medical information (other than medical contact information treated in the manner required under section 1681c(a)(6) of this title) about a consumer, unless-

    (A) if furnished in connection with an insurance transaction, the consumer affirmatively consents to the furnishing of the report;

    (B) if furnished for employment purposes or in connection with a credit transaction-

        (i) the information to be furnished is relevant to process or effect the employment or credit transaction; and

        (ii) the consumer provides specific written consent for the furnishing of the report that describes in clear and conspicuous language the use for which the information will be furnished; or

    (C) the information to be furnished pertains solely to transactions, accounts, or balances relating to debts arising from the receipt of medical services, products, or devises, where such information, other than account status or amounts, is restricted or reported using codes that do not identify, or do not provide information sufficient to infer, the specific provider or the nature of such services, products, or devices, as provided in section 1681c(a)(6) of this title.

**(2) Limitation on creditors**

Except as permitted pursuant to paragraph (3)(C) or regulations prescribed under paragraph (5)(A), a creditor shall not obtain or use medical information (other than medical information treated in the manner required under section 1681c(a)(6) of this title) pertaining to a consumer in connection with any determination of the consumer's eligibility, or continued eligibility, for credit.

The body of § 1681b(g)(1) contains the word "unless", therefore § 1681b(g)(1)(C) clearly contains an exception that allows medical debt reporting—that is—the very specific

information about transactions allowed under § 1681b(g)(1)(C), which is a subset of "medical information" as a whole.

The CFPB argues in the record that the term "unless" before enumerated (A)–(C) does not insulate medical debt information from restrictions in other provisions:

> "[t]he protection in FCRA section 604(g)(1)(C) ensures that the medical information obtained or used by creditors would be anonymized to protect consumers' privacy. The fact that FCRA section 604(g)(1)(C) carves certain anonymized information out of the general prohibition in FCRA section 604(g)(1) does not immunize such anonymized information from restrictions contained in other provisions, such as FCRA section 604(a)'s permissible purpose restrictions or regulations issued under FCRA section 621(e)." 90 Fed. Reg. 3303.

But when interpreting acts of Congress, courts seek the ordinary meaning of the enacted language. *Nat'l Ass'n of Priv. Fund Managers v. SEC*, 103 F.4th 1097, 1110 (5th Cir. 2024). The ordinary, contemporary, and common meaning of "unless" as a conjunction is: *(1) except on the condition that : under any other circumstance than; (2) without the accompanying circumstance or condition that: but that : but*.[11] *See Barr v. Securities and Exchange Commission*, 114 F.4th 441 (2024) (relying upon dictionary to determine ordinary meaning), citing *Belt v. EmCare, Inc.*, 444 F.3d 403, 412 (5th Cir. 2006) ("[W]e routinely consult dictionaries as a principal source of ordinary meaning . . .").

Likewise, § 1681b(g)(2) contains a parenthetical that uses the phrase "other than," which conveys Congressional intent that the limitation on creditors has an exception for medical debt that complies with the confidentiality requirement at Section 1681c(a)(6). (*Supra* at 14.) The ordinary, contemporary, and common meaning of the phrase "other

---

[11] "Unless." Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/unless. Accessed 7 Jan. 2025; *accord* The American Heritage Dictionary of the English Language, Fifth Edition. https://ahdictionary.com/word/search.html?q=unless. Accessed 7 Jan. 2025. (defining "unless" as, "Except on the condition that; except under the circumstances that;" and as a preposition as, "Except for; except.")

than" as a preposition is "*with the exception of : except for, besides*." As a conjunction, "other than" means: "*except, but*."[12] Again, Congress used a term that clearly conveys an exception to the general proposition.

Accordingly, the FCRA allows CRAs to provide medical debt information on the condition that it is the specific subset of medical information that pertains solely to transactions, accounts, or balances relating to debts arising from the receipt of medical services *and* where the information is reported using codes that do not identify the specific provider or the nature of such services. *See* 15 U.S.C. § 1681b(g)(1)(C). The CFPB states in the record that the parenthetical in § 1681b(g)(2) means something non-obvious on the face of statute. 90 Fed. Reg. 3314 n. 190. But with all disputes of statutory interpretation, "we begin with the text of the statute." *United States v. Lauderdale Cnty., Mississippi*, 914 F.3d 960, 961 (5th Cir. 2019). CFPB's explanation of parentheticals and "technical amendments" is too convoluted to support the agency's reading, much less that Congress intended such machinations to overwhelm clearly-written text.

b.    *FCRA legislative history says that medical debt is reportable.*

The FCRA allows medical debt use on its face; but also, section 1681b(g)'s legislative history shows that 1681b(g) contemplates creditors considering consumer applicants' medical debt in lending decisions. For example, in 2003, when summarizing the then-proposed amendments in the FACTA to the FCRA's governance of medical information in the financial system, House Report 108-263 explained that medical

