IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| ACA INTERNATIONAL<br><br>and<br><br>SPECIALIZED COLLECTION SYSTEMS, INC.,<br><br>            Plaintiffs,<br><br>v.<br><br>CONSUMER FINANCIAL PROTECTION BUREAU; and ROHIT CHOPRA, in his official capacity as Director of the Consumer Financial Protection Bureau,<br><br>           Defendants. | Case No. 4:25-CV-00094 |

**SWORN DECLARATION OF JENNIFER WHIPPLE
IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**I.
INTRODUCTION**

1.   I, Jennifer Whipple, am the President of Collection Bureau Services, Inc ("CBS"). I am also the President Elect of the Board of Directors of ACA International.

2.   I am over 18 years old and have personal knowledge of the facts sworn to herein and if called to testify, I could and would competently so testify. I submit this Declaration in support of ACA International and Specialized Collection Systems Inc.'s ("SCS") (collectively

"Plaintiffs") Motion for Preliminary Injunction.

3. If the CFPB's Final Rule regarding Prohibition on Creditors and Consumer Reporting Agencies Concerning Medical Information, published in the Federal Register at 90 FR 3276 (the "Rule") becomes effective on March 17, 2025, my business and my personal financial situation will be irreversibly harmed with no opportunity for recompense.

A.     **Summary of Testimony that Supports Vacating the Final Rule**

4. The Rule must be enjoined from taking effect or my business or I will face financial and asset losses that can never be recovered. My testimony provides the below facts in support of Plaintiffs:

- **Restricts Speech.** The Rule cuts off my firm's only means to communicate accurate information about the medical debts it collects to creditors via the credit reporting agencies ("CRAs"). It infringes upon my First Amendment right to convey and receive accurate information about facts that are important to my business.

- **Harm to Health Care Providers**. The Rule removes an incentive for people to pay my clients many of whom are healthcare providers.

- **Medical Debts are Accurate.** The Rule is based on a fallacy that medical bills are "plagued with inaccuracies." In my experience, medical bills are rarely inaccurate. Rather, consumers need one-on-one conversations with my collections staff to better understand their bills and their payment obligations.

- **Consumers Already Have Protections.** The Rule is unnecessary because my policies and procedures under the Fair Debt Collection Practices Act ("FDCPA") and Fair Credit Reporting Act ("FCRA") provide consumers to right to understand the medical debts they owe and dispute amounts they do not believe they owe. My firm is legally required to correct errors under the FDCPA and FCRA. The Rule is unnecessary because the No Suprises in Billing Act helps alleviate the out-of-network medical expenses consumers have faced in the past.

- **Harm to the Healthcare System.** The Rule will cause medical providers to lose revenue, which causes a host of trouble. It will harm access to healthcare, especially in small and rural communities. It disincentivizes payment for healthcare services and may disincentive people from paying for health insurance.

- **Harm to Consumers**. If CBS must stop furnishing medical debt information in Montana, CBS's collections will decrease significantly. CBS has already felt the effect of the prior regulations that prohibit credit reporting for balances under $500. CBS anticipates it will need to increase telephone contacts, mailing services, and litigation to ensure that healthcare clients

2

are fairly paid for their services. Additionally, my healthcare clients will stop providing medical services prior to payment, thus more people will need to pay upfront for healthcare services.

B. **Collection Bureau Services, Inc. Collects Medical Debt for Healthcare Clients**

5. CBS is a licensed third-party debt collector and woman-owned business located in Missoula, Montana. It is a small, local, family-owned business in its third generation of ownership with less than 30 employees. CBS is a dues-paying member of ACA International.

6. CBS's principal purpose is the collection of debts owed or due, or asserted to be owed or due, to another. It is a "debt collector" under the FDCPA and a "covered person" under the Consumer Financial Protection Act. As a debt collector, CBS relies on accurate credit reporting to assess the value of accounts, individuals' propensity to repay, and other important financial data.

7. CBS regularly seeks to recover unpaid past due amounts for services rendered—including for medical and hospital care. CBS works with its healthcare clients to answer consumer questions, resolve disputes, and achieve resolutions, including settlements and payment plans.

8. I also own and manage a medical billing services business under the CBS corporate structure. This business services accounts on behalf of healthcare companies. These services are performed on accounts during the period before the healthcare provider deems the account to be in default. The services that it provides to the healthcare providers and consumers are far different from those provided by CBS because the accounts it services are in an earlier stage of the revenue management cycle and are often still receiving reimbursements from third-party payors. Further, these owed amounts are not yet past due, and often never become past due. Currently, the medical billing services business is not subject to the FDCPA under the currently-established meaning of "default" in the FDCPA and its implementing Regulation F.

