EXHIBIT
2

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |
|---|---|
| ACA INTERNATIONAL<br><br>and<br><br>SPECIALIZED COLLECTION SYSTEMS, INC.,<br><br>             Plaintiffs,<br><br>v.<br><br>CONSUMER FINANCIAL PROTECTION BUREAU; and ROHIT CHOPRA, in his official capacity as Director of the Consumer Financial Protection Bureau,<br><br>             Defendants. | Case No. 4:25-CV-00094 |

**SWORN DECLARATION OF ANDREW NIGRINIS IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

### I.   INTRODUCTION

1.      I, Andrew Nigrinis, am an economist at Legal Economics LLC, a consulting firm specializing in economic and statistical analysis. Prior to joining Legal Economics, I was the sole enforcement economist at the Consumer Financial Protection Bureau's ("CFPB" or "Bureau") enforcement division.

2.      I am over 18 years old and have personal knowledge of the facts sworn to herein and if called to testify, I could and would competently so testify. I submit this Declaration in

support of ACA International ("ACA") and Specialized Collection Systems Inc.'s ("SCS") (collectively, "Plaintiffs") Motion for Preliminary Injunction.

3.       If the CFPB's Final Rule, *Prohibition on Creditors and Consumer Reporting Agencies Concerning Medical Information (Regulation V)*, issued on January 7th, 2025 and published in the Federal Register at 90 Fed. Reg. 3276 (the "Rule"), becomes effective on March 17, 2025, the American credit markets will be irreversibly harmed with no opportunity for recompense. The CFPB failed to study and measure major foreseeable effects of this Rule and did not study and measure relevant data to understand the actual benefits of the Rule. Additionally, healthcare providers, creditors, debt collectors, and consumers will all face significant economic harm.

4.       Compliance with the Rule will fundamentally change the nature of the credit reporting industry and all those who rely on it to facilitate an efficient credit market. The Rule must be enjoined from taking effect or the accuracy and usefulness of the credit reporting system will be irrevocably damaged.

**A.  <u>Professional Expertise</u>**

5.       I earned a Ph.D. in Economics from Stanford University. I completed a master's degree in economics at Queen's University in Canada and my bachelor's degree at the University of Alberta in Canada. I won the economics medal at the University of Alberta. I was a Carmichael Fellow at Queens University and a Stanford Institute for Economic Policy Research Fellow at Stanford.

6.       Throughout my career, I have managed investigations related to allegations of unfair or deceptive practices, fair lending, disputes between financial services providers and lenders, allegations of mortgage and student loan servicing issues, credit card fees, debt collections, and dark patterns. I have also provided economic analysis of consumer financial

regulations and policies and have extensive experience with sampling and big data.

7.    While at the CFPB, I led the Bureau's economic analysis and evaluation of over 70 cases. Additionally, I have worked with State Attorneys General, the Department of Justice ("DOJ"), and Office of the Comptroller of Currency ("OCC") officials on various matters.

**B.  Summary of High Level Conclusions Regarding the Final Rule**

8.    I was originally hired by Brownstein Hyatt Farber Schreck, LLP, counsel for ACA, to provide my opinion concerning the possible economic impact of a potential rule restricting medical debt credit reporting on the consumer finance industry and medical providers, including small businesses during the Small Business Regulatory Enforcement Fairness Act ("SBREFA") process convened in October 2023. That opinion, *Economic Analysis of the Consumer Financial Protection Bureau's FCRA Rule Proposals*, was completed on November 6th, 2023, and is attached hereto as **Exhibit A** (hereinafter **Exhibit A**).

9.    Brownstein also asked me to provide my opinion concerning the economic analyses and empirical evidence used by the Bureau in the then-Proposed Rule on the Prohibition on Creditors and Consumer Reporting Agencies Concerning Medical Information (Regulation V), issued on June 11th, 2024 and published at 89 Fed. Reg. 51682 ("NPRM"). That opinion, *Economic Analysis of the Consumer Financial Protection Bureau's Prohibition on Creditors and Consumer Reporting Agencies Concerning Medical Information (Regulation V)*, was completed on July 8th, 2024, and is attached hereto as **Exhibit B** (hereinafter **Exhibit B**). Additionally, both of my comments reviewed other literature and studies produced by other economic professionals.

