EXHIBIT
2-A

# Economic Analysis of the Consumer Financial Protection Bureau's FCRA Rule Proposals

By Andrew Rodrigo Nigrinis, Ph.D.

## Contents

Qualifications and Assignment ................................................................................................ 2

Summary of Conclusions ......................................................................................................... 3

Background .............................................................................................................................. 4

What is the purpose of credit scores? ..................................................................................... 8

    Effect on protected classes and others ............................................................................... 11

    Deterrence ............................................................................................................................ 12

    Credit Repair ....................................................................................................................... 15

Lack of analysis of the potential consequences ................................................................... 15

    2023 Model Critique ........................................................................................................... 17

    2014 Model Critique ........................................................................................................... 20

The CFPB needs a valid analysis of the consequences of the data brokerage changes they propose ..... 24

    The Attention Economy ...................................................................................................... 25

The effect of this rule on other industries ............................................................................ 27

    Case Study: Improved Credit Assessment .......................................................................... 27

    Case Study: Data Privacy .................................................................................................... 28

The impact of this rule on debt collection ............................................................................ 30

The effect of this rule on debt collectors .............................................................................. 38

The impact of this rule on medical providers ....................................................................... 39

The effect of this rule on medical consumers ....................................................................... 39

## Qualifications and Assignment

1.      I am an economist at Legal Economics LLC., a consulting firm specializing in economic and statistical analysis.  Before joining Legal Economics, I was the sole enforcement economist at the Consumer Financial Protection Bureau (CFPB) in consumer financial services. I led the Bureau's economic analysis and evaluation of over 70 cases. Throughout my career, I have managed investigations related to allegations of unfair or deceptive practices, fair lending, disputes between financial services providers and lenders, allegations of mortgage and student loan servicing issues, credit card fees, debt collections, and dark patterns. I also provided economic analysis of consumer financial regulations and policies and have extensive experience with sampling and big data. While at the CFPB, I worked with State Attorney Generals, DOJ, and OCC officials on various matters. I earned a Ph.D. in Economics from Stanford University. I completed a master's in economics at Queen's University in Canada and my bachelor's degree at the University of Alberta in Canada. I won the economics medal at the University of Alberta. I was a Carmichael Fellow at Queens University and a Stanford Institute for Economic Policy Research fellow at Stanford.

2.      Brownstein Hyatt Farber Schreck LLP hired me to provide my opinion concerning the economic analyses and empirical evidence cited in the Consumer Financial Protection Bureau's (CFPB) Proposed Rule addressing several consumer reporting topics under the Fair Credit Reporting Act (FCRA). Brownstein Hyatt Farber Schreck LLP also asked me to provide my opinion concerning the possible economic impact of the proposed rule on the debt collection industry and the

expected impact on the consumer finance industry. I am being compensated for this report.

## Summary of conclusions

3.      My review of the proposed changes to the regulatory framework of the FCRA is that the CFPB (Bureau) needs to do a meaningful analysis of the effects on consumers, lenders, small businesses, or the broader market that relies on credit reporting. The CFPB did not provide a valid economic analysis of the impact of the proposed rule:

- There would be increased levels of financing for unqualified borrowers.
- There would be decreased access to credit-qualified borrowers.
- There would be an increase in difficulty in meaningfully repairing credit scores.
- The loss of income to medical providers from losses due to non-payment for services.
- Potential increase in litigation costs to collect debts.
- There would be increased uncertainty in consumer finance as predictive information is removed from credit reports.
- The loss in consumer benefits from the internet if data brokerage rules materially reduce the effectiveness of digital marketing.
- There is potential to harm consumers without health insurance, chronic diseases, or protected class members.
- The unintended consequence would be the loss of predictive information on credit reports, which may result in more lending of the type that precipitated the financial crises that culminated in the formation of the CFPB.

- Expected liquidation rates of referred debts to collectors to lower by 10%.[1]
- Reduction in collections for physicians.
- Disproportionately impact the South and Mid-West States.

4.    The CFPB should have provided an analysis of the impact this rule will have on small business providers of healthcare services. There is no analysis of how consumers of private market healthcare providers can finance these services. The CFPB has yet to study whether providers will respond by refusing to provide credit and cutting off the consumers the Bureau purports to be helping from health services or whether healthcare providers will respond by raising prices on all consumers and hurting everyone, or if they will respond by requesting cash up-front for co-pays and deductibles, hurting low-income community members who can't afford to pay those all at once, thereby reducing their access to health care. They've also not studied if negatively impacted small and/or rural Providers will be an impetus for those physicians to move to urban areas or to change their practice models—such as to the concierge model, thereby reducing access for low-income community members.

## Background

5.    Medical debt tradelines are a large portion of consumer debt reported in the U.S. A recent CFPB study found that[2]

- From Q1 2018 to Q1 2022, the total number of collections tradelines on credit reports declined by 33 percent, from about 261 million tradelines in 2018 to about 175 million in 2022.

---

[1] I am using industry nomenclature. To decrease by 10% means the value of accounts collectors are collecting, "liquidating", has fallen by 10%. I.e., Collectors receive less from accounts referred to them.

[2] Market Snapshot: An Update on Third-Party Debt Collections Tradelines Reporting, Feb 2023

- Medical bills account for 68.9 percent of furnished collections by contingency-fee-based debt collectors, followed by telecommunications at 12.5 percent and utilities at 4.5 percent.
- Medical collections tradelines still constitute a majority (57 percent) of all collections on consumer credit reports.

The last point emphasizes how the Bureau's proposal to remove medical collections is a significant change in credit reporting with market-wide implications.  This rule will drastically reduce the information available to lenders on the creditworthiness of potential borrowers.

6.    The distribution of these medical debt tradelines around the U.S. is not random. The Urban Institute[3] produces the following graph with 2021 data:



FIGURE 1

**Percentage of Consumers with Medical Debt in Collections, August 2021**

☐ 0%-10%    ☐ > 10%-20%    ☐ > 20%-30%    ☐ More than 30%    ☐ N/A

**Source:** Urban Institute Analysis of August 2021 credit bureau data.
**Note:** N/A = not available because the sample size is too small.

---

[3] Blavin, Fredric, Breno Braga, and Anuj Gangopadhyaya. "Which County Characteristics Predict Medical Debt?." *Washington, DC: Urban Institute* (2022).