---

[12] Webster's "Other than." Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/other%20than. Accessed 7 Jan. 2025.

information may be included in a credit report if the information does not identify the provider or nature of services:

> Medical information may be included in a report for employment or credit purposes only where the information is relevant for purposes of processing or approving employment or credit requested by the consumer and the consumer has provided specific written consent, *or if the information meets certain specific requirements and is restricted or reported using codes that do not identify or infer the specific provider or nature of the services, products, or devices to anyone other than the consumer (except for certain insurance purposes).*

H.R. Rep. 108-263 (Sept. 4, 2003) (emphasis added).[13]

Similarly, speaking in support of the FACTA, Rep. Paul Kanjorski emphasized the regulation's focus on privacy concerns, noting the legislation would "improve the accuracy of and correction process for credit reports and establish strong privacy protections for consumers' sensitive medical information." FACTA, 149 Cong. Rec. H8122-02 (2003) (also explaining that the legislation "contains important provisions to protect medical information that is present in financial services' systems and provides for confidentiality of medical data in all credit reports").

      c.    *Regulations cannot supersede statutes.*

The CFPB believes that it has the power to supersede Congressional intent and ban medical debt on credit reports under three grants of rulemaking authorities: FCRA Sections 1681b(g)(3)(C), 1681b(g)(5)(a), and 1681s(e)(1). It is incorrect.

---

[13] This explanation implicitly acknowledges that credit transactions will include medical information as provided in section 604(g), but that redisclosure—in other words unauthorized violations of a consumer's privacy and confidentiality—was prohibited. This same report also expressly notes that, subject to the required restrictions, medical information "may be included in a report for . . . credit purposes" "where the information is relevant for the purposes of processing or approving . . . credit requested by the consumer." *Id.*

The rulemaking authority under Section 1681b(g)(3)(C) allows the Bureau to determine additional situations where disclosure of medical information is not treated as a consumer report, but it does not give authority to suppress medical debt information:

**(3) Actions authorized by Federal law, insurance activities and regulatory determinations**
Section 1681a(d)(3) of this title shall not be construed so as to treat information or any communication of information as a consumer report if the information or communication is disclosed-
    (A) in connection with the business of insurance or annuities, including the activities described in section 18B of the model Privacy of Consumer Financial and Health Information Regulation issued by the National Association of Insurance Commissioners (as in effect on January 1, 2003);
    (B) for any purpose permitted without authorization under the Standards for Individually Identifiable Health Information promulgated by the Department of Health and Human Services pursuant to the Health Insurance Portability and Accountability Act of 1996, or referred to under section 1179 of such Act,[1] or described in section 6802(e) of this title; or
    (C) as otherwise determined to be necessary and appropriate, by regulation or order, by the Bureau or the applicable State insurance authority (with respect to any person engaged in providing insurance or annuities).

The above language says that the Bureau can expand and contract its list of information "otherwise determined to be necessary and appropriate," but nothing in the statute says that the CFPB can overwrite the statutory exception. The Fifth Circuit will not allow agencies to rewrite statutes. *VanDerStok v. Garland*, 86 F.4th 179, 195 (5th Cir. 2023), cert. granted, 144 S. Ct. 1390 (2024) ("Where the statutory text does not support [the agency's] proposed alterations, [the agency] cannot step into Congress's shoes and rewrite its words"). Likewise, the FCRA Section 1681b(g)(5)(a) grants the Bureau the rulemaking authority to "permit" additional types of transactions where it may be appropriate to obtain or use medical information (other than medical information treated in the manner required under Section 1681c(a)(6) of this title) pertaining to a consumer in connection with any determination of the consumer's eligibility, or continued eligibility, for credit:

**(5) Regulations and effective date for paragraph (2)**

**(A)** [2] **Regulations required**

The Bureau may, after notice and opportunity for comment, prescribe regulations that permit transactions under paragraph (2) that are determined to be necessary and appropriate to protect legitimate operational, transactional, risk, consumer, and other needs (and which shall include permitting actions necessary for administrative verification purposes), consistent with the intent of paragraph (2) to restrict the use of medical information for inappropriate purposes.

In this provision, "paragraph (2)" refers to the limitation on creditors at Section

1681b(g)(2):

**(2) Limitation on creditors**

Except as permitted pursuant to paragraph (3)(C) or regulations prescribed under paragraph (5)(A), a creditor shall not obtain or use medical information (other than medical information treated in the manner required under section 1681c(a)(6) of this title) pertaining to a consumer in connection with any determination of the consumer's eligibility, or continued eligibility, for credit.