9. As a local collection agency, CBS understands the needs of Montana businesses and consumers alike. Over the years we've found that our clients appreciate our willingness to

work with consumers and also our understanding that a consumer may need additional flexibility on a specific account. We prioritize excellence in employee training and compliance with all state and federal laws. Our agency is accredited, and our staff maintains certification through ACA International, the trade association for credit and collection professionals.

10. My agency provides debt collection and billing work for many medical providers in rural Montana, as well as government, utility, and a multitude of other private businesses who provide service to our Montana consumers. I am committed to our clients, the ARM industry, and the work that we do to help every American consumer keep costs low in our economy by returning monies to healthcare, government, and other industries.

11. In my tenure with CBS, I've helped create many policies and procedures to ensure clients are listing accounts that are accurate, consumers are receiving accurate statements, agents on calls are providing accurate information, and credit reporting is accurate. Accuracy is key in our industry, and my agency and the agencies who are part of ACA work hard every day to make certain accurate information is received and presented in every segment of our businesses.

12. I have studied, received training, and provided training on Confidentiality, the Health Insurance Portability and Accountability Act ("HIPAA"), 501(r), the FDCPA, the Gramm-Leach-Bliley Act ("GLBA"), the Fair Credit Reporting Act ("FCRA"), Regulation F, Identity Theft, Red Flags, Accuracy & Integrity, Bankruptcy, and more.

13. I have also actively engaged in regulatory outreach, including participating in a CFPB town hall in 2021 so that Director Chopra would have the opportunity to meet an actual member of the industry. At the town hall, I discussed rural banking in Montana and provided insight about my agency. Many interested parties, including banks and collection agencies attended this town hall and were prepared to answer questions from the CFPB. Despite the opportunity, the

CFPB elected not to ask about credit reporting from any industry stakeholders.

C.     **My Involvement in the CFPB's SBREFA, Notice, and Comment Process**

14.    The Rule was published in the Federal Register by the CFPB on January 14, 2025. Prior to the issuance of this Final Rule, the CFPB conducted a Small Business Regulatory Enforcement Fairness Act ("SBREFA") panel in October 2023, followed by publication of the Proposed Rule in the Federal Register on June 11, 2024 at 89 FR 51682.

15.    SBREFA is a regulatory process which requires certain agencies, including the CFPB, to obtain input on proposed rulemakings from members of the small business community. This process is intended to give small businesses a meaningful voice in regulatory developments, especially considering the economic burden that increased regulatory and compliance requirements place on small businesses as compared to their larger industry counterparts. Thus, the SBREFA process is meant to promote fairness for small businesses and provide a forum for these entities to share critical information with government agencies about the impact proposed rulemakings will have on their businesses, industry, and the American economy generally.

16.    I participated in the SBREFA process as a Small Business Entity Representative ("SER"). Through this process, I participated in industry discussions with the CFPB, provided feedback on the Bureau's first round of proposals, and identified significant issues with the proposals. I also submitted a comment letter as part of the SBREFA process.

17.    In my opinion, the SBREFA process was largely inadequate because it failed to include appropriate participants, and failed to fully comply with the procedural requirements of SBREFA. Specifically, the proposals circulated by the CFPB were incredibly vague and demonstrated a lack of understanding regarding the intersection between the healthcare industry, the medical billing industry, and the credit reporting industry. The SBREFA panel meetings and discussions were on an inappropriately short timeline. The CFPB failed to include key industry

5

stakeholders such as doctors and other medical or health care providers who would be directly impacted by the proposals that, in large part, now make up the Rule.

18. Following the SBREFA process, the CFPB published the Proposed Rule on June 11, 2024. I reviewed that Proposed Rule and found that many of the concerns raised by myself and other SERs during the SBREFA process remained unaddressed. It is my belief that the CFPB wholly ignored my SBREFA comment letter and the comments of other SERs, instead choosing to proceed with a Rule it knew was seriously flawed and would harm American businesses and consumers, including small businesses like CBS. CBS timely submitted a comment to the CFPB regarding the significant deficiencies in the Proposed Rule. It was over sixty pages long and included significant data informing the CFPB that the Proposed Rule would harm consumers, harm the healthcare industry, and cause significant negative market effects.

19. CBS, through its comment letter, provided data and estimates of CBS's cost of compliance for the CFPB to consider the impact of the rulemaking on the industry. Now, the CFPB has published the Rule, which contains the same flawed data, methodologies, and purported solutions. The Rule largely fails to consider the myriad problems, costs, and negative externalities raised by commenters, including CBS. It is unlawful and will irreparably harm my businesses, consumers, the credit and account receivables industries, and the American economy generally.

## II.
## THE RULE IS UNNECESSARY AND WILL HARM THE ECONOMY AND PEOPLE'S ACCESS TO MEDICAL CARE

**A.    The Rule's Restriction of Speech Directly Harms Me and CBS**

20. Federal law does not stop CRAs from providing medical debt information on credit reports. But under the Rule, no creditor can get information about consumer medical debts.