10.    Because the CFPB did not alter its economic analysis between the NPRM and the Final Rule, my studies apply equally to the Rule, now in its final form.

11.    To conduct my analysis, I started with the common sense logical chain that if it is harder to collect debt, then fewer debts are paid. This leads to losses to collectors, which are then

passed on to providers, which are similarly passed on to consumers and the like. My analysis and data interpretation sought to quantify the first step: namely the impact on debt collection due to the Rule.

12.    In both the SBREFA and notice and comment processes, I reviewed data compiled by ACA and its members regarding the economic impact of limits on credit reporting. I studied the impacts on the collection industry, medical providers, consumers, and the economy as a whole. In doing so, I did not account for growth in healthcare costs in an effort to be conservative with my cost estimates. Similarly, I did not account for indirect costs, such as increased litigation or reduced consumer welfare. I wanted to remain extremely conservative in my estimates to quantify the impacts of the Rule, and not accounting for these factors served that goal.

13.    My analysis showed that the CFPB did not provide a valid economic analysis of the impact of the Rule in several key areas. As it related to small businesses in particular, I outlined in **Exhibit A** some critical aspects of the problem created by the proposed Rule that the CFPB failed to analyze:

   a. The CFPB did not study whether providers will respond to reduced collections by refusing to provide credit and thereby cutting off access to healthcare services for consumers.
   b. The CFPB did not study whether healthcare providers will respond to the Rule by raising prices for all consumers.
   c. The CFPB did not study whether providers might request cash up-front for co-pays and deductibles, and whether this might result in disadvantaging consumers who cannot afford to pay these amounts all at once.
   d. The CFPB did not study the impacts to patient health from this Rule.
   e. The CFPB has also not examined how rural and underserved communities operating on thin margins could be impacted;
   f. Furthermore, the CFPB must evaluate whether changes in the ability to recoup payment causes shifts to a concierge model, which could further reduce access for low-income community members.

14.    My analysis also showed that the Rule would have many foreseeable economic

impacts—each of which the CFPB failed to evaluate. These Rule changes all stand to make fundamental changes to the credit ecosystem and, as a result, the economy at large. As outlined in **Exhibit A**, these include:

a. There would be increased uncertainty in consumer finance as predictive information is removed from credit reports;

b. Restricting the use of accurate information about valid debts would cause increased financing for unqualified borrowers. There is a strong possibility of more lending of the type that precipitated the financial crises;

c. There would be decreased access to credit for credit-qualified borrowers;

d. There would be an increase in difficulty in meaningfully repairing credit scores;

e. Medical providers would suffer a loss of income from non-payment of services. My very conservative estimate of direct losses in the first year is estimated to be $24 billion. My estimated range for the losses over time ranges from $82 billion to $655 billion;

f. There is a likely increase in litigation costs for medical providers to collect debts, including increased costs to consumers facing that litigation;

g. There is potential to harm consumers, including those without health insurance and many in protected classes;

h. There is a risk of health insurance markets entering a death spiral if young and healthy consumers who infrequently use health care forgo insurance due to not needing to pay for medical treatment.

15.     In sum: the CFPB proposed, and now enacted, a Rule with major impacts on consumers, lenders, small businesses, and the broader market that relies on credit reporting. All of this should have been studied—extensively—when the Rule was working its way through notice and comment procedures.

16.     The CFPB failed to study and measure major foreseeable effects of this Rule and did not study and measure relevant data to understand the actual benefits of the Rule. The result is a Rule that irrevocably damages the credit ecosystem.

## II. THE CFPB IGNORED CLEAR EVIDENCE OF THE USEFULNESS OF MEDICAL DEBT IN CREDIT UNDERWRITING

17.     The CFPB justifies the final Rule saying: Research has shown that medical debt

has limited predictive value for credit underwriting purposes. 90 Fed. Reg. 3297–98.

18.     The CFPB relies on a 2014 Model that "has raised questions about the predictive value of [medical debt]" to justify its Rule. This statement by the CFPB has two problems. First, the research into the predictive problems of medical debt has serious methodological issues. Second, the Bureau has misinterpreted the research's conclusion to justify its rulemaking.