As can be seen from the national map, medical debt is overwhelmingly a problem for consumers in the rural Southern United States. The following table from the same report shows the ten counties with the highest percentage of consumers with medical debt compared to the U.S. average:

TABLE 1

**Counties with the Highest Share of Consumers with Medical Debt in Collections as of August 2021 and the Counties' Characteristics**

| County | State | Pop. | % with medical debt in Collections | % Uninsured | Avg. Income | % Hispanic | % Black non-Hispanic | % 6+ CCP |
|--------|-------|------|------------------|-----------|-----------|-----------|-----------|---------|
| Warren | GA | 5,215 | 50.5 | 13.0 | $53,077 | 1.0 | 58.4 | 20.3 |
| Greene | NC | 20,451 | 46.0 | 16.6 | $53,007 | 14.4 | 35.2 | 17.3 |
| Lenoir | NC | 55,122 | 44.7 | 12.5 | $56,708 | 7.9 | 40.0 | 20.3 |
| McDuffie | GA | 21,632 | 43.1 | 12.1 | $55,341 | 3.7 | 40.0 | 19.7 |
| Anson | NC | 22,055 | 41.6 | 11.1 | $52,077 | 3.0 | 44.6 | 19.5 |
| Nolan | TX | 14,738 | 40.9 | 19.0 | $64,120 | 36.3 | 4.2 | 24.5 |
| Pecos | TX | 15,193 | 40.8 | 18.1 | $68,797 | 71.4 | 3.3 | 16.4 |
| Brooks | GA | 16,301 | 40.7 | 18.1 | $60,621 | 5.9 | 34.9 | 23.7 |
| Haskell | TX | 5,416 | 40.6 | 20.8 | $49,230 | 25.4 | 3.3 | 17.2 |
| Harmon | OK | 2,488 | 40.3 | 15.2 | $65,261 | 29.7 | 6.0 | 22.8 |
| Average top 10 | | | 42.9 | 15.7 | $57,824 | 19.9 | 27.0 | 20.2 |
| Average top 100 | | | 36.9 | 14.8 | $57,825 | 19.2 | 23.6 | 20.5 |
| US | | | 13.9 | 8.8 | $88,607 | 18.7 | 12.1 | 17.7 |

**Sources:** Urban Institute Analysis of August 2021 credit bureau data combined with county-level characteristics (see table A.1 for additional details).

**Notes:** Pop. = population, CCP = chronic condition prevalence.

A few key takeaways can be gleaned from this table. Medical debts are high in counties with a high percentage of uninsured consumers. As of this writing, Texas and North Carolina have not implemented the Medicaid expansion. Oklahoma implemented the Medicaid expansion in July 2021 (just before the Urban Institute's analysis)[4]. These counties are in the rural South with low average incomes and a high percentage of a non-Hispanic Black population.  According to CMS data, the 6+CCP is the percent of the Medicare population with six or more

---

[4] The other states that have not implemented the Medicaid expansion are AL, GA, FL, KS, MS, SC, TN, WI, and WY.

out of 21 chronic conditions. It is a proxy for the underlying health of the people. Medical debt is concentrated in counties with high levels of chronic disease.

7.      The study then uses a machine learning algorithm to determine the factors most contributing to medical debt.  The following table shows the results:

FIGURE 3

**The Relative Importance of Predictors for Percentage with Medical Debt in Collections**



**Sources:** Urban Institute August 2021 credit bureau data combined with county-level characteristics (see table A.1 for additional details).
**Notes:** We use a machine learning random forest algorithm to predict the share of adults with medical debt in collections. Variable importance is calculated by adding up the improvement in the objective function given in the splitting criterion over all internal nodes of a tree and across all trees in the forest, separately for each predictor variable. In the implementation of random forest, the variable importance score is normalized by dividing all scores over the maximum score; the importance of the most importance variable is always 100 percent. AAPI = American Asian and Pacific Islander, AIAN = American Indian and Alaska Native.

Though this is not a causal analysis, it is informative. Counties with high levels of medical debt on credit reports are impoverished counties in politically conservative jurisdictions (that rely on market-based healthcare) with high percentages of

uninsured people.  The high levels of chronic disease in the Medicare population and the high rate of low-birth-weight live births point to a general problem of poverty. Medical debt appears not to be the problem but rather a symptom of decisions made in the medical system.  Removing medical debts from credit report tradelines will not fix people's inability to make payments. This solution will make financing financial services more difficult for people who require financing options.

## What is the purpose of credit scores?

8.     The fundamental question in assessing the proposed rule by the CFPB is, what is a credit score? The CFPB provides a basic answer: "A credit score is a prediction of your credit behavior, such as how likely you are to pay a loan back on time, based on information from your credit reports."[5]

9.     In practice, there are two dimensions. The first is the 3-digit score, and the second is the tradelines with information on a consumer's accounts. These accounts can be active, closed, delinquent, etc. The 3-digit score is meant to compress the data to a single number that predicts an adverse credit outcome (delinquency or default). Thus, each credit score can be the result of a multitude of factors. To paraphrase Tolstoy, each perfect credit score is alike, and each imperfect credit score is unique.

10.     The economic value of a credit report is to facilitate financing by allowing financing firms to assess the true riskiness of a potential borrower. The value of the credit score is increased by increasing its precision. Market forces determine the actual pricing of risk. Because of competition, firms cannot expect sustained long-

---

[5] https://www.consumerfinance.gov/ask-cfpb/what-is-a-credit-score-en-315/

run profits by mispricing risk. Nor can they be expected to remain solvent by extending credit to poor risks that are not profitable.

11.     Risk assessment is critical to efficient credit markets' functioning. Without information, all borrowers would be priced at the same terms. Market forces would ensure a fair equilibrium price of credit, and all would have credit extended at the same terms. However, a consumer with a history of paying debts should be considered a safer risk than one with a default history. Thus, the safer borrower is a profit center for the financing firm, and the risky borrower is a source of losses. If the safer borrower can be reliably identified, they can be provided better terms of financing that reflect their lower risk. Conversely, the poor risk would pay more to compensate for expected losses. Providing financing on the same terms forces good risks to pay more as an implicit subsidy to the poor risk customers. The poor risks gain, but the good risks lose.

12.     Credit scores and reports aim to identify the type of risk a consumer is. Both types of borrowers can be serviced by the financial markets but at different financing terms. This is a gamble, as safe risks can default, and risky customers can pay. However, the more information there is, the more nuanced and customized financial markets can be.  This may seem a remedial point, but it is fundamentally missing from the CFPB's proposal. The CFPB is proposing the degradation of credit reporting.

13.     As markets can segment consumers by risk, they can expand. As consumers are more finely judged by risk, more specialized financing can be available. Mechanisms such as collateral, the threat of credit reporting, and down payments can be deployed to reduce exposure to financing risks. Credit reporting facilitates this by allowing different customers to be given other options to reveal risk types (as an augmentation to a credit report) or to identify risk pools where risks can be

shared to extend credit. The increase in credit reporting accuracy makes companies more profitable by risk segment and expands the market for consumer credit.

14.    Credit reports are not definitive in credit decisions but are an essential input. The market is dynamic, and competition encourages experimentation to identify better risks. Credit reports and scores are valuable inputs but do not determine lending. Credit scores are used in mortgage markets, as are other metrics, such as loan-to-home value. Many firms have proprietary risk algorithms that use credit scores and reports as inputs. No one is obligated to use this data. However, if these data are degraded, there is no alternative input.