Thus, the CFPB's rulemaking authority is limited to "permitting" transactions that

are in addition to those already excepted because the medical debt information is treated as

required. To read otherwise would ignore the phrases "permit" and "other than" in the

statutory text.  The phrase "other than" cannot be ignored to favor the CFPB's

interpretation. *See, e.g.*, *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992)

("[C]ourts must presume that a legislature says in a statute what it means and means in a

statute what it says there."). Therefore, the Rule change at § 1022.30 is inconsequential, as

the statute nevertheless permits medical debt information to be reported if it otherwise

meets confidentiality requirements.

Finally, CFPB justifies new Rule § 1022.38 under a general grant of rulemaking

authority at § 1681s(e)(1) that allows the CFPB to "administer and carry out" the purposes

and objectives of the FCRA. 90 Fed. Reg. 3303. Under both the major questions doctrine

and the plain text, this authority does not allow the agency to limit credit reporting of

particular types of debt. The FCRA's purpose is to promote accuracy and meet the needs of

20

credit. (*Supra* at ii.) The CFPB's authority to regulate the medical industry is notably absent from Title 42 or the Dodd-Frank Act, 12 U.S.C. § 5512.  In fact, in prior publications, the CFPB has stated that it has authority to regulate the debt collection market because that "is a market for financial products and services under the Act," but that debt arising from medical expenses should be excluded because it is "unrelated to consumer financial products or services." 77 Fed. Reg. 9597 (Feb. 17, 2012). Because revised § 1022.30 is contrary to the statutory text and FCRA purpose, new § 1022.38 must be vacated and set aside.

2.    Congress did not delegate authority to CFPB under the Major Questions Doctrine.

Not only does the FCRA itself forbid the Rule, the CFPB does not have the power it claims under the Major Questions Doctrine. "[I]n certain extraordinary cases, both separation of powers principles and practical understanding of legislative intent make [the court] reluctant to read into ambiguous statutory text the delegation claimed to be lurking there. To convince [the court] otherwise, something more than a merely plausible textual basis for the agency action is necessary. The agency instead must point to clear congressional authorization for the power it claims." *West Virginia v. EPA*, 597 U.S. 697, 723, (2022) (citation and internal quotation marks omitted). There are three indicators that each independently trigger the doctrine: (1) when the agency "claims the power to resolve a matter of great political significance"; (2) when the agency "seeks to regulate a significant portion of the American economy or require billions of dollars in spending by private persons or entities"; and (3) when an agency "seeks to intrude into an area that is the particular domain of state law." *Id.* at 743–44 (Gorsuch, J., concurring) (citations and

internal quotation marks omitted); *see also Texas v. Nuclear Regul. Comm'n*, 78 F.4th 827,

844 (5th Cir. 2023) (applying the major questions doctrine because of the political

significance of the issue).

The Final Rule presents a major question on several bases. *First*, healthcare payment

responsibility and billing practices is a matter of great political significance, as

demonstrated by the recent passage of the 2020 No Surprises Act, which directly addresses

how hospitals bill patients for services. (*Supra* at **Error! Bookmark not defined.**.) The

political significance is also shown from the letter by many members of Congress who

opposed this rule. (*Id.*) *Second*, the Final Rule regulates a significant portion of the

American economy and causes billions of dollars in losses by the healthcare industry: it

impacts approximately 15 million private agreements (*supra* at 4) and will cost healthcare

providers over $ 970 billion in ten years. (*Id.*) Recent cases applying the doctrine based on

economic significance have similarly involved hundreds of billions of dollars of impact. *See*

*e.g.*, *Biden v. Nebraska*, 600 U.S. —, 143 S. Ct. 2355, 2362 (2023) ($430 billion); *West*

*Virginia v. EPA*, 597 U.S. 697, 715 (2022) ($1 trillion by 2040). The instant case falls

cleanly within those bounds.

Critically, the CFPB doesn't even regulate healthcare. (*Supra* at **Error! Bookmark**

**not defined.**.)  It is implausible that Congress intended a financial services regulator to

cause such a massive impact on healthcare policy and payments without an express

delegation of statutory authority. Therefore the entire Rule is in excess of statutory

authority and must be vacated.

**C.**    **Claim 2 – Arbitrary and Capricious–5 U.S.C. §§ 553, 706(2)(A).**

In an arbitrary and capricious challenge under 5 U.S.C. § 706(2)(A), the core

question is whether the agency's decision was "the product of reasoned decision making."

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 52

(1983); *see also Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998)

("the process . . . must be logical and rational"). The court "is not to substitute its judgment

for that of the agency." *State Farm*, 463 U.S. at 43. "Nevertheless, the agency must

examine the relevant data and articulate a satisfactory explanation for its action including a

rational connection between the facts found and the choice made." *Id.* (internal quotation

marks omitted). When reviewing that explanation, the court "must consider whether the

decision was based on a consideration of the relevant factors and whether there has been a

clear error of judgment." *Id.* (internal quotation marks omitted).