21. If there is no longer any utility in furnishing medical debt information to CRAs, CBS will stop furnishing medical debt information under this Rule. The Rule stops me and CBS

from conveying truthful speech about past due medical accounts to creditors in the United States.

22. The Rule, by suppressing accurate medical debt information from credit reports, removes a consequence for failing to pay amounts fairly owed. Without this consequence, consumers are less likely to pay. This hurts my revenue and also means healthcare providers are not compensated for their services. To address this, CBS and other agencies are more likely to use litigation to collect on accounts. Litigation is more costly for CBS, its clients, and consumers.

23. The cost to CBS to collect a hypothetical $1,500 account in Montana state courts is $127.50 in filing and service fees alone. That cost is included in the amount owed by the consumer, and therefore increases the total amount due from the consumer. In cases with higher balances at issue, these filing fees increase. In some cases, CBS may also add the cost of attorney's fees depending on the underlying contract with the consumer. Once CBS receives a judgment, we may garnish wages, tax returns, or funds in bank accounts. Before the Rule, if a consumer made a payment arrangement during a typical collections conversation, that consumer would have any number of choices about payment timing and amounts, but the Rule eliminates that option.

B.  **CBS Collects Accurate Medical Debt in Compliance with the FDCPA and FCRA**

24. CBS currently collects medical debts that are accurate and fairly owed. It has policies and procedures to ensure that medical debt accounts are accurate, that consumers receive accurate statements, that call agents provide accurate information, and credit reporting is accurate.

25. When a patient disputes a medical debt, they usually are incorrect and need help understanding their bill. In my experience, less than 1% of medical debt disputes received by CBS are actually inaccurate. The CFPB's data concerning credit reporting disputes and complaints about medical debt are inapposite. Complaints and disputes do not corroborate actual inaccuracies.

C.  **Consumers Already Have Adequate Protections**

26. CBS complies with the FDCPA, the FCRA, Regulation F, the GLBA, HIPAA, and

numerous other laws. These, and many state laws, already address the CFPB's concerns related to inaccurate credit reporting and consumer privacy. Under the FCRA, when CBS receives a medical debt dispute, it follows this process: if the dispute is made within the validation period, CBS suspends the account, contacts the client, and verifies or corrects the disputed information. Then, CBS informs the consumer of the results and unsuspends the account. If the dispute is received beyond the validation period, CBS reviews the dispute against client records and responds to the consumer if appropriate. Consumers also have protections through the No Suprises Billing Act.

27. Finally, Healthcare Financial Management Association ("HFMA") and ACA International, in 2020, jointly published the 2nd edition of Best Practices for Resolution of Medical Accounts with input from consumer groups and providers. These Best Practices further enhanced controls over credit reporting, and purposefully arrived at a recommended standard that causes furnishers to wait 120 days from the date of first discharge billing to begin credit reporting. This recommendation ensures accuracy in the final adjusted amounts and provides time for the consumer to file a claim with the third-party payer (usually insurance) if needed.

28. The Bureau appears to have issued the Rule as a solution to medical billing or insurance denial issues, but a back-end approach is not a solution to a front-end concern. The risk of inaccurate credit reporting is already well regulated by a number of existing laws.

D.     **The Rule Will Damage the Healthcare System in Multiple Ways**

29. The Rule disincentivizes consumers to pay their medical debts. People pay their debts so they are attractive to lenders. Likewise, people avoid becoming delinquent on their debts because they understand negative marks on their consumer reports will hinder their eligibility for credit in the future. But if a debt is not reflected on their report, some consumers believe they don't need to pay it. For those that do understand they still have an obligation to repay, there is little incentive to pay those debts if it will not impact their future credit eligibility.

30. When healthcare providers lose revenue due to this Rule, it will hurt the availability of medical care. I am aware of healthcare providers in Montana consolidating with other firms or closing their doors when they are not earning sufficient revenue. It is not uncommon for small towns to only be served by a few medical providers. If small providers cannot get paid, they may close or merge with a large company, leading to further market consolidation.

31. In rural parts of America, there is a dearth of healthcare access—including Montana. This Rule will make it harder for patients in rural areas to receive medical care. In parts of Montana, this may mean traveling dozens, or even hundreds of miles to access critical medical services. While this may be a matter of convenience for those who have the luxury of time, it could mean life or death for others. A likely result in rural areas like Montana is that a sick or injured person must drive 45 minutes or more to receive care. If the medical need is great enough to warrant ambulance services or an air lift, the consumer is then saddled with excessive costs for that emergency transport. For example, Eagle Ambulance stopped providing emergency medical services in Granite County, Montana in July 2023. According to a public article, reimbursement and payment were the main factors.