19.     Methodologically, the CFPB's 2014 Model fails to effectively isolate the effect of medical debts on delinquency (or, their measure of risk). The research design assigned consumers into one category: medical (MM) debt and non-medical debt (MNM). Consumers were then stratified further: paid medical debts (MPM) and unpaid (MUM). The CFPB then studied delinquency by credit score for the MM and MNM groups over time. The problem is that an MM and a MNM are a mixture of credit lines. This is not a clean test of the effect of medical tradelines on a credit report at the margin.

20.     Without data on the composition of the groups, it is impossible to make an apples-to-apples comparison. We do know that medical debt is not random in the U.S. population. Medical debt falls most heavily on low-income counties with a high percentage of uninsured people. *See* Ex. B, ¶ 45, fn. 18. The CFPB's 2014 study does not use standard statistical controls for economic research. The effect of medical debt may be confounded by the income and healthcare policies of the states in which the people of the sample reside. But this analysis was not performed. Further, the CFPB's study is not published. Before using research to make major policy changes, the CFPB should open its code and data to the public for scrutiny.

21.     Even if we took the results at face value, the conclusion that medical debt tradelines can be removed with little impact on credit scores is false. The CFPB's own data shows an estimated credit score difference of 16 to 21 points for medical debts versus non-medical debts.

But in their example, the credit score of a consumer with medical debt tradelines is still almost 100 points lower than their score prior to the tradeline deletion, implying a large impact from the removal of medical debt tradelines under the Rule. There are methodological issues that make the estimates suggestive but not definitive. But the Bureau's work, on which they base policy, concludes that medical debts have a predictive value that their removal from credit reports would lose. The conclusion that medical debt has no predictive value is wrong.

### III. THE CFPB IGNORED EVIDENCE OF THE HARMS AND PROVIDED CONTRADICTORY JUSTIFICATIONS

22.     In my report, I stated that, with fewer repercussions for medical debt, consumers would not pay their medical debts under the proposed rule. Ex. B, ¶¶ 22–25. This revenue loss has multiple consequences: price increases, closures of practices with tight margins, and providers asking for prepayment in advance of services.

23.     The CFPB dismisses these results as unlikely because "CFPB expects that the reduction in health care provider revenue under the rule would be equal to no more than 2 percent of their total costs." 90 Fed. Reg. 3328. This analysis was not provided in the NPRM, nor did the CFPB provide further analysis or citations in the final Rule.

24.     But the CFPB's determination of a 2 percent increase in healthcare costs equates to $97.33 billion per year. Total Health Consumption Expenditures reported by CMS were $4.866 trillion in 2023.[1] Even if the 2 percent figure were limited to only hospital bad debt, this amounts to $30.39 billion per year based on 2023 CMS data. This figure is substantial and very likely to impact market behavior.

---

[1] https://www.cms.gov/data-research/statistics-trends-and-reports/national-health-expenditure-data/historical#:~:text=U.S.%20health%20care%20spending%20grew,For%20additional%20information%2C%20see%20below.

25.     Moreover, the CFPB contradicts its own analysis in the Rule when elsewhere the CFPB estimated a $900 million reduction in recoverable medical debt over 10 years under the rule. 90 Fed. Reg. 3322. Over ten years, the same 2 percent increase in costs estimated above is $973.30 Billion—not even accounting for yearly growth in healthcare costs. In sum, the CFPB has purported to study the costs of the rule to healthcare providers and arrived at figures that vary over ten years by over $972 billion.

26.     At no point has the CFPB conducted analysis of how consumers of private market healthcare providers can finance healthcare services under the Rule. The CFPB has yet to study whether providers will respond by refusing to provide credit and cutting off the consumers the Bureau purports to be helping from health services or whether healthcare providers will respond by raising prices on all consumers and hurting everyone, or if they will respond by requesting cash up-front for co-pays and deductibles, hurting low-income community members who can't afford to pay those all at once, thereby reducing their access to health care. The CFPB also failed to study whether any healthcare providers would be forced to exit the market due to decreased revenues.

27.     I summarized key findings regarding the economic impacts of the NPRM in **Ex. B**, ¶ 3 as follows:

    a.  The research shows that improved accuracy of credit reports, which this rule undermines, leads to an expansion of lending to reasonable risks and a reduction in poor risks. This is done by providing more credit at better terms to low-risk consumers while reducing access and raising costs for lower-risk consumers. Overall, this benefits businesses as profitability rises;

    b.  Medical account collections referred to third-party debt collectors will decrease by 8%, thus reducing revenue for medical service providers;

    c.  There will be increases in write-offs at the provider level as more patients interpret the message behind the message that medical debt should take a back seat to the priority of paying other debts;

    d.  The CFPB failed to assess whether the burdens associated with regulations could result in market exits for small medical care providers and debt collectors;

e.  Medical debt disproportionately impacts the South and Mid-West States;

f.  The CFPB, in their technical appendix, shows that medical debt is predictive of expected losses the credit card industry faces. But the CFPB used a faulty methodology and did not properly interpret or chose to ignore the results showing the harm removing medical debts would have on the credit system.