15.    The market will not use the information if medical debt tradelines do not identify risk. As will be shown later (Section 2014 Model Critique), the CFPB's research indicates that medical tradelines are informative in assessing a potential consumer's risk. However, given that there is no obligation to use credit report data, *if* medical debt had no value in assessing risks, then good risks, having depressed credit scores due to medical debts, were being offered bad financing terms. Enterprising firms would be incentivized to identify this mispriced risk and provide better financing terms. The business stealing effect is real, powerful, and disciplines markets. By removing medical tradelines, the CFPB is, on the one hand, eliminating valuable information for the pricing of risk or removing information the market would not use if it were not relevant.

16.    By the CFPB's admission, the market is responding. In the CFPB's 2023 report on medical debt, they state that "The FHFA has further announced that it will implement FICO 10T and VantageScore 4.0 as the credit scores that Fannie Mae and Freddie Mac will use as thresholds for screening in loans. These credit scores underweight or do not include medical collections, unlike the credit score models that FHFA-backed loans have historically used for screening-in

decisions."[6] Presumably, the market demanded credit scores that removed or underweight medical debt, and now the market has alternative credit scores that exclude or exclude underweight medical debt. If medical debt depresses credit scores in an uninformative manner for predicting delinquency, profits incentivize the market to incorporate these new tools.  The CFPB proposal is a solution without a problem.

### Effect on protected classes and others

17.    If the Bureau's proposed rule is implemented, a significant unintended consequence will be a restriction of lending to various protected classes.  The information on how much uncollected medical debt exists and who is not paying is well known (see background section). Financial firms in the market understand the distribution of this debt. Financial firms are under competitive pressure to maximize profits and avoid losses from lending to bad risks. It is common knowledge that medical debt predicts delinquency or default. As a result, financial firms will engage in statistical discrimination. Statistical discrimination occurs when there is imperfect information about individuals, such as their lending risk, but there is information about group averages. From the Urban Institute report,[7] it is well known that one of the most significant predictors of medical debt is the percentage of the non-Hispanic black population in a county. Lesser predictors are Hispanics, Asian Americans, and Native Americans percentages in a county. The market will use all the information it has due to competitive pressures. As firms try

---

[6] Alyssa Brown and Eric Wilson "Data Point: Consumer Credit and the Removal of Medical Collections from Credit Reports", *Washington, DC: CFPB* (2023). Pg24

[7] Blavin, Fredric, Breno Braga, and Anuj Gangopadhyaya. "Which County Characteristics Predict Medical Debt?." *Washington, DC: Urban Institute* (2022).

to avoid losses or be compensated for taking on extra risks, they will restrict access to credit to these protected classes or offer credit on worse terms.

18.     The Bureau's rule will disproportionately damage financing to the poor, sick, rural, and conservative populations. The Urban Institute also finds that counties with lower levels of income, significant levels of chronic disease, located in the rural South, and that voted for Trump over Biden have higher levels of medical debt. Income and chronic illness as indicators of the likelihood of holding medical debt are straightforward to explain as these populations interact with the medical system more and have lower levels of income to pay various co-pays and deductibles. The effect of the Bureau's rule on Southern counties that supported Trump is that the regions of the U.S. that supported Trump over Biden are more likely to rely on market mechanisms in their health care and are more likely to have uninsured populations due to not expanding Medicaid with the implementation of the Affordable Care Act. Any rule that makes the financing of medical debt more complicated will disproportionately affect jurisdictions that rely on market mechanisms and minimize the transfer of resources to poorer populations. Regardless of one's political views, profit-maximizing firms must restrict financing or increase the cost of financing medical services based on easily verifiable data.

Deterrence

19.     No analysis of the effect of removing medical debt from credit reports on the deterrence to consumers in not paying legal medical debts. In a simple model of deterrence, there are two actions. Pay the debt or not pay it. The probability of being caught is 100 percent, and not being caught is 0 percent. Thus, a consumer is deterred from not paying if the non-payment cost exceeds the alternative use of the

funds. Many people are cash-constrained, so a market without a legal deterrent is not feasible.

20.     This gets to the central failing of the CFPB's analysis of deterrence. It fails to account for the fact that deterrence is a continuum. Medical debts are medical income for medical goods and service providers. These providers need to be paid, and the market has three methods to ensure payment:

- Forgiveness or ignoring the debt and not reporting it.
- Report the debt to a credit reporting agency.
- Litigate to collect the debt in court.

The Bureau is proposing the end of reporting medical debts. This will allow for only one of two responses. The first is to refrain from reporting medical debts. The second is litigation for repayment.

21.     If the ability to report medical debts is eliminated, some consumers will not have medical debts reported, and some will see litigation. Currently, medical debts are only reported to credit reporting agencies if sent there by the debt collector or the health care provider. There will be a substitution from reporting medical debt to not reporting medical debts. Undeniably, these consumers will benefit. However, on the other end of the continuum, some firms will substitute credit reporting for litigation.

22.     The social costs of litigation will be increased and borne by consumers.  As more debt collectors and health care providers turn to the legal system, the consumers the Bureau's rule was intended to benefit will be forced to pay for litigation and court expenses. Although the civil judgment cannot be disclosed in a credit report, the civil judgment would still exist and can be discovered by checking public records.  From a social viewpoint, litigation is an expensive method to transfer resources from a debtor to a creditor and is a loss to society. All

consumers will bear the ultimate costs of this litigation since one can only estimate the bad debtors in advance through increased financing costs or by providers refusing to see patients who require credit. This loss of access to health care would make these and other consumers net losers if the Bureau's proposal is accepted.

23.    If there is no litigation over medical debts, then the Bureau's proposal would make medical debt payment voluntary. Since litigation is expensive for all parties (including debt collectors), the result would be a voluntary payment system if litigation is never used as a substitute for the loss of credit reporting. Some consumers will pay their debts due to strong cultural norms of honoring obligations. But this would quickly unravel the medical debt market. If health providers cannot expect to be paid for services rendered (even if it is just a deductible or co-payment), they will react to protect themselves. One option could be to raise prices to account for losses due to uncollectable medical debt. Another option would be to refuse to see patients who require financing. Finally, one option would be to require payments of cash up-front for the co-pay and deductible.  Or to require levels of collateral for patients based on their credit scores. It's realistic to expect some mixture of these options to unfold in the market. All these scenarios are inefficient and destructive for consumers. Specifically, bad for the consumers, the Bureau intends to assist with this policy.  Beyond that, if the Provider community, especially small or rural physicians and/or dentists, get too frustrated, they might move to urban areas, or they might switch their practices to the concierge model where they only take cash-paying patients, again leaving low-income community members without access to care.

## Credit Repair

24.    The credit score and tradelines are not constant but can be improved by consumer action. Credit scores are not one-way streets that only go down. Since failure to pay medical debts is predictive of default (see Section: 2014 Model Critique), clearing those debts is predictive of a consumer being a reasonable risk to lend to. Consumers can improve their credit reports by resolving medical tradelines – by paying off debts or correcting erroneous tradelines. This avenue for improving credit scores would be lost for those who want to improve them. The desire and actions to raise a credit score are often done before a major purchase, such as a house. A contrary opinion holds that removing all medical debts would raise credit scores. This is true, but the credit scores would be less predictive, resulting in more default risk and lower financing terms.  Those who diligently work to raise their credit scores would be denied the opportunity and lumped into a general risk pool, with those who do not resolve their medical debts and would not be able to signal to lenders their better risk profile through meaningful actions.