For example, an agency action is arbitrary and capricious if the agency "entirely

failed to consider an important aspect of the problem, offered an explanation for its decision

that runs counter to the evidence before [it], or [the explanation] is so implausible that it

could not be ascribed to a difference in view or the product of agency expertise." *Id.* The

party challenging an agency's action as arbitrary and capricious bears the burden of proof.

*Mississippi Hosp. Ass'n, Inc. v. Heckler*, 701 F.2d 511, 516 (5th Cir. 1983).

Courts across the U.S. and this Circuit have held rules to be arbitrary and capricious

on multiple bases, many of which appear in the Final Rule. *See Texas v. United States*, 555

F.Supp.3d 351, 418 (S.D. Tex. 2021) (agency's failure to tie factual considerations to the

enumerated policy was arbitrary and capricious); *Ryan LLC v. FTC*, — F.Supp.3d —, 2024

WL 3297524, *11 (N.D. Tex., July 3, 2024) (agency Rule arbitrary and capricious when based on inconsistent and flawed empirical evidence); and *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999 (5th Cir. 2019) (an agency's excuse of "lack of sufficient data" for its rulemaking decisions was arbitrary and capricious).

1. <u>The CFPB ignored clear evidence of usefulness of medical debt in underwriting.</u>

The CFPB concludes from internal studies that removing medical debt from all credit reports in the U.S. will not reduce lender's underwriting models' ability to predict delinquency:

> "Based on this research, the CFPB expects that medical collections can be removed from underwriting models without significantly reducing their ability to predict serious delinquency if underwriting models continue to include other variables that are sufficiently predictive of delinquency risk."

90 Fed. Reg. at 3322–23. But this is a guess, and is not supported by evidence in the record.

First, the CFPB did not study all, a portion, or even a handful of "underwriting models." Creditors' underwriting models are trade secret proprietary information that are not shared. (Ex. 5, ¶ 9.) It is simply impossible for the CFPB to arrive at the conclusion that all underwriting models can adapt to the loss of 57 % of the collections data contained on U.S. credit reports.

Furthermore, its 2014 study actually says that medical debt has a reasonable amount of predictive value, just slightly lesser than other types of debt.[14] (Ex. 2, ¶ 21.) Specifically, the 2014 study determined that "medical debt collections tradelines . . . are less predictive

---

[14] *See* Andrew Rodrigo Nigrinis, *Comment Letter on Prohibition on Creditors and Consumer Reporting Agencies Concerning Medical Information (Regulation V)*, at 19 (Aug. 13, 2024), https://www.regulations.gov/comment/CFPB-2024-0023-1019 ("Research by the CFPB indicates that medical debts are less predictive of default—but still predictive. Because medical debts have some predictive value, rules to limit underwriting consideration of medical debts will damage the market.")

of future consumer credit performance than nonmedical collections." 90 Fed. Reg. at 3297. The CFPB's own data shows an estimated credit score difference of 16 to 21 points for medical debts versus non-medical debts. (Ex. 2, ¶ 21.) But in their example, the credit score of a consumer with medical debt tradelines is still almost 100 points lower than their score prior to the tradeline deletion, implying a large impact from the removal of medical debt tradelines under the Rule. (*Id.*) The CFPB's claims that creditors can still "rank order" borrowers after the Rule totally failed to respond to commentary that suggests medical debt is the largest driver of consumer bankruptcy.[15] Imagine a borrower with a "prime" credit score getting a loan and filing bankruptcy days later due to medical debt. Under this Rule, creditors will be unable to trust any scoring model data.

The Rule is similar to the arbitrary and capricious rule in *State Farm* because it also runs counter to the evidence before the agency. *See State Farm*, 463 U.S. at 43. Here, the CFPB study says that medical debt has less predictive value than other types of debts, but this does not justify the conclusion that removing all instances of medical debt from underwriting models will not "significantly reduc[e] their ability to predict serious delinquency…" The CFPB did not actually study this question. It provides a Technical Appendix that has serious methodological flaws. (*See* Ex. 2 ¶¶ 43–47.) But it also fails to address the one relevant question: what will happen to the reliability of underwriting models when vast amounts of relevant data suddenly disappear?

---

[15] Cmt. CFPB-2024-0023-1075 at 70 ("Anecdotal and self-reported evidence suggests that medical debt is the largest driver of consumer bankruptcy.  In turn, invisibility of bankruptcy risk frustrates the utility of credit reports in general for all purposes.")