32. In my own experience, I have observed a marked decrease in the collection of medical accounts following the CFPB's rhetoric surrounding medical debt and the Bureau's position on removing it from consumer credit reports. I anticipate that some consumers will also stop paying for health insurance because there is no incentive to do so when a consumer can forego paying monthly premiums, incur healthcare costs, and then not pay them, without any real consequence. This, in turn, may result in a large reduction in insurance dollars, causing a reduction in coverage, services, or staff available to patients.

33. In my role as President-Elect of the Board of Directors of ACA International, I

participated in a webinar on July 10, 2024 wherein ACA members were polled on their experiences related to the Proposed Rule. In response to a query regarding whether they believed consumers would forego health insurance if credit reporting on unpaid medical debt ceased. Approximately 75% of responding members stated they believed there was a moderate to high chance that consumer views on the need for medical insurance would be impacted by the Rule and its suppression of credit reporting for medical debt.

**E.**     **Harm to Consumers**

34.     In my experience, when clients are not reaching revenue targets from collections, one of their options is to require consumers to pre-pay for services. I anticipate that this will become more frequent if my healthcare clients are unable to collect on accounts where service was provided before payment. This will cause significant harm to consumers because: (a) People may not seek and receive preventative care meaning small or preventable medical issues could grow into life-threatening emergencies; (b) People who cannot afford the out-of-pocket costs for care will be forced to use high-cost financing methods like credit cards, or forgo medical treatment all together; (c) People who cannot pay upfront will be denied access to care; and (d) The reduction in access to credit will lead some consumers to the black market for healthcare items.

35.     Indeed, during ACA's July 2024 webinar regarding the anticipated effects of the Rule, ACA members were asked, "What options do you see your own provider organization taking to mitigate losses from eliminating credit reporting – including overall behavior changes even if you don't credit report?" 72% of those polled responded that they would "require full or partial payment in advance from patients for non-emergency procedures." Over 38 % stated they would "start or increase the use of legal strategies for collection in-house or in partnership with third-party agencies." Over 15% responded that they would raise prices. More than 22% stated they would "send accounts to collection agencies earlier than we currently do" and over 24% stated

they would "send accounts to the early out process earlier than we currently do."

## III.
## THE RULE WILL CAUSE IRREPARABLE HARM TO CBS AND MY RIGHTS

36. If the Rule is not enjoined, CBS will face substantial and irreparable harm. To comply with the Rule by March 17, 2025, CBS must expend significant money and time to make compliance changes, including rewriting policies and procedures, re-negotiating contracts with medical clients, employee training, and system updates. There will also be the cost of hiring additional legal counsel if collections become more difficult, and increased litigation becomes necessary. Hiring in-house or outside law firms, and the cost of litigation may be approximately a $100-150 thousand dollars a year for CBS. CBS may need to update computer programs and software, invest in different technologies, and renegotiate contracts with vendors and third parties to accommodate the changing nature of each business and how they are covered by the FCRA.

37. The Rule interferes with our ability to conduct efficient collections at the same volume CBS currently collects, and therefore will result in a reduction of revenue. To offset the Rule's limitations, I anticipate increased call campaigns which will require additional staff to make more phone calls and send more letters. Employment hiring is extremely challenging, and it will be very difficult to increase my staff within just two months. I am concerned about attrition in current staff, by having limited resources due to loss of ability to collect. I need ample time to prepare CBS and my clients for such a large change.

38. I also expect a reduction of settlement options to consumers. Due to increased costs of collection and reduction in remedies under the Rule, healthcare clients and agencies will likely reduce offerings for discounts and settlements.

39. To reduce the risks and offset the costs created by the Rule, many small businesses, including CBS will likely reduce or restrict product and service offerings. For example, CBS is

considering removing its offering of credit reporting altogether and would also need to consider the cost/benefit of certain medical and governmental debt and could restrict certain accounts or balances from acceptance to our listing process.

40. These compliance and cost burdens are exacerbated for small businesses, like mine, who have fewer staff members and less in-house legal counsel. In some instances very specific client bases will be disproportionally impacted, and fewer resources will be available to devote to duplicative compliance requirements. The Rule is set to take effect on March 17, 2025. It represents a massive change, so small entities will need as much time as possible to take necessary measures to comply. It will be impossible for many small businesses, including CBS, to achieve full compliance by that deadline and we will be at risk of fines, penalties, and enforcement action.

41. The Rule and its departures from existing standards creates significant hardship for CBS. They will both cost time and money when implemented, and to maintain, draining the finite resource of CBS staff time and energy.

Pursuant to Local Rules, I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 16, 2025.

_____
Jennifer Whipple, President
Collection Bureau Services, Inc.