28.  I specifically reviewed the impact this Rule would have on the debt collection industry. To do so, I used a data set contributed directly to me by collection agency members of ACA. Ex. B, p. 50. These data contain 1,615 client accounts (not consumers, but 1,615 creditor organizations) from 19 self-reported debt collection agencies. This data include the number of referrals, collections, and the estimated impact of the rule change on liquidation rates of referred debts to collectors (or writing off debt) due to the changes. This data reflected the restrictions on reporting medical debts under $500—of course, the Rule restricts reporting of all medical debt balances.

29.  From this data, I reviewed the estimated change of liquidation of referred debts due to not credit reporting. **Exhibit B** contains a more complete analysis of the data, but the topline result is clear: the impact of the Rule on small businesses is substantial. *See* Ex. B, ¶¶ 89–105. Small collection agencies will suffer as the result of this Rule. The data is clear: smaller collection agencies will find it harder to collect.

30.  The struggles of debt collectors will be passed on to companies financing medical procedures and, ultimately, medical providers. The Rule will drastically affect the ability of small business physician practices to collect revenue via collections. This will have far-reaching implications. Small physician practices may resort to litigation to collect on lost revenue, or they may simply stop serving the same communities the CFPB claims to be protecting. Neither result is productive; both are the inevitable result of this Rule on a market-based healthcare system.

31.  My analyses also showed that the impact disproportionately hurts rural physicians.

Based on my analysis of the data, physicians in non-metro zip codes will experience a more considerable decrease in expected liquidations of referred debts. 10.4% of these lost accounts represent a substantial loss of revenue to collections on behalf of rural physicians.

32.     My analysis makes two things clear. First, the Rule has an outsized impact on small businesses, both collection businesses and small medical providers. The Rule makes it harder for collectors to collect—and harder for providers to get paid. Second, the CFPB should have conducted extensive analysis on that point. The impact on small businesses is so substantial that the CFPB cannot justify avoiding this analysis.

33.     As part of my broader analysis of the Rule, I evaluated collection dates (based on the data provided by ACA) when the new rules limiting the ability to report medical debts were already in effect. I noted in my report  that the collection rates continued to fall as time went on. *See* Ex. B, ¶ 5. My conclusion from this trend is that, while the initial impact of the reporting rule may have been baked into the data, the continued change in the collection rates by region suggests that the message behind the message is that medical debts do not need to be paid.

34.     This data paints a clear picture: the initial impact of limits on medical debt reporting have negatively impacted the collection of medical debt. Those trends have continued and showed no signs of slowing down.

35.     The CFPB shrugged off the impact of the Rule on debt collectors, critically relying on the fact that debt collectors could still bring litigation against consumers to collect on this medical debt. See generally 90 Fed. Reg. 3276, 3329 at § VII.E.4. But during the SBREFA Panel, the CFPB completely dismissed increased litigation as a non-issue. This complete change of position did not allow stakeholders such as ACA to properly study the impact of increased litigation costs under the Rule.

36.     As I stated in my report, *see generally* **Exhibit B**, the research in the arena of information relied upon for underwriting credit decisions irrefutably demonstrates facts and outcomes that advise against the implementation of the Rule.

## IV. THE CFPB FAILED TO CONSIDER CURRENT AND PROPER ECONOMIC DATA

37.     Despite the evidence presented regarding the massive change this Rule will bring to the credit ecosystem as a whole, the CFPB failed to adequately consider relevant economic data showing the scope of the impact. The easily predicable results of the Rule (which are outlined above) are clear enough to any rational observer. Yet, the commentary and analysis supporting the Rule failed to provide any quantitative or empirical evidence addressing these readily predictable results of the Rule.