## Lack of analysis of the potential consequences

25.    The Bureau cites internal research that does not predict or illuminate the expected consequences of its proposed rule. There are many blog posts and documents, but everything comes down to two key pieces of research. The first is "Data Point: Consumer Credit and the Removal of Medical Collections from Credit Reports" from April 2023. This report finds a 25-point increase in credit scores after their last medical collection is removed. They also find that consumers with a medical collection deleted are more likely to have a first-lien mortgage inquiry. This is to be expected given that those who are in the market for a mortgage are active in clearing tradelines off their credit report.  Except for this

immediate consequence, there is no study of the general impact on medical debt collection or consumer credit. Second, the CFPB cites a 2014 work, "Data point: Medical debt and credit scores." This work finds that medical debts are not as predictive as other types of unpaid debt. This is an interesting result, but it is not to be interpreted as medical debt tradelines have no predictive power in credit scores. The Bureau repeatedly uses the less predictive claim to justify removing medical debt, which, according to the CFPB's research, would make credit reports less accurate.

26.    None of the CFPB's research has been peer-reviewed or had the results questioned or vetted.  If the CFPB seeks to make decisions in an evidence-based way, its results need to be open to public scrutiny. In economics, this is by publishing results. At the least, they should turn over all data and codes to industry to verify their results.

27.    Additionally, none of these results shed any light on the implications of their rule on consumer financial markets. A study should be conducted to determine the effect of their rule's implementation on medical debt payment. An investigation should be performed into how medical providers respond to falls in collections. The Bureau may be protecting consumer finance consumers, but these same consumers will also need to access healthcare services. Finally, the degradation of consumer credit reports will affect every industry that relies on them for risk assessment.  Currently, there are no Bureau studies or estimates in an evidence-based way to answer these preliminary concerns.

2023 Model Critique

28.    The 2023 report[8] by the CFPB Office of Research is the primary citation used to quantify the change in credit scores from removing medical debt credit lines. The authors find that the average person who removes medical tradelines of less than $500 has a 21-point increase in their credit score. For debts over $500, the increase is 32 points on average. This result is used to justify the potential for a significant consumer benefit by eliminating the reporting of medical debt.

29.    The study is based on an event analysis conducted by the Bureau and not on a more rigorous difference-in-differences analysis.  The Bureau's analysis is a simple event analysis that analyzes how credit scores change over time after removing a medical debt tradeline. However, time often cures credit scores as tradelines drop off credit reports. Old tradelines are often given less weight. Thus, a comparable group should be created to provide a basis for comparison. No control group is ever built. If a control group is included, the magnitude should fall significantly. A rise in credit score should happen regardless since removing negative information should make a consumer appear to be a safe risk. However, the magnitude of benefits is likely overstated by this analysis.

30.    The study constructs its measure incorrectly, which makes any accurate measurement of benefits impossible to interpret. The study uses as its sample consumers who have had a medical debt removed from their credit reports. This excludes consumers who never had a medical debt tradeline nor those who had medical tradelines and could not remove them.  An obvious hypothesis is that those who can have a medical debt tradeline removed are disproportionately likely to have a medical debt reported by mistake. Alternatively, they have clean records

---

[8] Alyssa Brown and Eric Wilson "Data Point: Consumer Credit and the Removal of Medical Collections from Credit Reports", *Washington, DC: CFPB* (2023).

with this anomalous tradeline. This means that these records included in the sample *are likely different from* those with a medical debt tradeline.

31.    The ability to remove medical debt tradelines means the consumers are different from the norm.  By actively monitoring and acting to clear up their credit reports, these consumers have shown diligence and attentiveness to their records, which likely means that the Bureau used a non-representative sample.

32.    The results indicate reverse causation. One of the results of this study shows that those who have cleared up a medical tradeline were more likely to have a first-lien mortgage inquiry. The authors responsibly acknowledge that "Because medical collections are not removed from credit reports randomly, the event study analysis does not provide causal evidence."[9] Simply put, are consumers removing medical debt tradelines because they intend to use more credit? Or is it because removing the medical tradeline gave them more access to credit? If it is the former, where consumers actively remove medical tradelines in anticipation of using credit, then the results are biased. A simple example is a consumer who is planning to purchase a home. When buying a home, it helps to have a higher credit score. But also, the need to save for a downpayment and clear up old debts and tradelines results in a behavioral change involving removing medical tradelines as part of a general move to boost their credit score. Thus, the analysis is overstating the benefits of the medical tradeline removal as it is concurrent with other changes. The results are most likely a mixture of the two effects. But, the results of this research would be overstated.

33.    Additionally, the study design allows consumers to remove multiple medical tradelines. In a more rigorous difference-in-differences design, repeated treatment of the change in credit reports from medical tradeline removal would bias the

---

[9] Alyssa Brown and Eric Wilson "Data Point: Consumer Credit and the Removal of Medical Collections from Credit Reports", *Washington, DC: CFPB* (2023). Pg.25

results. Recent work has shown that the formation of the groups and the frequency and timing of treatment would radically change the results.[10]

34.    The data used is out of date. The data used in this study is from March 2011 to June 2022, where medical collections were removed between June 2012 and December 2020. The first problem is that data is being used from vastly different time periods with no statistical controls. The data from the COVID-19 period is different from pre-COVID data. And hopefully, it will not be comparable to future data. During COVID, there were massive transfers from government to consumers. Additionally, student loan payments were suspended. It is shown in another Bureau research that consumers with medical debt delinquencies are also likely to have student loan delinquencies. The increase in credit scores from removing medical debt tradelines may result in consumers having more resources to devote to student loan debt. The pre-COVID period was before the implementation of the changes to Regulation F that decreased the expected number of reported medical tradelines.

35.    In the future, the results will be less informative. The No Surprises Act was enacted on January 1st, 2022,[11] which will reduce emergency services costs and out-of-network insurance bills. This will reduce the easier-to-challenge medical tradelines that may drive the Bureau's observed results. The No Surprises Act and Regulation F have already reduced medical debt tradelines on credit reports.

36.    Even if one accepts the results, the rise in credit scores shouldn't be surprising -- but the unintended consequences may be. The results of this study likely overstate the benefits to consumers from removing medical tradelines. But it

---

[10] Technical note: To estimate the effect would require a difference in differences instrumental variables analysis as proposed in Baker et al (2022). The decision to seek out medical tradelines is potentially endogenous. In addition, repeated treatments that may also be endogenous will bias any results.

[11] "Complaint Bulletin: Medical billing and collection issues described in consumer complaints", *Washington D.C.: CFPB* April 2022

isn't a surprising result. Those who have negative information removed should have their credit scores increased. However, this research doesn't capture the unanticipated effects of this rule. It has no predictions for the increase in unpaid debts due to less deterrence from the possibility of having a negative tradeline. It does not estimate the cost to consumer lending markets from the degradation of credit reports that lenders rely on to assess risk. Nor does it quantify the higher borrowing costs borne by diligent and responsible borrowers with high credit scores. In short, the Bureau has identified the obvious beneficiary of this rule without studying the costs paid by others.