Further, not only is the Appendix inapposite, it was not released for peer review or public commentary, which alone renders the Rule procedurally flawed. *See Texas v. EPA*, 389 F.Supp.3d 497, 505 (S.D. Tex. 2019) ("an agency commits serious procedural error when it fails to reveal portions of the technical basis for a proposed rule in time to allow for meaningful commentary") (internal quotations omitted). Accordingly, the CFPB's studies fail to support its conclusion that medical debt is unnecessary or inappropriate for credit reporting and that removing it from the credit system will cause no harm to lenders' underwriting models.

The flawed studies alone are significant, but also, the CFPB's conclusion runs contrary to actual observed results submitted by credit scoring and credit reporting agencies like Fair Isaac (FICO) and Equifax.[16] In 2015, FICO reported that "[o]ur research has consistently found that individuals with unpaid collections are more risky (i.e., less likely to repay loans) than those who do not have unpaid accounts."[17] Thus, "ignoring ALL medical collections, regardless of whether those accounts have been paid, can have an adverse impact on score predictiveness."[18] Further, "it is not accurate to claim that empirical evidence shows that, especially in the current credit environment, medical debt is not predictive of future borrower performance and that it is not necessary and appropriate for creditors to obtain or consider medical debt information as part of the credit decision process. The opposite is closer to the truth."[19]

---

[16] See, e.g., Amy Crews Cutts, Comment Letter on Prohibition on Creditors and Consumer Reporting Agencies Concerning Medical Information (Regulation V), at 4 (Aug. 12, 2024), https://www.regulations.gov/comment/CFPB-2024-0023-0973 (reviewing one FICO study and one non-public industry study).
[17] *Id.*
[18] *Id.*
[19] *Id.*

Likewise, Equifax, a nationwide CRA, told the CFPB that that delinquency rates were "at least 8% higher for consumers with medical collections." 90 Fed. Reg. at 3322. Equifax also found that adding medical collections to a model without medical collections data increased the model's predictiveness by 34 percent. *Id.*

It is arbitrary and capricious for the CFPB to offer an explanation for its decision that runs counter to the evidence from the very companies that create credit scores which show that medical debt has some predictive value for underwriting. *See Am. Stewards of Liberty v. Dep't of the Interior*, 370 F. Supp. 3d 711, 728 (W.D. Tex. 2019) (finding agency action arbitrary and capricious when there is "available, substantial scientific and commercial information" to the contrary). Nothing in the 2014 study concluded that medical debt lacked any predictive value, and indeed its own study said that medical debt in fact had some predictive value. *See Sw. Elec. Power Co. v. United States Env't Prot. Agency*, 920 F.3d 999, 1022 (5th Cir. 2019) ("we rely on EPA's own scientific conclusions in the rule itself to conclude that its choice of an outdated and ineffective technology . . . was unlawful under the Act").

It is also arbitrary and capricious to entirely fail to consider an important aspect of the problem. *State Farm*, 463 U.S. at 43. The CFPB did not study the effect of eliminating medical debt information from consumer reporting altogether. It determined without a basis that prediction models would have "other" data to replace medical debt data, but it did not either identify this data or study it. Not could it actually ever test all underwriting models to support this premise. It is therefore unreasonable for the agency to conclude that it is not "necessary and appropriate" for a creditor to consider medical debt when making a credit

27

decision (and thereby command that medical debt be removed from consumer reports) merely because medical debt is slightly less predictive than other forms of debt.

      2.    <u>The CFPB advances contradictory measurements of harm to the healthcare system.</u>

Evidence in the administrative record supports the conclusion that with fewer repercussions for unpaid medical debt, consumers would not pay their medical debts under the proposed rule. 90 Fed. Reg. at 3323. CFPB dismisses these consequences saying, "CFPB expects that the reduction in health care provider revenue under the rule would be equal to no more than 2 percent of their total costs." 90 Fed. Reg. at 3328. This analysis was not provided in the NPRM, thus the unnoticed study can be disregarded under *Texas v. EPA*, 389 F.Supp.3d 497, 505. But also, its conclusion is irrational.

The CFPB's determination of a 2 percent increase in "bad debt" costs equates to $97.33 billion per year. Total health consumption expenditures in 2023 were $4.866 trillion per year.[20] This figure is substantial and it is implausible that a $970 billion cost over ten years will not impact market behavior when it decreases revenue for healthcare providers. *State Farm*, 463 U.S. at 43 ("Normally, an agency rule would be arbitrary and capricious if the agency . . . offered an explanation for its decision … so implausible that it could not be ascribed to a difference in view or the product of agency expertise").