38.     The Bureau relies on internal research that fails to predict or shed light on the expected consequences of its proposed rule. Specifically, the Bureau points to a 2014 study titled "Data Point: Medical Debt and Credit Scores," which suggests that medical debts are not as predictive as other types of unpaid. My specific concerns with this finding are discussed *supra*, ¶¶ 16–20.

39.     The other problem with this study, however, is that it uses data collected from October 2011 to September 2013 that predates significant policy changes such as the Medicaid expansion of the Affordable Care Act. As shown by the Urban Institute, this expansion notably decreased the percentage of uninsured people, a factor that significantly drives medical bills. Therefore, updating the data for any policy analysis today is crucial to ensure its relevance and accuracy. *See* Ex. B ¶ 47, fn. 19. Additionally, this work predates the changes to Regulation F and the No Surprises Billing Act that reduced medical debt tradelines on credit reports.

40.     The changes to Regulation F and the passing of the No Surprises Billing Act are

Case 4:25-cv-00094   Document 14-2   Filed on 01/24/25 in TXSD   Page 12 of 17

particularly relevant as, by the author's admission:

> "The account-level information that is included in the credit records comprising the CCP allows us to identify which debts reported by third-party collection agencies were from medical or non-medical bills. While we can identify those collections that were from medical bills, nothing in the data reveals anything about the identity of the medical service provider, the type of institution that provided the service, or the nature of the services that were performed."

This analysis cannot distinguish between medical debts that would have been removed by the No Surprises Billing Act and Regulation F. Given that these laws and regulations were intended to eliminate or regulate expensive emergency healthcare services, out-of-network charges, and debt misreporting, the remaining medical debts may be equally predictive as non-medical debts. This underscores the urgent need for further studies and consideration with data that is not a decade old. Without these, there is no way to tell.

41.     Further, the CFPB's research has not been subjected to rigorous peer review, nor has its results been scrutinized or validated. Opening its findings to public scrutiny is imperative for an institution that seeks to base its decisions on evidence. In economics, this is typically done through the publication of results. At the very least, the CFPB should grant industry stakeholders access to all data and codes, enabling them to verify the Bureau's results.

42.     By failing to do so, the CFPB sidesteps what is typically part of a normal—and healthy—scientific process. Peer review, especially review of data that will form the basis of enforceable regulations, is critical.

43.     The Bureau also heavily relies on a "Technical Appendix," frequently referencing it to justify their conclusion that removing medical debts from credit reports will not have negative consequences. This analysis is presented unusually, as it is not a report, blog post, or peer-reviewed study. The CFPB is presenting work that has not undergone a peer review process to verify its validity, nor have they allowed the industry to review the data or code used to generate the results.

Consequently, there is no way to validate these results, which, as I show in my report, Ex. B ¶¶ 60–71, have serious methodological issues. Given the implications of this work, the CFPB should be more transparent in its research.

44.     As an example of the issue with its approach, the CFPB used an inappropriate model in the technical appendix, resulting in biased outcomes. Their research relies on regression discontinuity (RD), which is based on a straightforward concept: a threshold variable determines on which side of the "quasi-experimental" treatment an observation falls. When applied correctly, this methodology enables causal analysis. The CFPB applied a regression discontinuity in time (RDiT) design to estimate the effect of reported medical collections on consumers' access to credit and the performance of credit account tradelines resulting from creditors' inquiries. While similar to RD, RDiT analyzes effects over time. However, this application of RDiT by the CFPB is inappropriate, leading to biased results.

45.     The CFPB acknowledges its work's limitations and potential biases, particularly with regression discontinuity in time designs when it states that such designs "can be biased if observations far from the threshold period are included for identification, possibly due to autoregressive properties or unobservable confounders." 90 Fed. Reg. 3357. Moreover, academic literature highlights concern about bias when consumers improve their credit behavior during the threshold period, subsequently applying for credit and maintaining improved behavior. The severity of this bias cannot be accurately assessed because the CFPB has not released the data and code to independent researchers for scrutiny and verification.

46.     The CFPB also states, "The key assumption of a regression discontinuity analysis is that nothing is changing discontinuously across the threshold besides the treatment." 90 Fed. Reg. 3357. Surprisingly, the CFPB would utilize a methodology requiring stability. The period

from 2017 to 2022 (which spans the data of the appendix) was marked by *significant instability* in the medical debt collection environment, including the COVID-19 crisis, student loan debt moratoriums, government cash payments, and the implementation of Regulation F at the federal level, alongside numerous state-level changes.