### 2014 Model Critique

37.    The subsequent major work that the Bureau cites to justify its claim that eliminating medical debt from credit reports is "Data point: Medical debt and credit scores" from May 2014. This paper is the source that justifies the following statement:

> "The CFPB has long-standing concerns about the usefulness of medical debt collections tradeline information in predicting a consumer's creditworthiness. For example, research by the CFPB and others has raised questions about the predictive value of this information."[12]

There are two problems with this statement. First, the research into the predictive problems of medical debt has serious methodological issues. Second, the Bureau has misinterpreted the research's conclusion to justify its rulemaking.

38.    The research splits consumers into two groups that fail to isolate the effect of medical debts on delinquency – their measure of risk.  Their research design assigns consumers into one category: medical (MM) debt and non-medical debt

---

[12] SMALL BUSINESS ADVISORY REVIEW PANEL FOR CONSUMER REPORTING RULEMAKING OUTLINE OF PROPOSALS AND ALTERNATIVES UNDER CONSIDERATION, September 15, 2023, Pg. 17

(MNM). They also do tests with unpaid and paid debts. That would be mostly paid medical debts (MPM) and unpaid (MUM). They then study delinquency by credit score for the MM and MNM groups over time. The problem is that an MM and a MNM are a mixture of credit lines.[13] This is not a clean test of the effect of medical tradelines on a credit report at the margin.

39.    By not providing data on the composition of the groups, it is impossible to make an apples-to-apples comparison.  We do know that medical debt is not random in the U.S. population.  Medical debt falls most heavily on low-income counties that have a high percentage of uninsured people.[14] This study does not use any standard statistical controls of economic research. The effect of medical debt may be confounded with the income and healthcare policy of the states in which the people of the sample reside. This analysis is not performed.

40.    The work is interesting but has yet to be peer-reviewed or published outside the CFPB.  Before using research to make major policy changes, the CFPB should open up its code and data to the public to scrutinize it.  A data-driven agency should welcome transparency.

41.    The data used needs to be updated for any policy analysis today.  The dates used are from October 2011 to September 2013. This data is more than a decade old. Specifically, it predates the Medicaid expansion of the Affordable Care Act, which decreased the percentage of uninsured people. The Urban Institute shows that a county's percentage of uninsured people significantly drives medical bills.[15] Additionally, this work predates the changes to Regulation F and the No Surprises

---

[13] Consumers with an even split are removed.
[14] Blavin, Fredric, Breno Braga, and Anuj Gangopadhyaya. "Which County Characteristics Predict Medical Debt?." *Washington, DC: Urban Institute* (2022).
[15] Blavin, Fredric, Breno Braga, and Anuj Gangopadhyaya. "Which County Characteristics Predict Medical Debt?." *Washington, DC: Urban Institute* (2022).

Act that reduced medical debt tradelines on credit reports. These final two changes are particularly relevant as, by the author's admission:

> "The account-level information that is included in the credit records comprising the CCP allows us to identify which debts reported by third-party collection agencies were from medical or non-medical bills. While we can identify those collections that were from medical bills, nothing in the data reveals anything about the identity of the medical service provider, the type of institution that provided the service, or the nature of the services that were performed."

This analysis cannot distinguish between medical debts that would have been removed by the No Surprises Act and Regulation F. Given that these rules were to eliminate or regulate expensive emergency healthcare services, out-of-network charges, and debt misreporting, the remaining medical debts may be equally predictive as non-medical debts. Without further studies, there is no way to tell.

42.    Even if we took the results at face value, the conclusion that medical debt tradelines can be removed with little impact on credit scores is false.  The authors have a motivating example:

> "To understand the approach we take, consider two consumers with identical credit records, at the start of the performance period, neither of whom has any collections. Because their credit records are identical, both will have the same credit score, say 780, and would be expected to have the same likelihood of delinquency during the ensuing performance period. Now assume that at the start of the performance period each of the consumers had a debt collection reported on their credit record, one a medical collection and the other a non-medical collection. If the scoring model treats medical and non-medical collections equally, then the scores of both consumers will be decreased by

22

the same amount. Using the estimates published by Johnson (2012), we might expect the scores of these consumers to be decreased by about 115 points relative to the starting assumed credit score of 780. Both consumers would now have scores of 665. Since lower credit scores suggest greater risk, lenders would interpret this as reflecting an increased likelihood of delinquency during the performance period."[16]

The authors are not saying that medical debt removal is irrelevant to the predictive value of the credit score. As they state:

"If the credit scoring model nonetheless treated both types of collections equally, these consumers would both have 665 scores. This means that, if medical collections are truly less predictive about a consumer's creditworthiness than are non-medical collections, consumers with medical collections should perform better."[17]

This work results in an estimated credit score difference of 16 to 21 points for medical debts. This is an average effect, and the impact will depend on the observed credit score level. But as a first-order approximation, it will give a decent approximation. So, in their example, an accurate credit score would be from 780 to 665 for non-medical debts and 665 plus 16 to 21 points, or 681-686 credit score for medical debt. Yes, medical debts are less predictive, but medical debt has an informative value (780 to 681-686) for risk assessment. There are methodological issues that make the estimates suggestive but not definitive. But the Bureau's work,

---

[16] Kenneth P. Brevoort and Michelle Kambara "Data point: Medical debt and credit scores", *Washington, DC: CFPB* (2014) Pg. 9
[17] Kenneth P. Brevoort and Michelle Kambara "Data point: Medical debt and credit scores", *Washington, DC: CFPB* (2014) Pg. 9

which they base policy on, concludes that medical debts have a predictive value that their removal from credit reports would lose.

43.    Given the competitive nature of consumer finance, once this issue is realized, the market will be incentivized to re-price risk based on medical versus non-medical tradelines. An example of this from the CFPB's work is that "The FHFA has further announced that it will implement FICO 10T and VantageScore 4.0 as the credit scores that Fannie Mae and Freddie Mac will use as thresholds for screening in loans. These credit scores underweight or do not include medical collections, unlike the credit score models that FHFA-backed loans have historically used for screening-in decisions."[18] Firms are not obliged to use credit scores and reports, but they often use them as part of their internal decision-making and can weight medical debt tradelines as they are compelled to by market forces.

## The CFPB needs a valid analysis of the consequences of the data brokerage changes they propose.

44.    In the proposed changes to data brokerage stating that:

"provide that consumer information provided to a user who uses it for a permissible purpose is a "consumer report" regardless of whether the data broker knew or should have known the user would use it for that purpose or intended the user to use it for that purpose."[19]

This overbroad definition could limit marketers' ability to use basic levels of consumer information for targeting ads.