Moreover, other evidence shows the CFPB's nonchalance about healthcare provider revenues. In a second analysis, the CFPB estimated a $900 million reduction in recoverable

---

[20] *Centers for Medicare & Medicaid Services*, National Health Expenditure Data – Historical
https://www.cms.gov/data-research/statistics-trends-and-reports/national-health-expenditure-data/historical#:~:text=U.S.%20health%20care%20spending%20grew,For%20additional%20information%2C%20see%20below.

medical debt over 10 years under the rule. 90 Fed. Reg. at 3322. In sum, the CFPB has purported to study the costs of the Rule to healthcare providers and arrived at figures that vary over ten years by over $972 billion. Such a wide spread in costs supports finding this Rule arbitrary and capricious. *See Ryan LLC*, 2024 WL 3297524 at *11 (holding an agency Rule arbitrary and capricious when based on inconsistent and flawed empirical evidence).

Finally, CFPB's cost analysis disregards the cost to healthcare providers and collection agencies of using alternative means—such as multiple letters and litigation—to collect on owed amounts. *See* 90 Fed. Reg. at 3329, Section VII.E.4. The CFPB fails to account for how costs will be distributed across debt collectors, healthcare providers, and consumers. *Id.* It also ignores the recommendations that the SBA made during the SBREFA process. *Supra*, 4. Finally, the analysis does not consider the economic ripple effects, such as worsening financing terms and reduced patient welfare, even though these concerns clearly appear in the administrative record. (*See, e.g.*, Ex. 2-B, ¶ 17.) For example, CFPB made no inquiry whatsoever into the number of people who would not receive care if they must pay cash upfront for services. CFPB's failure to conduct adequate research to estimate the true financial *and human costs* of its Rule provides yet another basis to find the rule arbitrary and capricious. *Texas v. United States*, 555 F.Supp.3d at 418 (the EPA's rulemaking was arbitrary and capricious in part because it failed to consider important aspects of the problem.)

**D.    Claim 3 – Restriction of Speech Based on Content–5 U.S.C. §§ 553, 706(2)(B); U.S. Const. amend. I.**

Courts "hold unlawful and set aside" any agency action that is "contrary to constitutional right, power, privilege, or immunity." *Huawei Tech. USA, Inc. v. FCC*, 2

F.4th 421, 434 (5th Cir. 2021) (citing 5 U.S.C. § 706(2)(B)). The First Amendment provides that "Congress shall make no law. . .abridging the freedom of speech." U.S. Const. amend. I. The Supreme Court has held "that the creation and dissemination of information are speech within the meaning of the First Amendment." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011). "The party seeking to uphold a restriction on commercial speech carries the burden of justifying it." *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 71 n.20 (1983).

Restrictions on protected speech trigger First Amendment scrutiny when entities are prohibited from either disseminating or receiving protected speech. *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc*., 425 U.S. 748, 756 (1976). This is because, "[w]here a speaker exists, as is the case here, the protection afforded is to the *communication*, to its source and to its recipients *both*." *Id.* (emphasis added).

1.   The Rule is content based because it singles out particular content (medical debt information), communicated by particular speakers (CRAs).

The Rule is content based because it "singles out specific subject matter for differential treatment." *Barr v. Am. Ass'n of Political Consultants, Inc*., 591 U.S. 610, 619 (2020). Under the Rule, a CRA's ability to speak depends on the content of the underlying message. Put differently, the answer to a content based question (*does the message contain medical debt information?*) determines the lawfulness of the speech. The transfer of consumer medical debt information is protected commercial speech. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 571 (2011) (restrictions on speech from pharmaceutical companies violate the First Amendment despite being purely commercial speech). *Sorrell* involved a state law prohibiting the sale of prescriber data for marketing purposes. *Id.* at 560. The

Vermont law "ha[d] the effect of preventing detailers—and only detailers—from communicating with physicians in an effective and informative manner." *Id.* at 564. Because the regulation in *Sorrell* disfavored commercial speech with a particular content when expressed by certain disfavored speakers, the Court held it unlawfully restricted commercial speech.

Just as the regulation in *Sorrell* singled out a specific subject matter for content regulation, so too does the Rule here. CRAs may continue to communicate information about other types of accounts, such as mortgages, credit cards, and housing rentals; but CRAs may not provide a credit report to creditors with medical debt information if used for credit eligibility.[21] *See* 90 Fed. Reg. at 3372–74 ; (Compl. ¶ 52.) The only way to determine whether a communication runs afoul of the Rule is to evaluate the speech's content and determine who is initiating it and who is receiving it. If the content pertains to medical debt (and medical debt only), and is initiated by CRAs (and CRAs only), the speech is unlawful.