47.     The CFPB's heavy reliance on the Technical Appendix is but another instance of the CFPB failing to study and measure major foreseeable effects of this Rule.

## V. THE FINAL RULE IRREPARABLY DAMAGES THE AMERICAN ECONOMY

48.     The Final Rule negatively impacts the credit market as a whole, collectors of debt, healthcare providers, and consumers. The CFPB has ignored the significant and catastrophic economic impacts that will follow from the implementation of this Rule. This harm will be irreparable.

## A.     Impact on Credit Markets

49.     In a capitalist system, the healthy functioning of credit markets is critical to the nation's economic well-being. Policies that erode confidence in the credit system are destabilizing. This Rule is just that. If the ability of creditors to utilize and rely on medical debts is eliminated, some consumers will not pay those debts (and in some cases may even be unaware they exist). When these consumers fail to make timely payments, they may be pursued through litigation. Unfortunately, the social costs of litigation will be increased and borne by consumers. As more debt collectors and healthcare providers turn to the legal system, the consumers the Rule is intended to benefit will be forced to pay for litigation and court expenses. Litigation is a more expensive method to transfer resources from debtors to creditors than through informal resolutions like settlement agreements to pay contractual obligations outside the court system.

50.     Ultimately, if there is an increase in litigation, all consumers may face increased

financing costs or experience providers refusing patients who rely on credit, resulting in losing access to healthcare and making them net losers if the proposed regulation is enacted.

51.     Additionally, credit reporting is an extremely important tool to educate potential lenders. Medical debt may be unpleasant but it remains debt. Limits on reporting will result in unqualified borrowers obtaining access to lines of credit. This instability and increased faulty lending standards could cause another Great Recession-style collapse of the financial sector.

**B.    Impact on Collectors of Debt**

52.     The implications of this Rule on the debt collection industry are significant. Debt collection plays a vital role in financial markets, as it enforces the payment of contracts. This service, however, comes at a cost. The industry operates in a competitive environment, with fees aligning with costs. Therefore, any reduction in the effectiveness of collectors, as can be anticipated by this Rule, will likely lead to an increase in collection costs or a decrease in collectible amounts. These changes will ultimately be passed on to the consumers of these services—the companies providing financing.

53.     In **Exhibit B**, I walk through calculations on the cost of the Rule. The Rule's cost due to the inventory of medical debt lost is expected to be $17.6 billion. The annual loss will be $6.44 billion when the Rule becomes effective.  In addition, the Bureau conducted a separate analysis that "bad debt" costs would rise 2 percent, which is as much as $ 97.3 billion annually. Moreover, the annual loss will continue indefinitely. This will result in a monumental amount of money lost.

**C.    Impact on Healthcare Providers**

54.     It should be made clear: America has a market-based healthcare system, and with competitive pressures, systematically losing revenue cannot be written off. Losses for debt collectors will become losses to medical providers—and subsequently, their patients. Rational,

profit-maximizing firms will likely need to restrict financing or increase the cost of financing medical services based on easily verifiable data. This process is already underway, with many hospitals and medical providers requiring upfront payments.

55.     My data illustrates how referrals of debts for collections have increased. It is consistent with the data to hypothesize that the message consumers are getting is that they do not need to pay their medical debts. If true, this would result in providers receiving less compensation. This hypothesis should have been carefully studied before any new rules are promulgated because, ultimately, medical providers will need to protect themselves and deny care. This could result in heavier government or non-profit care usage or people going without medical treatments, goods, or services.

**D.    Impact on Consumers**

56.     Consumers, ultimately, will lose out. Consumers who gain by having their medical debt records removed or never reported will potentially suffer from worse financing terms or the inability to access health care and, ultimately, debt financing. Consumers who diligently pay their medical debts will not get credit for doing so but potentially lose access to medical access. A market-based health system without financing would be a terrible equilibrium.

57.     While I respect the CFPB's attempts to protect consumers, this Rule does just the opposite. Consumers may not like medical debt—but they also need medical services. These medical services must be paid for.

Pursuant to Local Rule, I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 17, 2025.

Andrew Rodrigo Nigrinis
Digitally signed by
Andrew Rodrigo Nigrinis
Date: 2025.01.17
19:48:02 -05'00'

Dr. Andrew Nigrinis