---

[18] Alyssa Brown and Eric Wilson "Data Point: Consumer Credit and the Removal of Medical Collections from Credit Reports", *Washington, DC: CFPB* (2023). Pg.25

[19] SMALL BUSINESS ADVISORY REVIEW PANEL FOR CONSUMER REPORTING RULEMAKING OUTLINE OF PROPOSALS AND ALTERNATIVES UNDER CONSIDERATION, September 15, 2023, Pg. 7

## The Attention Economy

45.     One of the most interesting issues in digital economics is that a plethora of content and services are provided at zero prices on the Internet.  This has led to an interest in "Attention Markets."  Attention markets are where consumers consume content, and advertisers offer advertisement placements. The value of these ads increases the more they are customized to a customer's profile.  A personal finance blog may serve up mortgage or credit card ads. If customers are sub-prime and view the page to get advice, then ads for credit products aimed at sub-prime consumers are beneficial. Alternatively, diligent consumers who read about personal finance and have super-prime credit would benefit from advertisements for consumer products specialized for them.  Both types of consumers may visit the webpage or App.  Thus, the ability to buy data to target individuals or sub-groups makes the ad placement more profitable. This ad-driven model is the primary funding source for the free services of Google, Facebook, and many websites and Apps.[20]

46.     The value of the Attention Economy is enormous, and any regulation that shrinks it can be economically destructive.  The most recent estimate of the internet portion of the Attention economy by Evens (2020)[21] is determined by looking at the time Americans spend on these services.  The value of time is the implicit price being paid for these free goods.  In 2019, Americans spent 514 billion hours on ad-supported content. The time value used was $13.60 per hour, taken from a U.S. Department of Transportation study. This led to a valuation of $7 trillion for ad-supported content in 2019.  Because this value is so high, I include other valuations as cited by Evans:

---

[20] An interesting take is on the personal finance blog Mr. Money Mustache https://www.mrmoneymustache.com/2011/06/01/an-experiment-with-blog-moneymaking/
[21] Evans, David S. "The economics of attention markets." *Available at SSRN 3044858* (2020).

| Study | Summary | Yearly Value Per U.S. Adult User of the Medium | Aggregate Yearly Value (in billions) |
|---|---|---|---|
| Brynjolfsson, Collis, and Eggers (2019) | Utilized online discrete choice experiments during 2017 to estimate the monetary compensation consumers needed to compensate losing access to various digital goods. | Search engines: $17,957 Social Media: $330 Online video: $274 Online music: $70 | $3,797 |
| Allcott, Braghieri, Eichmeyer, and Gentzkow (2019) | Used a Becker-DeGroot-Marschak mechanism to elicit Facebook users' willingness to-accept (WTA) to stay deactivated from Facebook for four weeks during 2018. | Facebook: $2,340 | $410 |
| Brynjolfsson and Oh (2012) | Used data on consumers time spent using the internet and their opportunity cost of time (income) to estimate consumer surplus from the internet during 2011. | Internet: $4,880 | $928 |
| Goolsbee and Klenow (2006) | Used data on consumers time spent using the internet and their opportunity cost of time (income) to estimate consumer surplus from the internet during 2005. | Internet: $2,053 - $3,120 | $287-436 |

Note: Authors' estimates are multiplied by a factor that represents my estimate of the proportion of the media that is accounted for by an ad-supported model. If the author estimates are on a per-user basis, I compute aggregate valuations based on estimates of the number of U.S. adults that use the media form. See Appendix B for details.

The Brynjolfsson and Oh[22] estimates are from the most defensible methods. In 2011, this was $928 Billion **a year** in value. This would be about $1.2 trillion in 2023.  If the data brokerage rules reduce the value of ad-supported content by a mere 1%, then $12 Billion of economic value could be destroyed **annually**. Of course, the CFPB has no estimates on how they will affect this market. With

---

[22] Brynjolfsson, Erik, Seon Tae Kim, and Joo Hee Oh. "The attention economy: measuring the value of free goods on the internet." *Information Systems Research* (2023).

numbers this large, the Bureau should proceed carefully and analyze the implications of restricting data access.

## The effect of this rule on other industries

47.    The CFPB needs to study the effect a degradation in the quality of credit reports would have on the consumer finance lending industry. Currently, analysis has yet to be done on the end users of the credit reports and the potential consequences of removing the predictive information in the medical debt tradelines. Below are two case studies based on academic work.

### Case Study: Improved credit assessment

48.    Few studies document how improving credit scoring affected lenders and lending. The Bureau is proposing reducing the information value, i.e., degrading, of the credit reports by removing predictive information about risks faced in consumer lending to potential consumers. Einev et al. (2013)[23] studied the effects on a car dealership with a few locations that provided auto financing in a low-income, high-risk market. This firm operates in a high default population where profitability depends on identifying consumer risk quality. Furthermore, the firm matches cars (high or low value) to consumers and offers customized lending terms.  It is important to remember that computational, data-intensive, and readily available credit scores are a relatively modern phenomenon. Credit reports are ubiquitous today, but even 30 years ago, they were not commonly used. The benefits of credit reports to the financial markets are often taken for granted.

49.    This firm went from a low to a higher information environment. The lender adopted credit scoring by the end of June 2001. Before this, employees made judgments on credit based on information they elicited out of the sales process.

---

[23] Einav, Liran, Mark Jenkins, and Jonathan Levin. "The impact of credit scoring on consumer lending." *The RAND Journal of Economics* 44.2 (2013): 249-274.

This firm began using credit reports and inputting the information into its proprietary algorithms to assess risk. This is a case study of using data to make more informed decisions.

50.    The effects of improved risk assessment are apparent. The firm was able to identify better risks and extend more credit to them to increase profitability. This was achieved by more accurately identifying customers as low or high risks.  The company closed deals with less than half the high-risk customers than before. However, the default rate fell as the firm was better at avoiding bad risks. Additionally, as higher risks, they were required to put higher down payments for purchases. Credit became tighter for this population. The applicants identified as low-risk were able to take out bigger loans.

51.    The Bureau's proposed rule is to take this process of improving lending through predictive credit information backward. The proposed rule changes would result in credit reports being less accurate, and consequently, lenders in consumer finance will be less able to assess default risks. The low-risk borrowers will be less able to signal their lower risk level and have access to credit constrained.  Lenders will see a fall in profitability as they unwittingly take on risky borrowers.  This will result in more credit for the risky borrowers. But more defaults.

## Case Study: Data Privacy

52.    There are few studies about how the restriction in the flow of data through privacy laws affects consumer financial markets. Kim and Wagman (2015) study the effect of privacy on consumer finance on theoretical and empirical levels. They show that a firm's ability to sell consumer information can lead to lower prices, higher screening intensities, and increased social welfare. Empirically, they show their model is consistent with the fall in denial rates in home loans and refinancing in counties that adopted more stringent privacy regulations. Subsequently, these

counties had higher foreclosure rates in the 2007-2008 financial crises. This issue of unstable mortgage origination and high foreclosure during this exact crisis was the raison d'etre for establishing the CFPB itself.