This subjects the Rule to strict scrutiny, which this Rule fails to satisfy. *See Sorrell*, 564 U.S. at 567 (holding that when state action "is directed at certain content and is aimed at particular speakers," the action is content based and requires heightened scrutiny under the First Amendment). Supreme Court precedent is clear: "[i]n the ordinary case it is all but dispositive to conclude that a law is content based and, in practice, viewpoint discriminatory." *Sorrell*, 564 U.S. at 571; *see also R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992) ("Content-based regulations are presumptively invalid").

---

[21] Moreover, under the Rule, CRAs may still include medical debt on consumer reports to entities other than creditors, like insurers and employers. The Rule is thus (1) content, (2) speaker, and (3) listener based.

2.     The Restriction is Not Narrowly Tailored to Further Compelling
       Governmental Interests

When the government infringes on protected First Amendment expression via

content, speaker, or viewpoint discrimination, "the government must show that its action is

narrowly tailored to further compelling governmental interests." *McDonald v. Longley*, 4

F.4th 229, 246 (5th Cir. 2021) (describing the strict scrutiny standard); *Hines v. Pardue*,

117 F.4th 769, 774 (5th Cir. 2024). A restriction of protected speech will not be narrowly

tailored—and thus fail a strict scrutiny analysis—when it fails to advance a compelling

government interest, or is overbroad in its attempts to advance that interest. *Sorrell*, 564

U.S. at 574 ("Rules that burden protected expression may not be sustained when the options

provided by the State are…too broad to protect speech").

The Rule fails strict scrutiny review on two primary accounts. *First*, the Rule is

overbroad. It restricts communication regarding *all* medical debt in an attempt to eliminate

a minority of communications about inaccurate medical debt. (Compl. ¶¶ 58-64.) *Second*,

even assuming the CFPB's justifications were compelling, the Rule ignores available

alternatives that are less restrictive of protected speech. (*Id.* at ¶¶ 63–64.)

While restricting inaccurate credit reporting may have value, the Rule overbroadly

restricts accurate credit reporting information as well. To justify the Rule, the CFPB asserts

that of medical accounts in collections between 2017-2022, 5.7 percent of the accounts

were flagged as disputed at some time. (Supra at **Error! Bookmark not defined.**.) But this

is the same rate as consumers disputing any type of delinquent tradeline—indicating

medical debt presents no special frequency of inaccuracy. *Id.* Moreover, this count (5.7

percent) of disputes does not equate to actual inaccuracies. Many times, patients dispute

these bills based on the fact that the patient does not recognize the name of the provider—not because of any factual inaccuracy. *Id.* The actual error rate is believed to be less than 1 percent. *Id.* This clumsy attempt to solve a *de minimis* problem with a content based ban does not survive constitutional scrutiny. *American Academy of Implant Dentistry v. Parker*, 860 F.3d 300, 308 (5th Cir. 2017) (regulation was more extensive than necessary).

Even if the CFPB could produce a compelling government interest justifying the Rule, the Rule still fails because less restrictive alternatives exist. Regulation  F—which implements the FDCPA—already prevents debt collectors from furnishing inaccurate information to CRAs. (Compl.  ¶ 63.) Regulation F prevents the furnishing of information about a debt before the debt collector communicates with the consumer.[22] Thus consumers may dispute the accuracy of an account with the debt collector before information is shared with a CRA. Even taking the CFPB's posited dispute rate as presenting even a legitimate state interest, Congress and Regulation F already provide a less restrictive means to solve the problem. *See Express Oil Change, L.L.C. v. Mississippi Bd. of Licensure for Pro. Eng'rs & Surveyors*, 916 F.3d 483, 493 (5th Cir. 2019) (holding that the regulatory action at issue fails First Amendment scrutiny because the regulator "fails to address why alternative, less-restrictive means . . . would not accomplish" the regulator's goals).

---

[22] Specifically, Regulation F prevents the furnishing of information about a debt before the debt collector: (i) speaks to the consumer about the debt in person or by telephone; or (ii) places a letter in the mail or sends an electronic message to the consumer about the debt and waits a reasonable period of time to receive a notice of undeliverability. 12 C.F.R. § 1006.30(a)(1).

3. <u>Even if the Rule is evaluated under the *Central Hudson* standard, it still fails First Amendment scrutiny because the restricted communications contain accurate and lawful information regarding consumer medical debts.</u>

While Supreme Court and Fifth Circuit precedent indicate that restrictions on commercial speech should follow the analysis outlined above, *Sorrell*, 564 U.S. at 567; *Hines*, 117 F.4th at 774, the Rule still fails the intermediate scrutiny analysis outlined in *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N. Y.*, 447 U.S. 557, 566 (1980).[23] *See also Express Oil Change, L.L.C. v. Mississippi Bd. of Licensure for Pro. Eng'rs & Surveyors*, 916 F.3d 483, 487 (5th Cir. 2019) (applying *Central Hudson* and holding that a restriction on commercial speech violated the First Amendment because less restrictive alternatives were available to regulators).