53.     The motivation for this academic work was the 1999 enactment of the Gramm-Leach-Bliley Act (GLBA), allowing a variety of financial institutions to sell, trade, share, or give out nonpublic personal information about their customers. In their model, financial institutions use data to reduce customer service costs. Market competition results in cost savings passed to consumers via price cuts or better financing terms. For this to be profitable, firms use the newly available information more heavily to screen applicants, and as a result, potentially high-risk borrowers are denied credit. Thus, industry and borrowers, but not rejected applicants who would not have defaulted[24], benefit as consumer information increases.

54.     The test for this theory was when three out of five counties in the San Francisco-Oakland-Fremont Metropolitan Statistical Area (MSA) adopted a privacy ordinance on January 1, 2003, requiring consumers to opt-in to releasing information under GLBA.  Given most people's status quo bias, this effectively reduced the amount of privacy information lenders could access. By studying loan data of conventional home purchases at the census tract levels in these counties from 2001 to 2006, they established market behavior before and after the enactment of the privacy ordinance.

55.     The theoretical results are consistent with their empirical findings. The theory predicts that these weaker privacy laws would result in less screening of mortgage applicants. This would result in a fall in loan denial rates. But foreclosure rates eventually rise as these weaker risks are more likely to default. When looking

---

[24] Rejected applicants who would have defaulted would have benefited if the costs of default, e.g., foreclosure, is high.

at the data, the census tracts with higher shares of 2003-04 originated loans in the counties that enacted the privacy opt-in had a higher foreclosure rate. As the authors put it:

> "The results in this paper give rise to the conjecture that privacy acts may have played some role in the subprime mortgage crisis by weakening lenders' incentives to screen loan applications."[25]

56.    The Bureau's rule is essentially a privacy rule against medical debt tradelines. The result would be a move to a lower information environment. Only if consumers voluntarily disclose their medical collections history will lenders have a complete picture. This will result in more credit being available to unqualified borrowers.

## The effect of this rule on debt collection

57.    To quantify the magnitude of these proposed changes on debt collectors, I have used a data set contributed directly to me by collection agency members of ACA International (ACA). These data contain 1,615 client accounts (not consumers, but 1,615 creditor organizations) from 19 self-reported debt collection agencies. These data include the number of referrals, collections, and the estimated impact of the rule change on liquidation rates of referred debts to collectors (or writing off debt) due to the changes. This data reflected the restrictions on reporting medical debts under $500[26]. The Bureau is proposing restricting all medical debt balances—a more drastic rule with more drastic consequences. Unfortunately, a more rigorous analysis was not conducted due to the rushed nature

---

[25] Kim, Jin-Hyuk, and Liad Wagman. "Screening incentives and privacy protection in financial markets: A theoretical and empirical analysis." *The RAND Journal of Economics* 46.1 (2015): Pg. 7

[26] This change went into effect April 1, 2023. The credit reporting agencies also took two other actions prior to that (removing paid medical debt, and delaying credit reporting for a year), none of which has been empirically studied for potential degradation of the lending environment.

of the SBREFA process. However, this is more evidence of the effects of the proposed rule change on the industry than the Bureaus have conducted.

58.    The data is disproportionately weighted to California. California makes up 60.3% of the sample.  This is not a representative sample of the U.S.  However, I split the data into the four regions defined by the Census Bureau: North-East, Mid-West, South, and West.  Despite this aggregation, the general results will reflect the West and California.

Table 1: Data by Region

| region | Freq. | Percent |
|--------|-------|---------|
|        |       |         |
| Mid-West | 193 | 14.89 |
| North-East | 30 | 2.31 |
| South | 113 | 8.72 |
| West | 960 | 74.07 |
|        |       |         |
| Total | 1,296 | 100 |

The remaining observations did not have an identified State and, thus, region.

59.    The data includes referrals (amounts to be collected) and gross collections.  I used the 2nd Quarter data for 2022 and 2023. Debts might not be collected in the quarter they are referred so this approach is an approximation.  Figure 1 shows the referrals and collections for Q2 2022 and 2023 for the data collected by ACA.  This data will be skewed by who submitted the data. Referrals to collect increased in the U.S. increased in 2023 compared with 2022.  The cause of the increase in these referrals is unknown. However, this could result from providers receiving fewer payments for their medical services and consequently making more debt collection referrals. Gross collections remained stable from 2022 to 2023.



60.    The geographic distribution of the data does not reflect the data overall. The West constitutes about 74% of the data, but most collections originate in the Mid-West.

61.    The number of collections determines the size of the market, but the collection rate indicates whether payments are occurring. I find the collections rates by dividing gross collections by referrals for 2022 and 2023. The results by region are in Figure 2.  Collection rates are between 10-15%, with the Mid-West in 2022 as a high outlier and the South as a low outlier.



62.    The data was collected after new rules limiting the ability to report medical debts came into effect. Thus, the fall in collection rates in Figure 2 may already reflect the reduction in creditors' rights these last few years. The change in the collection rates by region suggests that the message behind the message is that medical debts do not need to be paid.  For the U.S., in Figure 2, the collection rate fell by 2.7%. However, this obscures meaningful differences within the U.S.  In the regions where obstructions to the reporting of medical debt have spread, the North-East and West (mainly California), we see a slight increase in collections or no change.  However, in the Mid-West and the South, there are large reductions in the collections of medical debts. This could be an anticipatory effect of the belief that debts would not have to be paid.  These amounts are large and could be a harbinger of future problems for the industry created by the proposed rule change. A good metric would be to see the decrease in expected liquidation rates of referred debts to collectors that could be attributed to limits to credit reporting.

63.     The ACA data has estimates if the rate of liquidation of referred debts to collectors is caused by ceasing credit reporting and indicates that it will decrease[27]. The data submitted by the ACA members show the expectations of a decrease in liquidation of referred debts due to the proposed rule, see Table 2.

Table 2: Estimate of Change in decrease of
Liquidation of Referred Debts Percentage
due to not Credit Reporting

|  | Mean | Median |
|---|---|---|
| **U.S.** | -10.1% | -4% |
| **U.S. less California** | -10.8% | -4% |
| **Mid-West** | -13.1% | -8% |
| **North-East** | -7.3% | -4% |
| **South** | -9.8% | -3% |
| **West** | -9.5% | -3% |

I present two sets of numbers, the mean and median response. The mean/average is the best estimate for the actual value, but extreme values may skew it. The median is a more conservative number.

64.     The effect of ending credit reporting on liquidation rates of referred debts to collectors varies by region. The overall amount decreases by 10.1% on average or a median of -4%.  Because the data is so heavily California-centric, I calculated the difference for the rest of the U.S. I get a slight rise in the average and the same median. By region, we see that the Mid-West will be most affected by the proposed rule changes—a shockingly high average decrease of 13.1% on average. Even the more conservative median value is an 8% decrease.

65.     The median values align with what has been seen elsewhere. In an amicus brief filed by the Nevada Hospital Association (NHA), the NHA estimated that an

---

[27] I am using industry nomenclature. To decrease by 10% means the value of accounts collectors are collecting, "liquidating", has fallen by 10%. I.e., Collectors receive less from accounts referred to them.

increase of a "cooling off" period on reporting medical debts to 60 days would result in an expected loss of 1.5% to 5% for 2022[28]. This proposed rule differs because the "cooling off" period is permanent.  Thus, the losses should be higher and align with the mean values reported in Table 2 (-9.5% in Western States). This is not proof but evidence that my estimates are reasonable.