*First*, the information in question is largely factual and lawful (only 5.7 percent of accounts are disputed, of which an even smaller portion are actually erroneous). (*Supra* at **Error! Bookmark not defined.**.) By prohibiting all communication regarding medical debts, "truthful and nonmisleading expression will be snared along with" inaccurate medical debt information, tarnishing the Rule. *American Academy of Implant Dentistry v. Parker*, 860 F.3d 300, 308 (5th Cir. 2017). *Second*, the CFPB can claim no substantial interest in restricting accurate medical debts—particularly since they have some predictive value. *Supra* at C.1. *Third*, the Rule fails to directly advance the stated interest of inhibiting communications regarding *inaccurate* debts by instead targeting communication regarding *all* debts. *Fourth*, the Rule ignores already existing regulations and statutes, like Regulation

---

[23] *See Express Oil Change, L.L.C. v. Mississippi Bd. of Licensure for Pro. Eng'rs & Surveyors*, 916 F.3d 483, 493 (5th Cir. 2019) ("We do not reach the issue of whether *Sorrell v. IMS Health Inc*. altered the commercial speech analysis because the Board's ban fails to meet the traditional scrutiny test outlined in *Central Hudson*.") (citation omitted).

F, that seek to achieve the same goals by less restrictive means. (Compl. ¶¶ 63–64.) That final fact alone dooms the Rule in a First Amendment analysis.

## VI.    **RELIEF REQUESTED**

Because the CFPB violated the APA under sections 553 and 706(2)(A)–(D), its actions should be set aside. Here, "vacatur under § 706 is ... the 'default' remedy for unlawful agency action." *Braidwood Mgmt., Inc. v. Becerra*, 104 F.4th 930, 952 (5th Cir. 2024); The Fifth Circuit also clarified the scope of the vacatur remedy, explaining that "setting aside agency action under § 706 has nationwide effect, is not party-restricted, and affects persons in all judicial districts equally." Id. at 951 (internal quotation marks and citations omitted). Accordingly, consistent with the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), and this Circuit's precedent, *see Braidwood*, 104 F.4th at 951, the Advisory Opinion must be set aside as to all affected parties.

### **Statement Pursuant to Local Rule**

Plaintiffs have properly served this request for relief upon the CFPB and Department of Justice by ECF and personally. In addition, on Wednesday, January 15, 2025, Plaintiffs requested the CFPB by email to voluntarily retract the Final Rule or consent to this application for injunctive relief. As of the time of this filing, the CFPB has not responded to either request.

Therefore, Plaintiffs respectfully request this Court immediately enjoin the

Defendants from enforcing the Final Rule prior to its effective date on March 17, 2025,

among any other relief that the Court deems just and equitable.

Dated: January 24, 2025

Respectfully submitted,

ACA INTERNATIONAL and SPECIALIZED
COLLECTION SYSTEMS, INC.

By its attorneys,

BROWNSTEIN HYATT FARBER SCHRECK,
LLP


*/s/ Sarah J. Auchterlonie*
Sarah J. Auchterlonie
(attorney in charge)
CO Bar No. 50932, SD Tex. #3872480
675 Fifteenth Street, Suite 2900
Denver, CO 80202
Telephone: 303-223-1100
Facsimile: 303-223-1111
Email: sja@bhfs.com

and

Leah Dempsey
DC Bar. No. 1033593, (pro hac vice pending)
1155 F Street, NW
Washington, DC, 20004
Telephone: 202-296-7353
Facsimile: 202-296-7009
Email: ldempsey@bhfs.com

and

FROST ECHOLS LLC

Cooper M. Walker
TX Bar No. 24098567, SD Tex. #3136096
18383 Preston Road, Suite 350
Dallas, TX 75252
Phone: (817) 290-4356
Email: Cooper.Walker@frostechols.com

and

MARTIN GOLDEN LYONS WATTS MORGAN
PLLC

Eugene Xerxes Martin, IV
TX Bar No. 24078928, SD Tex. #134982737
8750 Northpark Central, Suite 1850
8750 Northpark Central Expressway
Dallas, Texas 75231
Email: xmarin@mgl.law

**Certificate of Service**

I certify that on January 24, 2025 I electronically filed the foregoing document(s) using the CM/ECF system and they are available for viewing and downloading from the Court's CM/ECF system, and that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system where appropriate. Further, I caused service to be made by personal service at the CFPB office on 1700 G. Street, NW, Washington, D.C. 20552.

/s/ *Kathleen M. Stehling*
Kathleen M. Stehling, Paralegal
Brownstein Hyatt Farber Schreck, LLP
675 Fifteenth Street, Suite 2900
Denver, CO 80202
Phone: 303-223-1100