66.    I repeat the exercise of observing the estimated liquidation rates of referred debts to collectors by medical specialty in Figure 3. Again, to be conservative, I graph the mean of the estimated rate and the median (which is more conservative).



The highest change is in GMD -- general medicine. These are primarily family physicians and general practitioners. The fall in expected liquidations of referred

---

[28] Brief for the Nevada Hospital Association as Amicus Curiae, *Aargon Agency, Inc. v. O'Laughlin*, 70 F.4th 1224 (9th Cir. 2023).

debts is 11.6%. Even the conservative estimate using the median is a 5.5% decrease.  Thus, industry is expecting a large decline in the local physicians' ability to collect revenue. Additionally, we see a considerable reduction in HOS, hospital services, DDS, dental services, SPC, specialty medicine, and MSC, miscellaneous (for difficult-to-categorize services). The Bureau has not considered how the impact will vary by medical practice. However, few businesses operating under market principles can sustain such sudden drops in revenue by collectors that will pass them on to medical practices.

67.    The impact on small businesses is substantial. Table 3 shows the data's decrease in expected liquidations of referred debts from small business clients[29]. The small business rate is slightly higher than the average for the U.S. The key takeaway is that this proposed rule change will drastically affect the ability of small business physician practices to collect revenue via collections.

Table 3: Small Businesses and Metro Area
Estimate of Change in Liquidation of
Referred Debts Percentage

|  | Mean |
|---|---|
| **Small Business** | -10.2% |
| **Non-Metro** | -10.4% |
| **Metro** | -9.9% |

68.    The impact disproportionately hurts rural physicians.  The data was matched via zip codes to the Rural-Urban Commuting Area (RUCA) defined by the U.S. Census Bureau. These codes measure census tracts and zip codes and the flow of people living in that area into a primary metropolitan area. For example, Hoboken, N.J., is part of New York City. The code I used for a business to be included in a

---

[29] I am using industry nomenclature. To decrease by 10% means the value of accounts collectors are collecting, "liquidating", has fallen by 10%. I.e., Collectors receive less from accounts referred to them.

metro is 10% commuting or higher. This captures most suburban communities that use a metro area's medical facilities. Thus, my definition of non-metro is towns sufficiently far away from metro areas, so commuting is uncommon. Physicians in non-metro zip codes have a more considerable decrease in expected liquidations of referred debts. 10.4% of these accounts represent a substantial loss of revenue to collections on behalf of rural physicians.

69.    The impact on expected liquidation of referred debts in the data depends on whether a firm was already credit reporting delinquent accounts.  Table 4 shows the fall in the expected liquidations of referred debts for non-credit reporting collection agencies is -5.8% and -10.9% for credit reporters. This could be due to credit reporters being in States that severely limit their ability to report or collect debts, or it could be due to the type of medical debt collected. In the data, 84.7% of accounts are credit reporters; thus, the impact will be substantial if the proposed rule changes are implemented. This is consistent with the deterrent effect of credit reports. The removal of credit reporting causes a large decrease in liquidations. Firms that don't report to credit reporting agencies have already adjusted to this policy. However, non-credit reporters expect a fall of almost 6% since the message that medical debts need not be paid will be clear and well-known amongst borrowers.

Table 4: Credit Reporting and Usage of Legal System Estimate of Change of Liquidation of Referred Debts Percentage

|                              | Mean   |
|------------------------------|--------|
| **No Credit Reporting**      | -5.8%  |
| **Credit Reporting**         | -10.5% |
| **Do not use legal collections** | -10.9% |
| **Uses legal collections**   | -7.3%  |

70.    Using the legal system to enforce collections is an essential differentiator amongst collection firms, and consequently, the expected liquidation rate of referred debts decreases due to non-credit reporting.  In the deterrence section, I emphasized there were three levels of consequences for non-payment of debt. The first was not to have the debt reported or no consequence. The second was to report delinquency to the credit bureaus – the medium step. The third was to use legal collections. The data shows that 84.7% are credit reporters, but only 25% use legal collections.[30] Table 4 shows that collectors who do not use legal collections expect a fall of 10.9%, but firms that use legal collections expect only a 7.3% decrease. This difference cannot be known from this data, but presumably, this may be due to legal collectors planning to use the legal system to enforce their rights to receive payment.  If some debts could be collected via credit reporting but now require legal action, this would entail a net social loss due to the costs of the legal system.

## The effect of this rule on debt collectors

71.    The net effect of these data is to show a contraction in the debt collection industry.  Debt collection is a necessary part of financial markets. The service they provide is to enforce payment of contracts. They, of course, do this for a fee. It is a competitive industry, resulting in fees aligning with costs.  Thus, by reducing the effectiveness of collectors, the result will be a rise in collection costs or a reduction in collectible amounts, which will be passed on to their consumers –companies providing financing. Some firms will leave the market, reducing competition, employment, and options for collection companies and, by extension, healthcare providers.

---

[30] There is no limit to using credit reporting and legal collections. Given legal collections are more costly to initiate than a credit report, I assume legal collectors are credit reporters and that legal collections are an escalation in the collections process.

## The effect of this rule on medical providers

72.    The struggles of debt collectors will be passed on to companies financing medical procedures and, ultimately, medical providers. Without efficient debt collection, medical providers would have to raise the cost of financing or cut consumers off from medical services. America has a market-based healthcare system, and with competitive pressures, systematically losing revenue cannot be written off. The data shows net losses in collections can be over 5-10% and concentrated in rural areas and general medicine.  Given the competitive nature of this industry, much of these losses will be passed on to medical providers and subsequently – their patients. Further, this will be a systematic issue across the entire country. Unfortunately, there is no data documenting the losses to providers from the reduction in the ability to collect medical debts. Given that Americans pay co-pays, deductibles, and out-of-pocket expenses in market-based healthcare, this amounts to a large portion of provider's incomes being put at risk by the proposed Bureau rule change.  However, in Figure 1, I have shown how referrals of debts for collections have increased. It is consistent with the data to hypothesize that the message consumers are getting is that they do not need to pay their medical debts. If true, this would result in providers receiving less compensation. This hypothesis should be studied before any new rules are promulgated because, ultimately, medical providers will need to protect themselves and deny care. This could result in heavier government or non-profit care usage or people going without medical treatments, goods, or services.

## The effect of this rule on medical consumers

73.    The final stakeholder who will ultimately lose is the consumer of medical services.  Consumers who gain by having their medical debt records removed or never reported will potentially suffer from worse financing terms or the inability to

access health care and, ultimately, debt financing. Consumers who diligently pay their medical debts will not get credit for doing so but potentially lose access to medical access. A market-based health system without financing would be a terrible equilibrium.


_Andrew Nigrinis_

Andrew Nigrinis, Ph.D.

November 6th, 2023