EXHIBIT
2-B

# Economic Analysis of the Consumer Financial Protection Bureau's Prohibition on Creditors and Consumer Reporting Agencies Concerning Medical Information (Regulation V)

By Andrew Rodrigo Nigrinis, Ph.D.

## Contents

Qualifications and Assignment ................................................................................................ 2

Summary of Conclusions ....................................................................................................... 3

Background ........................................................................................................................... 6

What is the Purpose of Credit Scores? ................................................................................. 10

    Effect on Protected Classes and Others .......................................................................... 14

    Deterrence ...................................................................................................................... 16

    Credit Repair .................................................................................................................. 17

    Making the Ability to Repay Analysis More Difficult ..................................................... 19

Lack of Analysis of the Potential Consequences ................................................................. 20

    2023 Model Critique ...................................................................................................... 22

    2014 Model Critique ...................................................................................................... 26

    Recent Works ................................................................................................................. 30

    Proposed Rule Technical Appendix Research Critique ..................................................... 35

The effect of this rule on other industries ........................................................................... 43

    Case Study: Medical Bankruptcy .................................................................................... 43

    Case Study: Improved Credit Assessment ...................................................................... 47

    Case Study: Data Privacy ................................................................................................ 48

The impact of this rule on debt collection .......................................................................... 50

The impact of this rule on debt collectors .......................................................................... 60

The impact of this rule on medical providers ...................................................................... 65

The impact of this rule on medical consumers .................................................................... 66

Ensuring Research and Transparency: The CFPB's Mandate ................................................ 67

## Qualifications and Assignment

1.      I am an economist at Legal Economics LLC, a consulting firm specializing in economic and statistical analysis.  Before joining Legal Economics, I was the sole enforcement economist at the Consumer Financial Protection Bureau (CFPB) in the enforcement division. I led the Bureau's economic analysis and evaluation of over 70 cases. Throughout my career, I have managed investigations related to allegations of unfair or deceptive practices, fair lending, disputes between financial services providers and lenders, allegations of mortgage and student loan servicing issues, credit card fees, debt collections, and dark patterns. I also provided economic analysis of consumer financial regulations and policies and have extensive experience with sampling and big data. While at the CFPB, I worked with State Attorney Generals, DOJ, and OCC officials on various matters.  I earned a Ph.D. in Economics from Stanford University. I completed a master's degree in economics at Queen's University in Canada and my bachelor's degree at the University of Alberta in Canada. I won the economics medal at the University of Alberta. I was a Carmichael Fellow at Queens University and a Stanford Institute for Economic Policy Research fellow at Stanford.

2.      Brownstein Hyatt Farber Schreck LLP hired me to provide my opinion concerning the economic analyses and empirical evidence cited in the Consumer Financial Protection Bureau's (CFPB) Proposed Rule on the Prohibition on Creditors and Consumer Reporting Agencies Concerning Medical Information (Regulation V). Brownstein Hyatt Farber Schreck LLP also asked me to provide my opinion concerning the possible economic impact of the proposed rule on the debt collection industry and the expected impact on the consumer finance industry and medical providers. I am being compensated for this report.

## Summary of Conclusions

3.    My review of the proposed changes to the regulatory framework of the FCRA is that the CFPB (Bureau) has not done—but absolutely must—perform a meaningful analysis of the effects on consumers, lenders, small businesses, Providers, or the broader market that relies on credit reporting before promulgating the proposed rule. The proposed rule has many foreseeable economic impacts that the Bureau has not evaluated:

- Restricting the use of accurate information about valid debts would cause increased financing for unqualified borrowers.

- There would be decreased access to credit for credit-qualified borrowers.

- There would be an increase in difficulty in meaningfully repairing credit scores.

- The proposed rule would cause conflicting obligations on creditors under the Truth in Lending Act (TILA) and Regulation Z, particularly under the ability to repay provisions.

- There would be adverse effects if certain medical debts were excluded from underwriting decisions or consumer reports.

- Medical providers would suffer a loss of income from non-payment of services. The loss in the first year is estimated to be $24 billion. The estimated range for the losses over time ranges from $82 billion to $655 billion.

- There is a likely increase in litigation costs for medical providers to collect debts, including increased costs to consumers facing that litigation.

- There would be increased uncertainty in consumer finance as predictive information is removed from credit reports.
- There is potential to harm consumers, including those without health insurance and many in protected classes.
- There is a strong possibility of more lending of the type that precipitated the financial crises that culminated in the formation of the CFPB.
- There is a risk of health insurance markets entering a death spiral if young and healthy consumers who infrequently use health care forgo insurance due to not needing to pay for medical treatment.

The commentary and analysis supporting the proposed rule failed to provide any quantitative or empirical evidence addressing these readily predictable results of the rule. These predictions are informed both by modern economic theory and, specifically, research performed by other economists and myself. The research in the arena of information relied upon for underwriting credit decisions irrefutably demonstrates facts and outcomes that advise against the adoption and implementation of the proposed rule. In sum, curtailing the use of accurate information about consumer debt burdens is inefficient and places an undue burden on society:

- The research shows that improved accuracy of credit reports, which this rule undermines, leads to an expansion of lending to reasonable risks and a reduction in poor risks. This is done by providing more credit at better terms to low-risk consumers while reducing access and raising costs for lower-risk consumers. Overall, this benefits businesses as profitability rises.

- Medical account collections referred to third-party debt collectors will decrease by 8%, thus reducing revenue for medical service providers.

- There will be increases in write-offs at the Provider level as more patients interpret the message behind the message that medical debt should take a back seat to the priority of paying other debts.

- Assess whether the burdens associated with regulations could result in market exits for small medical care providers and debt collectors.

- Medical debt disproportionately impacts the South and Mid-West States.

- The CFPB, in their technical appendix, shows that medical debt is predictive of expected losses the credit card industry faces. I do not accept their methodology, but these estimated losses that the CFPB calculates are understated as they do not reflect the changes the proposed rule will have on medical debt collection.

4.      Furthermore, the CFPB should have provided an analysis of this rule's impact on small business healthcare service providers. Many consequences of the proposed rule have not been studied:

- There is no analysis of how consumers of private-market healthcare providers can finance these services.

- The CFPB has yet to study whether providers will respond to reduced collections by refusing to provide credit and thereby cutting off access to healthcare services for the consumers the Bureau aims to help or whether healthcare providers will respond by raising prices for all consumers, which would harm everyone. Additionally, providers might request cash up-front for co-pays and deductibles,

disadvantaging consumers who cannot afford to pay these amounts all at once, thus reducing their access to healthcare.

- The CFPB has also not examined how rural and underserved communities operating on thin margins could be impacted.
- Furthermore, it must evaluate whether changes in the ability to recoup payment cause shifts to a concierge model, which could further reduce access for low-income community members.

## Background

5.    Medical debt tradelines are a large portion of consumer debt reported in the U.S. A recent CFPB study found that:[1]

- From Q1 2018 to Q1 2022, the total number of collections tradelines on credit reports declined by 33 percent, from about 261 million tradelines in 2018 to about 175 million in 2022.
- Medical bills account for 68.9 percent of furnished collections by contingency-fee-based debt collectors, followed by telecommunications at 12.5 percent and utilities at 4.5 percent.
- The share of consumers with at least one medical collections tradeline dropped from nearly 20% in 2017 to 14% by March 2022.
- Medical collections tradelines still constitute a majority (57 percent) of all collections on consumer credit reports.

The last point emphasizes how the Bureau's proposal to remove medical collections is a significant change in credit reporting with market-wide implications.  This rule will drastically reduce the information available to lenders on the creditworthiness of potential borrowers.

---

[1] Market Snapshot: An Update on Third-Party Debt Collections Tradelines Reporting, Feb 2023

6.      The distribution of these medical debt tradelines around the U.S. is not random. The Urban Institute[2] produces the following graph with 2021 data:

FIGURE 1

**Percentage of Consumers with Medical Debt in Collections, August 2021**

0%-10%   > 10%-20%   > 20%-30%   More than 30%   N/A



**Source:** Urban Institute Analysis of August 2021 credit bureau data.
**Note:** N/A = not available because the sample size is too small.

As can be seen from the national map, medical debt is overwhelmingly higher for consumers in the rural Southern United States. The following table from the same report shows the ten counties with the highest percentage of consumers with medical debt compared to the U.S. average:

---

[2] Blavin, Fredric, Breno Braga, and Anuj Gangopadhyaya. "Which County Characteristics Predict Medical Debt?." *Washington, DC: Urban Institute* (2022).

TABLE 1

**Counties with the Highest Share of Consumers with Medical Debt in Collections as of August 2021 and the Counties' Characteristics**

| County | State | Pop. | % with medical debt in Collections | % Uninsured | Avg. Income | % Hispanic | % Black non-Hispanic | % 6+ CCP |
|---|---|---|---|---|---|---|---|---|
| Warren | GA | 5,215 | 50.5 | 13.0 | $53,077 | 1.0 | 58.4 | 20.3 |
| Greene | NC | 20,451 | 46.0 | 16.6 | $53,007 | 14.4 | 35.2 | 17.3 |
| Lenoir | NC | 55,122 | 44.7 | 12.5 | $56,708 | 7.9 | 40.0 | 20.3 |
| McDuffie | GA | 21,632 | 43.1 | 12.1 | $55,341 | 3.7 | 40.0 | 19.7 |
| Anson | NC | 22,055 | 41.6 | 11.1 | $52,077 | 3.0 | 44.6 | 19.5 |
| Nolan | TX | 14,738 | 40.9 | 19.0 | $64,120 | 36.3 | 4.2 | 24.5 |
| Pecos | TX | 15,193 | 40.8 | 18.1 | $68,797 | 71.4 | 3.3 | 16.4 |
| Brooks | GA | 16,301 | 40.7 | 18.1 | $60,621 | 5.9 | 34.9 | 23.7 |
| Haskell | TX | 5,416 | 40.6 | 20.8 | $49,230 | 25.4 | 3.3 | 17.2 |
| Harmon | OK | 2,488 | 40.3 | 15.2 | $65,261 | 29.7 | 6.0 | 22.8 |
| Average top 10 | | | 42.9 | 15.7 | $57,824 | 19.9 | 27.0 | 20.2 |
| Average top 100 | | | 36.9 | 14.8 | $57,825 | 19.2 | 23.6 | 20.5 |
| US | | | 13.9 | 8.8 | $88,607 | 18.7 | 12.1 | 17.7 |

**Sources:** Urban Institute Analysis of August 2021 credit bureau data combined with county-level characteristics (see table A.1 for additional details).
**Notes:** Pop. = population, CCP = chronic condition prevalence.

This table provides a few key takeaways. Medical debts are high in counties with a high percentage of uninsured consumers. As of this writing, Texas and North Carolina have not implemented the Medicaid expansion. Oklahoma implemented its' Medicaid expansion in July 2021 (just before the Urban Institute's analysis).[3] These counties are in the rural South, with low average incomes and a high percentage of non-Hispanic Blacks. According to CMS data, the 6+CCP is the percent of the Medicare population with six or more out of 21 chronic conditions. It is a proxy for the underlying health of the people. Medical debt is concentrated in counties with high levels of chronic disease.

7.     The study then uses a machine learning algorithm to determine the factors most contributing to medical debt.  The following table shows the results:

---

[3] The other states that have not implemented the Medicaid expansion are AL, GA, FL, KS, MS, SC, TN, WI, and WY.



FIGURE 3

**The Relative Importance of Predictors for Percentage with Medical Debt in Collections**

**Sources:** Urban Institute August 2021 credit bureau data combined with county-level characteristics (see table A.1 for additional details).

**Notes:** We use a machine learning random forest algorithm to predict the share of adults with medical debt in collections. Variable importance is calculated by adding up the improvement in the objective function given in the splitting criterion over all internal nodes of a tree and across all trees in the forest, separately for each predictor variable. In the implementation of random forest, the variable importance score is normalized by dividing all scores over the maximum score; the importance of the most importance variable is always 100 percent. AAPI = American Asian and Pacific Islander, AIAN = American Indian and Alaska Native.

Though this is not a causal analysis, it is informative. According to The Urban Institute, counties with high levels of medical debt on credit reports are impoverished counties that rely on market-based healthcare with high percentages of uninsured people.  The high levels of chronic disease in the Medicare population and the high rate of low-birth-weight live births point to a general problem of poverty. Medical debt appears not to be the problem but rather a symptom of decisions made in the medical system.  Removing medical debts from credit report

tradelines will not fix people's inability to make payments. This solution will make financing financial services more difficult for people who require financing options.

## What is the Purpose of Credit Scores?

8.      Because the proposed rule is designed to inflate what is commonly known as a "credit score" for persons with medical debt, one first must evaluate: What is a credit score? The CFPB provides a straightforward answer: "A credit score is a prediction of your credit behavior, such as how likely you are to pay a loan back on time, based on information from your credit reports."[4]

9.      In practice, credit assessment involves two dimensions. The first component is a credit score, which is usually three digits. The second is the tradelines containing information on a consumer's accounts. These tradelines can be active, closed, or delinquent, and importantly for this report, they are used to objectively determine the amounts a consumer owes to lenders and providers every month or in total balances. The three-digit score is derived from one of many predictive models that try to anticipate a consumer's likelihood of default on a given obligation.

10.     There are currently 16 distinct versions of the FICO Score used by creditors and other authorized users of personal credit data, such as landlords, utility companies, and companies performing certain pre-employment background checks. These are just a portion of the dozens of FICO® Score versions issued since 1989. For example, the FICO Auto Score 10 model is specially designed to

---

[4] CFPB, *What is a credit score?* (LAST REVIEWED: AUG 28, 2023, available at https://www.consumerfinance.gov/ask-cfpb/what-is-a-credit-score-en-315/ last accessed June 17th, 2024)

gauge the likelihood that a borrower will repay an auto loan. FICO Bankcard Score
10 adapts the scoring framework of FICO Score 10 to predict how borrowers may
pay their credit card bills.

11.     A credit report's economic value lies in its ability to facilitate financing by
enabling firms to accurately assess potential borrowers' riskiness. The precision of
a credit score enhances its value. Market forces determine the actual pricing of
risk. Due to competition, firms cannot expect to sustain long-term profits by
mispricing risk, nor can they remain solvent by extending credit to high-risk,
unprofitable borrowers.

12.     Risk assessment is crucial for the efficient functioning of credit markets.
Without reliable information, all borrowers would receive credit on the same terms,
as market forces would ensure a uniform equilibrium price. However, a consumer
with a history of timely debt payments should be considered less risky than one
with a history of defaults. Consequently, the less risky borrower becomes a profit
center for financing firms, while the risky borrower generates losses. By reliably
identifying safer borrowers, firms can offer them better financing terms that reflect
their lower risk. Conversely, higher-risk borrowers would pay more to offset the
expected losses. Providing financing on identical terms forces low-risk borrowers
to pay more, effectively subsidizing higher-risk customers. This benefits high-risk
borrowers but disadvantages low-risk borrowers.

13.     Credit scores and reports aim to categorize consumers based on their risk
levels. Both low-risk and high-risk borrowers can access financial markets but
receive different financing terms, such as varying credit limits and interest rates.
While there is always some uncertainty—low-risk borrowers may default, and
high-risk borrowers may repay—detailed information allows for more nuanced and
customized financial products. This fundamental but essential point is missing

from the CFPB's proposal. The CFPB is proposing the degradation of credit reporting.

14.    As markets segment consumers by risk, they can expand. More precise risk assessment allows for the availability of more specialized financing options. Mechanisms such as collateral, the threat of credit reporting, and down payments can be employed to mitigate financing risks. Credit reporting facilitates this process by enabling different customers to access various options to reveal their risk profiles or to identify risk pools where risks can be shared to extend credit. Enhanced credit reporting accuracy makes companies more profitable by better segmenting risk and expanding the market for consumer credit.

15.    Overall, credit scores and reports are fundamental in facilitating efficient credit markets by providing lenders with valuable information to assess borrower risk and tailor financing terms accordingly. As a former CFPB director stated:

> "Credit reporting is an important element in promoting access to credit that a consumer can afford to repay. Without credit reporting, consumers would not be able to get credit except from those who have already had direct experience with them, for example from local merchants who know whether or not they regularly pay their bills. This was the case fifty or a hundred years ago with "store credit," or when consumers really only had the option of going to their local bank. But now, consumers can instantly access credit because lenders everywhere can look to credit scores to provide a uniform benchmark for assessing risk. Conversely, credit reporting may also help reinforce consumer incentives to avoid falling behind on payments, or not paying back loans at all. After all, many consumers are aware that they should make efforts to build solid credit." [5]

Likewise, the current CFPB director has recognized that credit scores and reports are fundamental in facilitating efficient credit markets. He stated that including Buy

---

[5] CFPB, *Field hearing on new credit reporting supervision in Detroit, MI* (July 16, 2012, available at https://www.consumerfinance.gov/about-us/events/archive-past-events/field-hearing-on-new-credit-reporting-supervision-detroit-michigan/ , last accessed June 17th, 2024)

Now Pay Later balances in credit reports will enable lenders to make more informed decisions and avoid overextending credit to consumers. This same logic should be applied in the context of medical debt. Yet, in its proposal for medical debt, the CFPB leaves it to consumers to self-report their medical debt, thereby leaving lenders at risk of extending credit to individuals who cannot repay the loan.[6]

16.    Credit reports are not definitive in credit decisions but serve as essential inputs. The market is dynamic, and competition fosters experimentation to identify risks better. While credit reports and scores are valuable, they do not solely determine lending decisions. In mortgage markets, credit scores are used alongside other metrics, such as loan-to-home value ratios. Many firms use proprietary risk algorithms that incorporate credit scores and reports. Although the use of this data is optional, if its quality is degraded, no adequate alternative inputs are available.

17.    The market's response to medical debt tradelines is significant. The CFPB's research (Section 2014 Model Critique) demonstrates that medical tradelines are informative in assessing a potential consumer's risk. If medical debt had no value in risk assessment, consumers with depressed credit scores due to medical debts would be offered unfavorable financing terms. This would create an opportunity for enterprising firms to identify and capitalize on this mispriced risk by providing better financing terms. The business-stealing effect is a real and powerful force that

---

[6] CFPB, *Director Chopra's Prepared Remarks on the Release of the CFPB's Buy Now, Pay Later Report* (September 15, 2022, available at https://www.consumerfinance.gov/about-us/newsroom/director-chopras-prepared-remarks-on-the-release-of-the-cfpbs-buy-now-pay-later-report/ , last accessed June 17th 2024,) ("Overextension is also a significant issue in the broader credit card market as well, but is compounded by a host of issues we describe in the report. Additionally, consumer reporting companies have been slow to develop mature credit reporting protocols with respect to Buy Now, Pay Later. Mortgage lenders and auto lenders have raised concerns to me that the growth of Buy Now, Pay Later with no associated credit reporting makes it more challenging to know whether a borrower can afford a mortgage or auto loan. The Buy Now, Pay Later firms themselves also may have no idea how many other loans a consumer may have with other Buy Now, Pay Later providers.")

disciplines markets. By removing medical tradelines from underwriting considerations, the CFPB either eliminates valuable information for pricing risk or removes information that the market would naturally disregard if it were irrelevant.

18.    The CFPB's empirical analysis of the predictability of medical debts forms a feeble basis for the proposed rule. The study is deeply flawed—discussed at length below—and the results it purports to observe are nonconsequential. By the CFPB's admission, the market already factors into its scoring and underwriting decisions the inherent limitations on the predictability of medical debt at specific dollar amounts. Indeed, in the CFPB's 2023 report on medical debt, it is noted that "The FHFA has further announced that it will implement FICO 10T and VantageScore 4.0 as the credit scores that Fannie Mae and Freddie Mac will use as thresholds for screening loans. These credit scores underweight or do not include medical collections, unlike the credit score models that FHFA-backed loans have historically used for screening-in decisions."[7] This indicates that the market demanded credit scores that exclude or underweight medical debt, and such alternative credit scores now exist. If medical debt depresses credit scores in a way that is not informative for predicting delinquency, market forces driven by profit incentives will adopt these new tools.

### Effect on Protected Classes and Others

19.    If the Bureau's proposed rule is implemented, a significant unintended consequence will likely be a restriction of lending to various protected classes. Financial firms know the extent of uncollected medical debt and the demographics of those not paying (see background section). These firms understand the distribution of this debt and are under competitive pressure to maximize profits

---

[7] Alyssa Brown and Eric Wilson "Data Point: Consumer Credit and the Removal of Medical Collections from Credit Reports", *Washington, DC: CFPB* (2023). Pg24

while minimizing losses from lending to risky individuals. Medical debt is widely recognized as a predictor of delinquency or default—including bankruptcies. Knowing a borrower's medical debt helps assess their ability to repay, leading to more informed lending decisions.

20.    Financial firms may engage in statistical discrimination, which occurs when there is imperfect information about individuals' lending risk but information about group averages is available. According to the Urban Institute report[8], one of the most significant predictors of medical debt is the percentage of the non-Hispanic black population in a county, followed by lesser predictors such as the percentages of Hispanics, Asian Americans, and Native Americans. Due to competitive pressures, the market will utilize all available information. As firms seek to avoid losses or be adequately compensated for taking on additional risks, they may restrict access to credit for these protected classes or offer credit on less favorable terms.

21.    The Bureau's rule is expected to disproportionately impact financing for disadvantaged populations, including the poor, sick, rural residents, and conservative communities. According to the Urban Institute, these regions are more likely to rely on market mechanisms for healthcare and have larger uninsured populations due to not expanding Medicaid under the Affordable Care Act. Any regulatory measure that complicates medical debt financing will disproportionately impact jurisdictions reliant on market mechanisms and may exacerbate disparities in resource allocation to underserved populations. Profit-driven financial institutions will adjust their lending practices based on readily available data irrespective of political affiliations, potentially exacerbating inequalities in access to credit and healthcare services. Regardless of political views, profit-maximizing

---

[8] Blavin, Fredric, Breno Braga, and Anuj Gangopadhyaya. "Which County Characteristics Predict Medical Debt?." *Washington, DC: Urban Institute* (2022).

firms will likely need to restrict financing or increase the cost of financing medical services based on easily verifiable data. This process is already underway, with many hospitals and medical providers requiring upfront payments.[9]

## Deterrence

22.     The Bureau has yet to conduct an analysis of the effect of removing medical debt from credit reports on the deterrence to consumers from paying validly owed medical debts. In a simple model of deterrence, there are two actions: Pay the debt or not pay it. The probability of being caught is 100 percent, and not being caught is 0 percent. Thus, a consumer is deterred from not paying if the non-payment cost exceeds the alternative use of the funds. Many people are cash-constrained, so a market without deterrence to non-payment is not feasible.

23.     This gets to the central failing of the CFPB's analysis of deterrence. It fails to account for the fact that deterrence is a continuum. Medical debts are medical income for medical goods and service providers. These providers need to be paid, and the market has four market mechanisms to ensure payment:

- Forgiveness or ignoring the debt and not reporting it.
- Report the debt to a credit reporting agency.
- Litigate to collect the debt in court.
- In the longer term, the option to withhold credit allocation.

The Bureau proposes restricting lenders' access to credit reports with medical debt information. This will allow for only one of two responses: refraining from reporting medical debts or litigation for repayment.

---

[9] Melanie Evans, (2024) "Hospitals Are Refusing to Do Surgeries Unless You Pay in Full First", *The Wall Street Journal*, May 9th.

24.    If the ability to report medical debts is eliminated, some consumers will not have medical debts reported, and some will see litigation. There will be a substitution from reporting medical debt to not reporting medical debts; undeniably, some consumers will initially benefit from the change. However, on the other end of the continuum, some firms will substitute credit reporting for litigation. As a result, if the ability to report medical debts is eliminated, specific consumers will avoid having their medical debts reported. In contrast, others may face legal action from firms seeking to recover debts through litigation rather than credit reporting.

25.    Unfortunately, the social costs of litigation will be increased and borne by consumers. As more debt collectors and healthcare providers turn to the legal system, the consumers the proposed regulation is intended to benefit will be forced to pay for litigation and court expenses. Litigation is a more expensive method to transfer resources from debtors to creditors than through less formal agreements to pay contractual obligations outside the court system. Ultimately, if there is an increase in litigation, all consumers may face increased financing costs or experience providers refusing patients who rely on credit, resulting in losing access to healthcare and making them net losers if the proposed regulation is enacted. Specifically, consumers who face litigation will pay more and have less privacy than if a consumer debt was resolved through non-litigation means. On a market level, the proposed regulation would make medical debt payment voluntary if there is no litigation over medical debts.


Credit Repair

26.    Credit scores and tradelines are not fixed but can be enhanced through consumer action. They are not solely downward trajectories; consumers can take

steps to improve them. Since failure to pay medical debts predicts default (see Section: 2014 Model Critique), clearing such debts indicates a consumer's potential as a reliable borrower. Restricting credit reporting can greatly impact consumers aiming to enhance their credit scores and repair their credit history. One crucial method of boosting credit scores is addressing and resolving negative tradelines. If all medical and credit card debts are removed from credit reports, although this might temporarily boost credit scores, it would also diminish their predictive value regarding an individual's creditworthiness. Limiting credit reporting prevents diligent consumers from distinguishing themselves from those who neglect their financial obligations. Instead, all consumers may be grouped into a general risk category, making it harder for responsible borrowers to showcase their improved risk profile and access preferable financing terms. Limiting credit reporting undermines consumers' ability to effectively signal their creditworthiness to lenders. The CFPB's criticisms against the Buy Now Pay Later "BNPL" industry have been based on the need for credit reporting for consumers to build and repair their credit.

> "Until recently, few BNPL lenders furnished information about consumers to the nationwide consumer reporting companies (NCRCs). This lack of furnishing could have downstream effects on consumers and the credit reporting system. It could be bad for BNPL borrowers who pay on time and may be seeking to build credit, since they may not benefit from the impact that timely payments may have on credit reports and credit scores. It may also impact both BNPL lenders and non-BNPL lenders seeking to understand how much debt a prospective borrower is carrying."[10]

27.    The Bureau recognizes the value of credit reporting in incentivizing constructive behaviors that enhance credit scores. However, this opportunity for

---

[10] CFPB, *Buy Now, Pay Later and Credit Reporting*, (June 15th, 2022, available at https://www.consumerfinance.gov/about-us/blog/by-now-pay-later-and-credit-reporting/, last accessed on June 17th, 2024)

credit score improvement would be lost for individuals seeking to enhance their creditworthiness. The desire and efforts to improve a credit score often occur before significant purchases, like buying a house. Some argue that removing all medical debts would raise credit scores, which is true. However, these inflated credit scores would be less indicative of creditworthiness, leading to higher default risks and less favorable financing terms. Individuals who diligently work to enhance their credit scores would lose the opportunity to differentiate themselves and be grouped into a general risk pool with those who neglect to resolve their medical debts. As a result, they would be unable to demonstrate to lenders their improved risk profile through meaningful actions.

### Making the Ability to Repay Analysis More Difficult

28.    Under several regulations promulgated by the CFPB, lenders must verify a borrower's ability to repay a loan by considering underwriting factors like current debt obligations and monthly debt-to-income ratios. Typically, lenders rely on consumer credit reports to confirm this information. However, excluding medical debt from credit reports can distort the accuracy of these reports, potentially hindering lenders' ability to make accurate underwriting decisions. Research by the CFPB indicates that medical debts are less predictive of default – but still predictive. Because medical debts have *some* predictive value, rules to limit underwriting consideration of medical debts will damage the market.  The exclusion of valid and accurate predictive information about debt is contrary to the Fair Credit Reporting Act's objective of ensuring accuracy and fairness in credit reporting. Lenders may struggle to assess borrowers' accurate financial positions and capacity to fulfill loan obligations without access to complete credit reports, including medical debt information. As a result, removing medical debt from credit

reports complicates the ability-to-repay analysis mandated by federal law and undermines the fairness and precision of the lending process.

29.    The proposed rule would contradict regulations and enforcement actions the CFPB has previously engaged in related to an ability-to-repay analysis. In a legal action against an auto lender, the CFPB accused the lender of conducting an insufficient ability-to-repay analysis, deeming its failure to assess all payments as "abusive." The complaint asserts that the lender overlooked or didn't mandate dealers to inquire about the borrower's recurring financial obligations, including rent or mortgage payments and crucial monthly expenses like food, healthcare, or childcare. This contention is exemplified in the *Consumer Financial Protection Bureau v. Credit Acceptance Corporation* (1:23-cv-00038), filed in the Southern District Court of New York, where the CFPB criticized the lender for neglecting to consider recurring healthcare expenses and other debt obligations. Despite the absence of a mandate to evaluate weekly food and childcare expenses, the CFPB criticized the lender for its oversight in not accounting for these financial aspects in its credit extension decisions.


## Lack of Analysis of the Potential Consequences

30.    The Bureau relies on internal research that fails to predict or shed light on the expected consequences of its proposed rule. Two key pieces of research are frequently cited. The first, "Data Point: Consumer Credit and the Removal of Medical Collections from Credit Reports" from April 2023, notes a 25-point increase in credit scores after removing the last medical collection. It also finds that consumers with a deleted medical collection are likelier to have a first-lien mortgage inquiry. This Data Point proves little. It is well-understood that when individuals work to actively clear negative tradelines off their credit report, they

are more likely to be in the market for a mortgage. This Data Point fails to study anything beyond this immediate effect and has no informative conclusions about the broader impact on medical debt collection or consumer credit. The second cited work is a 2014 study titled "Data Point: Medical Debt and Credit Scores," which suggests that medical debts are not as predictive as other types of unpaid debt. While this finding is intriguing, it should not be interpreted as indicating that medical debt tradelines have *no* predictive power in credit scores. The Bureau frequently uses the less predictive claim to justify the removal or suppression of medical debt, which, according to the CFPB's research, would diminish the accuracy of credit reports and the underwriting based on credit reports.

31.    The CFPB's research has not been subjected to rigorous peer review, nor has its results been scrutinized or validated. Opening its findings to public scrutiny is imperative for an institution that seeks to base its decisions on evidence. In economics, this is typically done through the publication of results. At the very least, the CFPB should grant industry stakeholders access to all data and codes, enabling them to verify the Bureau's results.

32.    Additionally, none of these findings provide insights into the potential implications of the Bureau's rule on consumer financial markets. A comprehensive study should be conducted to evaluate the impact of implementing the rule on medical debt repayment. Furthermore, an investigation should explore how medical providers react to collection declines. While the Bureau may be aiming to protect consumer finance consumers, it's crucial to consider that these same consumers also require access to healthcare services. Lastly, the degradation of consumer credit reports will affect every industry reliant on them for risk assessment. The Bureau lacks evidence-based studies or estimates to address these initial concerns.

## 2023 Model Critique

33.    The 2023 report[11] by the CFPB Office of Research is the primary citation used to quantify the change in credit scores from removing medical debt credit lines. The authors find that the average person who removes medical tradelines of less than $500 has a 21-point increase in their credit score. For debts over $500, the increase is 32 points on average. This result is used to justify the potential for a significant consumer benefit by eliminating the reporting of medical debt.

34.    The 2023 Model has many serious errors and deficiencies, summarized immediately below and explained in the paragraphs that follow:

- The "event analysis" methodology is not as rigorous as a difference-in-differences analysis that incorporates a control group;

- The consumer records used in the study have inherent biases because they are comprised of only consumers who were able to have medical tradelines removed;

- The analysis overstates the benefits of medical tradeline removal concurrent with other changes. The results are most likely a mixture of effects;

- The data is outdated and is being used from vastly different time periods with no statistical controls;

- This research doesn't capture the unanticipated effects of this rule;

- The research does not reflect impacts from the No Surprises Act, enacted on January 1st, 2022;

35.    The study, as presented in the 2023 report by the CFPB Office of Research, is based on an event analysis conducted by the Bureau, which is not as rigorous as

---

[11] Alyssa Brown and Eric Wilson "Data Point: Consumer Credit and the Removal of Medical Collections from Credit Reports", *Washington, DC: CFPB* (2023).

a difference-in-differences analysis. The Bureau's analysis is a straightforward event analysis that tracks how credit scores change over time after removing a medical debt tradeline. However, credit scores often improve over time as tradelines are removed from credit reports. Old tradelines are typically given less weight. Therefore, a control group should be established for a more accurate comparison. Unfortunately, no control group has ever been created. If a control group were included, the magnitude of the results would likely decrease significantly. A rise in credit score should occur regardless, as removing negative information should make a consumer appear to be a safer risk. However, the analysis likely overstates the magnitude of the benefits.

36.    The study constructs its measure incorrectly, which makes any accurate measurement of benefits impossible to interpret. The study uses consumers who have had medical debt removed from their credit reports as its sample. This excludes consumers who never had a medical debt tradeline or those who had medical tradelines and could not remove them. An obvious hypothesis is that those who can have a medical debt tradeline removed are disproportionately likely to have a medical debt reported by mistake. Alternatively, they have clean records with this anomalous tradeline. This means that these records included in the sample *are likely different from* those with a medical debt tradeline.

37.    The ability to remove medical debt tradelines means the consumers are different from the norm. By actively monitoring and acting to clear up their credit reports, these consumers have shown diligence and attentiveness to their records, which likely means that the Bureau used a non-representative sample.

38.    The results indicate reverse causation. One of the results of this study shows that those who have cleared up a medical tradeline were more likely to have a first-lien mortgage inquiry. The authors responsibly acknowledge that "Because medical collections are not removed from credit reports randomly, the event study

analysis does not provide causal evidence."[12] Simply put, are consumers removing medical debt tradelines because they intend to use more credit? Or is it because removing the medical tradeline gave them more access to credit? If it is the former, where consumers actively remove medical tradelines in anticipation of using credit, then the results are biased. A simple example is a consumer who is planning to purchase a home. When buying a home, it helps to have a higher credit score. However, the need to save for a downpayment and clear up old debts and tradelines also results in a behavioral change involving removing medical tradelines as part of a general move to boost their credit score. Thus, the analysis overstates the benefits of medical tradeline removal concurrent with other changes. The results are most likely a mixture of the two effects. But, the results of this research would be overstated.

39.     Additionally, the study design allows consumers to remove multiple medical tradelines. In a more rigorous difference-in-differences design, repeated treatment of the change in credit reports from medical tradeline removal would bias the results. Recent work has shown that the formation of the groups and the frequency and timing of treatment would radically change the results.[13]

40.     The data used is out of date. The data used in this study is from March 2011 to June 2022, where medical collections were removed between June 2012 and December 2020. The first problem is that data is being used from vastly different time periods with no statistical controls. For example, the Affordable Care Act's provisions for Charity Care were enacted in December 2014. The data from the

---

[12] Alyssa Brown and Eric Wilson "Data Point: Consumer Credit and the Removal of Medical Collections from Credit Reports", *Washington, DC: CFPB* (2023). Pg.25

[13] Technical note: To estimate the effect , a difference-in-differences instrumental variables analysis would be required, as proposed in Baker et al. (2022). The decision to seek out medical tradelines is potentially endogenous. In addition, repeated treatments that may also be endogenous will bias any results.

COVID-19 period is different from pre-COVID data. And hopefully, it will not be comparable to future data. During COVID, there were massive transfers from government to consumers.[14] Additionally, student loan payments were suspended. It is shown in another Bureau research that consumers with medical debt delinquencies are also likely to have student loan delinquencies. The increase in credit scores from removing medical debt tradelines may result in consumers having more resources to devote to student loan debt. The pre-COVID period was before the implementation of the changes to Regulation F, which decreased the expected number of reported medical tradelines.

41.     In the future, the results will be less informative. The No Surprises Act was enacted on January 1st, 2022,[15] which will reduce emergency services costs and out-of-network insurance bills. This will reduce the easier-to-challenge medical tradelines that may drive the Bureau's observed results. The No Surprises Act and Regulation F have already diminished the presence of medical debt tradelines on credit reports. However, the primary component of the No Surprises Act, which involves obtaining an Advanced Explanation of Benefits, is still pending implementation. The anticipated benefits of this element, such as fostering increased competition and encouraging price shopping, have yet to materialize.

42.     Even if one accepts the results, the rise in credit scores shouldn't be surprising -- but the unintended consequences may be. The results of this study likely overstate the benefits to consumers from removing medical tradelines. But it isn't a surprising result. Those who have negative information removed should have their credit scores increased. However, this research doesn't capture the

---

[14] During COVID, people held the medical profession in very high regard and even referred to them as "Healthcare Heroes," and probably more patients were willing to pay their medical bills.

[15] "Complaint Bulletin: Medical billing and collection issues described in consumer complaints", *Washington D.C.: CFPB* April 2022

unanticipated effects of this rule. It has no predictions for the increase in unpaid debts due to less deterrence from the possibility of having a negative tradeline. It does not estimate the cost to consumer lending markets from the degradation of credit reports that lenders rely on to assess risk. Nor does it quantify the higher borrowing costs borne by diligent and responsible borrowers with high credit scores. In short, the Bureau has identified the obvious beneficiary of this rule without studying the costs paid by others.

## 2014 Model Critique

43.    The subsequent major work that the Bureau cites to justify its claim that eliminating medical debt from credit reports is "Data point: Medical debt and credit scores" from May 2014. This paper is the source that justifies the following statement:

> "The CFPB has long-standing concerns about the usefulness of medical debt collections tradeline information in predicting a consumer's creditworthiness. For example, research by the CFPB and others has raised questions about the predictive value of this information."[16]

This statement has two problems. First, the research into the predictive problems of medical debt has serious methodological issues. Second, the Bureau has misinterpreted the research's conclusion to justify its rulemaking.

44.    The research splits consumers into two groups that fail to isolate the effect of medical debts on delinquency – their measure of risk.  Their research design assigns consumers into one category: medical (MM) debt and non-medical debt (MNM). They also do tests with unpaid and paid debts. That would be mostly paid medical debts (MPM) and unpaid (MUM). They then study delinquency by credit

---

[16] SMALL BUSINESS ADVISORY REVIEW PANEL FOR CONSUMER REPORTING RULEMAKING OUTLINE OF PROPOSALS AND ALTERNATIVES UNDER CONSIDERATION, September 15, 2023, Pg. 17

score for the MM and MNM groups over time. The problem is that an MM and a MNM are a mixture of credit lines.[17] This is not a clean test of the effect of medical tradelines on a credit report at the margin.

45.    Without data on the composition of the groups, it is impossible to make an apples-to-apples comparison. We do know that medical debt is not random in the U.S. population. Medical debt falls most heavily on low-income counties with a high percentage of uninsured people.[18] This study does not use standard statistical controls for economic research. The effect of medical debt may be confounded by the income and healthcare policies of the states in which the people of the sample reside. This analysis is not performed.

46.    The work is interesting but has yet to be peer-reviewed or published outside the CFPB. Before using research to make major policy changes, the CFPB should open its code and data to the public for scrutiny. A data-driven agency built on trust and accountability should welcome transparency.

47.    The data used in this analysis, collected from October 2011 to September 2013, predates significant policy changes such as the Medicaid expansion of the Affordable Care Act. As shown by the Urban Institute, this expansion notably decreased the percentage of uninsured people, a factor that significantly drives medical bills. Therefore, updating the data for any policy analysis today is crucial to ensure its relevance and accuracy.[19] Additionally, this work predates the changes to Regulation F and the No Surprises Act that reduced medical debt tradelines on credit reports. These final two changes are particularly relevant as, by the author's admission:

---

[17] Consumers with an even split are removed.

[18] Blavin, Fredric, Breno Braga, and Anuj Gangopadhyaya. "Which County Characteristics Predict Medical Debt?." *Washington, DC: Urban Institute* (2022).

[19] Blavin, Fredric, Breno Braga, and Anuj Gangopadhyaya. "Which County Characteristics Predict Medical Debt?." *Washington, DC: Urban Institute* (2022).

"The account-level information that is included in the credit records comprising the CCP allows us to identify which debts reported by third-party collection agencies were from medical or non-medical bills. While we can identify those collections that were from medical bills, nothing in the data reveals anything about the identity of the medical service provider, the type of institution that provided the service, or the nature of the services that were performed."

This analysis cannot distinguish between medical debts that would have been removed by the No Surprises Act and Regulation F. Given that these rules were to eliminate or regulate expensive emergency healthcare services, out-of-network charges, and debt misreporting, the remaining medical debts may be equally predictive as non-medical debts. This underscores the urgent need for further studies and consideration. Without these, there is no way to tell.

48.    Even if we took the results at face value, the conclusion that medical debt tradelines can be removed with little impact on credit scores is false.  The authors have a motivating example:

"To understand the approach we take, consider two consumers with identical credit records, at the start of the performance period, neither of whom has any collections. Because their credit records are identical, both will have the same credit score, say 780, and would be expected to have the same likelihood of delinquency during the ensuing performance period. Now assume that at the start of the performance period each of the consumers had a debt collection reported on their credit record, one a medical collection and the other a non-medical collection. If the scoring model treats medical and non-medical collections equally, then the scores of both consumers will be decreased by the same amount. Using the estimates published by Johnson (2012), we might expect the scores of these consumers to be decreased by about 115 points relative to the starting assumed credit score of 780. Both consumers would now have scores of 665. Since lower credit scores suggest greater risk, lenders would interpret this as reflecting an increased likelihood of delinquency during the performance period."[20]

---

[20] Kenneth P. Brevoort and Michelle Kambara "Data point: Medical debt and credit scores", *Washington, DC: CFPB* (2014) Pg. 9

The authors are not saying that medical debt removal is irrelevant to the predictive value of the credit score. As they state:

> "If the credit scoring model nonetheless treated both types of collections equally, these consumers would both have 665 scores. This means that, if medical collections are truly less predictive about a consumer's creditworthiness than are non-medical collections, consumers with medical collections should perform better."[21]

This work results in an estimated credit score difference of 16 to 21 points for medical debts. This is an average effect, and the impact will depend on the observed credit score level. However, as a first-order approximation, it provides a decent estimate. So, in their example, an accurate credit score would be from 780 to 665 for non-medical debts and 665 plus 16 to 21 points, or 681-686 credit score for medical debt. Yes, medical debts are less predictive, but medical debt has an informative value (780 to 681-686) for risk assessment. There are methodological issues that make the estimates suggestive but not definitive. But the Bureau's work, which they base policy on, concludes that medical debts have a predictive value that their removal from credit reports would lose.

49.    The recent changes in medical collections reporting, initiated by the three nationwide credit reporting companies in March 2022, have significant implications for risk assessment in consumer finance. Once this issue is realized, the market will be incentivized to re-price risk based on medical versus non-medical tradelines. For instance, the FHFA has announced the implementation of FICO 10T and VantageScore 4.0 as the credit scores Fannie Mae and Freddie Mac will use as thresholds for screening loans. These credit scores underweight or do not include medical collections, unlike the credit score models that FHFA-backed

---

[21] Kenneth P. Brevoort and Michelle Kambara "Data point: Medical debt and credit scores", *Washington, DC: CFPB* (2014) Pg. 9

loans have historically used for screening-in decisions.[22] Firms are not obliged to use credit scores and reports, but they often use them as part of their internal decision-making and can weight medical debt tradelines as they are compelled to by market forces.

## Recent Works

50.    In a recent CFPB report, [23]  The Bureau finds that the recent changes in medical collections reporting, initiated by the three nationwide credit reporting companies in March 2022, have led to significant shifts in the landscape of consumer credit records. These changes included extending the period before unpaid medical collections appear on a consumer's credit record from 180 days to one year and excluding paid medical collections altogether. Additionally, unpaid medical collections with balances below a threshold of $500 were no longer reported on consumer credit records as of April 1, 2023.

51.    The impact of these changes has been notable. By June 2023, the share of consumers with medical collections on their credit records had plummeted from around 14 percent in March 2022 to only five percent. This sharp decline was attributed to removing low-balance medical collections and other factors, including a trend towards fewer medical collections being reported independently of the reporting changes. However, despite these reductions, most medical collections balances remain on credit records, totaling approximately $49.2 billion.

---

[22] Alyssa Brown and Eric Wilson "Data Point: Consumer Credit and the Removal of Medical Collections from Credit Reports", *Washington, DC: CFPB* (2023). Pg.25
[23] Ryan Sandler and Zachary Blizard, "Data point: Recent Changes in Medical Collections on Consumer Credit Records", *Washington, DC: CFPB* (2024)

FIGURE 1:   SHARE OF CONSUMERS WITH MEDICAL COLLECTIONS, AND SHARE OF CONSUMERS WITH A
MEDICAL COLLECTION THE PREVIOUS QUARTER WHO HAVE ALL MEDICAL COLLECTIONS
REMOVED, OVER TIME



(a) SHARE WITH AT LEAST ONE MEDICAL COLLECTION

(b) SHARE WITH ALL MEDICAL COLLECTIONS REMOVED
    SINCE PRIOR QUARTER

52.     One demographic group that benefited significantly from these changes is
consumers residing in majority-white and high-median-income census tracts. The
report found that most of the changes were likely to come from removing low-
balance medical collections, indicating that consumers with lower medical debt
were more likely to benefit (Table 2 of the report replicated below). Additionally,
the report suggested that consumers in certain states, particularly those with higher
median incomes and majority-white populations, were more likely to see their
medical collections removed.

**TABLE 2:** DISTRIBUTION ACROSS CENSUS TRACT CHARACTERISTICS OF CONSUMERS WITH MEDICAL COLLECTIONS IN MARCH 2022, BY STATUS IN JUNE 2023

| % of Consumers in tracts that are... | All CCP Consumers | Consumers with Med. Collections in 3/22 | | |
|---|---|---|---|---|
| | | All | At Least One Med. Collection Removed by 6/23 | All Med. Collections Removed by 6/23 |
| Majority Black | 6.3 | 10.4 | 10.1 | 9.9 |
| Majority Hispanic | 10.5 | 12.3 | 11.3 | 11.2 |
| Majority White | 73.3 | 68.0 | 69.7 | 70.0 |
| Majority Other or No Majority | 9.8 | 9.2 | 8.9 | 9.0 |
| Median Income $0 to $50K | 20.3 | 31.7 | 30.6 | 29.2 |
| Median Income $50K to $75K | 34.8 | 39.5 | 39.8 | 39.5 |
| Median Income $75K to $100K | 22.4 | 17.8 | 18.2 | 18.9 |
| Median Income $100K+ | 22.5 | 11.0 | 11.4 | 12.4 |
| Number of Consumers in CCP | 5,894,336 | 785,042 | 601,302 | 457,577 |

53.    The data analysis through June 2023 further confirms that consumers with medical collections remaining on their credit records tend to have lower credit scores and reside in lower-income census tracts compared to the larger population that had medical collections on their credit records before the reporting changes. This suggests that consumers in higher-income areas, who may have had relatively lower medical debts, were more likely to have their medical collections removed, benefiting from improved credit scores and financial opportunities (Table 1 of the report is replicated below).

TABLE 1:   CHARACTERISTICS OF CONSUMERS WITH MEDICAL COLLECTIONS, BEFORE, DURING AND
AFTER RECENT REPORTING CHANGES

| | Month Observed with Medical Collections | | |
|---|---|---|---|
| | March 2022 | December 2022 | June 2023 |
| Credit Score | 598.2 | 591.8 | 582.0 |
| At Least One Credit Card (Percent) | 58.6 | 59.1 | 57.1 |
| At Least One Auto Loan (Percent) | 51.3 | 50.5 | 48.6 |
| At Least One Non-Medical Collection (Percent) | 35.5 | 36.9 | 40.9 |
| No Other Tradelines (Percent) | 18.0 | 18.3 | 18.5 |
| Census Tract Percent Black | 16.7 | 17.2 | 17.9 |
| Census Tract Percent Hispanic | 19.7 | 20.2 | 21.1 |
| Census Tract Median Income ($) | 65,645.3 | 65,018.2 | 63,149.6 |
| Age 18–29 (Percent) | 15.0 | 16.0 | 15.8 |
| Age 30–44 (Percent) | 33.5 | 33.7 | 37.4 |
| Age 45–61 (Percent) | 31.2 | 30.9 | 31.2 |
| Age 62 + (Percent) | 18.1 | 17.7 | 14.8 |
| Medical Collections Per Consumer | 2.5 | 2.4 | 1.7 |
| Average Total Balance ($) | 2,090.9 | 1,886.8 | 3,148.7 |
| Medical Debts Less than $500 (Percent) | 65.2 | 62.2 | 0.0 |
| Number of Consumers in CCP | 786,321 | 635,679 | 325,788 |

54.    Moreover, consumers residing in majority-white census tracts likely benefited disproportionately from the reporting changes. The data show that residents of majority-white census tracts represent a slightly larger share of consumers who had all their medical collections removed than their share of consumers with any medical collections on their credit records. This indicates that consumers in majority-white areas were more successful in having their medical collections removed, potentially due to their higher financial resources and access to credit.

55.    The effect of this policy is apparent; consumers who benefited most from the changes in medical collections reporting were those residing in higher-income, majority-white census tracts and were more likely to have low-balance medical collections removed from their credit records. These changes have contributed to disparities in access to credit and financial stability, as consumers in lower-income

areas and communities of color continue to face challenges related to medical debt and credit scores. As a policy to alleviate hardship for low-income consumers, the Bureau's research shows it to be a failure. This underscores the need for policy changes to address these disparities.

56.      In a recent Datapoint Blog post,[24] The CFPB attempts to measure the recent changes in reporting low-balance medical collections and whether they had notable early impacts on consumer credit records and credit scores. Specifically, removing medical collections tradelines with initial balances of less than $500 has led to significant improvements in the credit scores of affected consumers. On average, consumers who had all their medical collections removed experienced a rise in credit scores by an average of 20 points. This improvement is unsurprising, given previous work. It would be odd if removing negative tradelines did not improve credit scores.

57.      The other main result is that removing medical collections has not yet prompted consumers to seek more credit. While many consumers with medical collections made inquiries for new accounts between April 2023 and August 2023, there was no discernible difference in credit-seeking behavior between consumers whose medical collections were expected to be removed and those whose medical collections were expected to remain on their credit records. This is an early result and has not been vetted or reviewed.

58.      To better understand the effects of the reporting changes, researchers focused on consumers whose largest medical collections tradeline in December 2022 was just under $500, leading to the expectation that all their medical collections tradelines would be removed. They compared them to consumers

---

[24] CFPB, *Early impacts of removing low-balance medical collections*, (May 16th, 2024, available at https://www.consumerfinance.gov/data-research/research-reports/data-spotlight-early-impacts-of-removing-low-balance-medical-collections/, last accessed on June 17th 2024).

whose largest medical collections tradeline was just above $500, indicating that some of their medical collections tradelines would likely remain on their credit records. This approach aimed to capture the differential impact of having all medical collections tradelines removed compared to having some or none removed, shedding light on the specific effects of the reporting changes on consumer credit outcomes. However, there is no control group, which makes any conclusions challenging to validate.  Additionally, the benefits to a person having their negative tradelines removed are obvious. The cost will be higher delinquency rates as poor risks look better than they should. This will take time to manifest in large enough levels to be detectable in the data. The Bureau does not attempt to quantify or even acknowledge the economic costs that imprecise credit scores will create. They affect credit scores, so the damage to others is a real effect.[25]

## Proposed Rule Technical Appendix Research Critique

59.     In the proposed rule,[26] The CFPB includes a new analysis in a technical appendix at the end, frequently referencing it to justify their conclusion that removing medical debts from credit reports will not have negative consequences. This analysis is presented unusually, as it is not a report, blog post, or peer-reviewed study. The CFPB is presenting work that has not undergone a peer review process to verify its validity, nor have they allowed the industry to review the data or code used to generate the results. Consequently, there is no way to validate these

---

[25] If credit scores didn't change when negative information is removed, then there would be no mechanism for poor credit risks to misprice risk pools.

[26] CONSUMER FINANCIAL PROTECTION BUREAU
12 CFR Part 1022
[Docket No. CFPB-2024-0023]
RIN 3170-AA54
Prohibition on Creditors and Consumer Reporting Agencies Concerning Medical Information
(Regulation V)

results, which, as I will show, have serious methodological issues. Given the implications of this work, the CFPB should be more transparent in its research.

60.     The CFPB analysis aims to demonstrate that removing medical debt tradeline information did not impact consumers' access to credit. They claim this conclusion implies no negative consequences from implementing the proposed rule. To support this, the analysis utilizes a 2017 change in consumer reporting practices that prevents medical collections less than 180 days past their date of first delinquency from appearing on consumer reports obtained from the nationwide consumer reporting agencies (NCRAs). The CFPB observes credit inquiries and whether a tradeline is opened, defining an inquiry as "successful" if it results in an open tradeline. However, this definition of "success" is problematic, as it does not necessarily indicate that the specific credit application generating the inquiry was approved. The CFPB cannot directly observe whether the specific credit application associated with an inquiry was approved. Hence, the CFPB's research does not have a clean standard for the analysis to report a successful outcome. Despite this methodological issue, the CFPB continues with the analysis.

61.     The CFPB asserts that its analysis "can be interpreted as modeling credit decisions and outcomes from creditors' perspective, rather than modeling the decisions of consumers or debt collectors."[27] While the data is structured to reflect what a creditor would see, this analysis omits critical aspects of risk management that creditors must consider. From a simplified risk management perspective, creditors need to account for three core concepts: the probability of default (PD), exposure at default (EAD), and loss-given default (LGD).

---

[27] ibid

62.    The CFPB's analysis attempts to proxy for PD by examining 30-, 60-, and 90-day delinquency rates within two years of credit origination. However, it neglects to consider EAD and LGD.

63.    The EAD represents the total value a creditor is exposed to in the event of default, varying by loan type. EAD is typically the entire credit limit for credit cards, as defaulters can max out their limit before defaulting. It is usually the remaining balance for mortgage products, plus fees and interest charges. The LGD represents the loss a creditor incurs when a loan defaults, accounting for mitigating factors such as the recovery rate, collateral that can be seized, and the value of the debt when sold to a debt buyer. As noted before, recoverable debt values are expected to fall, reducing the value of outstanding debt. The expected loss is calculated as:

$$\text{Expected Loss} = \text{PD} \times \text{EAD} \times \text{LGD}$$

The CFPB's analysis, at most, demonstrates that PD remains unchanged under the proposed rule. However, any risk practitioner—and the CFPB itself—should recognize that the cost to the industry also includes EAD and LGD. The CFPB's research does not focus on the implications of the proposed rule on the other dimensions of credit risk. Nor does the CFPB look at how markets would respond by limiting credit limits or using more aggressive recovery methods such as litigation. Therefore, the CFPB's claims are based on a fundamentally incomplete market analysis from a creditor's perspective.

64.    To study the problem, the CFPB created two datasets. The first dataset includes all inquiries made 180 days before and after each medical collection's addition to a consumer report. The second dataset tracks the two-year performance of all credit account tradelines, which can be traced back to an inquiry in the inquiry dataset. The analysis focuses on inquiries associated with medical collections first reported at least six months after the final implementation of the

NCAP in September 2017. This ensures that all medical collections are identifiable and that all consumers with reported medical collections had a past-due medical bill for at least 180 days before the medical collection appears on their consumer report. Additionally, each dataset includes a subsample of inquiries and tradelines associated with medical collections that had initial balances over $500 and were made when any other medical collections on the consumer report also had initial balances over $500. However, the CFPB acknowledges a limitation: "the CFPB cannot be certain that the observed inquiry is associated with a specific opened tradeline."

65.    The problem with the data is that it suffers from self-selection bias. Only consumers actively seeking credit are included in the dataset. Additionally, the behavior of consumers changes when they are in the market for credit. For example, before applying for a mortgage, a consumer might engage in positive behaviors such as reducing non-medical debt or making all payments on time. This self-selection leads to data anomalies that the CFPB acknowledges: "Only 7.4 percent of the inquiries in this sample are for mortgages, compared to almost 17 percent of all inquiries in the CCIP. This likely reflects that most consumers in the sample have thin credit files and subprime credit scores, and therefore may be less likely to apply for mortgages than for other types of credit, given the higher underwriting standards of mortgages."[28] These issues make the entire analysis questionable and further strengthen the argument for the CFPB to be open and transparent, lending legitimacy to their analytical work.

66.    The CFPB used an inappropriate model in the technical appendix, resulting in biased outcomes. Their research relies on regression discontinuity (RD), which is based on a straightforward concept: a threshold variable determines on which

---

[28] ibid

side of the "quasi-experimental" treatment an observation falls. When applied correctly, this methodology enables causal analysis. For example, consider low birthweight babies: if they weigh less than 1,500 grams, they receive extra medical treatment; if they weigh more, they do not. The difference between a baby weighing 1,501 grams and one weighing 1,499 grams is negligible. Here, the threshold variable is birthweight, and the treatment is extra medical attention. An RD analysis would compare the survival rates of babies just below and just above the threshold, attributing differences in survival rates causally to the extra medical care. An estimate of the value of medical care is obtained. The CFPB applied a regression discontinuity in time (RDiT) design to estimate the effect of reported medical collections on consumers' access to credit and the performance of credit account tradelines resulting from creditors' inquiries. While similar to RD, RDiT analyzes effects over time. However, this application of RDiT by the CFPB is inappropriate, leading to biased results.

67.    The CFPB acknowledges their work's limitations and potential biases, particularly with regression discontinuity in time (RDiT) designs when they state. Such designs can introduce bias if observations far from the threshold period are included for identification, possibly due to autoregressive properties or unobservable confounders. Moreover, academic literature highlights concern about bias when consumers improve their credit behavior during the threshold period, subsequently applying for credit and maintaining improved behavior. The severity of this bias cannot be accurately assessed because the CFPB has not released the data and code to independent researchers for scrutiny and verification.

68.    The CFPB's research spans from 2017 to 2022 in the inquiry or performance dataset. Due to the focus on two-year performance, credit account tradelines opened after January 2022 are excluded from the analysis because the CFPB cannot observe a full two years after origination. However, the CFPB states, "The

key assumption of a regression discontinuity analysis is that nothing is changing discontinuously across the threshold besides the treatment."[29] Surprisingly, the CFPB would utilize a methodology requiring stability. The period from 2017 to 2022 was marked by *significant instability* in the medical debt collection environment, including the COVID-19 crisis, student loan debt moratoriums, government cash payments, and the implementation of Regulation F at the federal level, alongside numerous state-level changes. Adding to this, the regression employed in their analysis lacks statistical controls. Despite substantial state-level variations during this period, the CFPB's model does not incorporate state-level controls. This suggests that according to their model, there is no differentiation between a creditor operating in Alabama versus California.

69.    Given the issues identified, the CFPB's findings that medical debt significantly influences credit origination decisions are unsurprising. However, the core of the CFPB's argument—that medical debt has no effect on the likelihood of 90-day delinquency over the two-year performance dataset—raises skepticism. Accepting this conclusion at face value suggests that medical debt may prevent credit origination unnecessarily. Based on the critiques of sample size and model validity mentioned earlier, I am skeptical of these results. Moreover, the analysis presents evident anomalies. For instance, the point estimates indicate that not having non-medical debt (such as student loans, car loans, etc.) makes a consumer more likely to be delinquent than one who carries consumer debt like credit cards. This should be reversed, as having non-medical debt should make delinquency more likely. The lack of effect on mortgages over two years is expected, as consumers typically adjust their behavior to meet rigorous underwriting standards before applying for mortgages. However, some results, such as the near-significant

---

[29] ibid

impact of non-medical debt on delinquency, appear unusual given the stringent nature of mortgage underwriting. These anomalies in the data suggest fundamental issues with either the data itself or the analysis methodology, which cannot be clarified due to the lack of transparency from the CFPB. These critical questions should undergo rigorous scrutiny in a peer review process, promoting accountability and ensuring the validity of their findings.

70.    The CFPB's findings reinforce industry concerns. To reiterate, expected losses are calculated as:

$$\text{Expected Loss} = PD \times EAD \times LGD$$

Using this framework, the CFPB observes that for credit cards, the average credit limit is $247.49 lower, amounting to 18.9% less on an average of $1,312.25 due to the presence of medical debt. The CFPB asserts that the probability of default (PD) remains unchanged. However, their results are incomplete. I replicate Table 17, Panel A below, to demonstrate that an initial estimate of the loss given default (LGD) is substantial and noteworthy. For credit cards in the sample where medical debt exceeds $500, the LGD is -$215.20, representing a 30.2% increase on an average value of $713.72. For the entire sample, the loss amounts to $62.83 on a base of $643.68, equating to a 9.8% increase. The CFPB set out to show that medical debt was irrelevant for credit originations as delinquency is not more likely. Instead, if you take their work at face value, they show that consumers with medical debt have higher expected losses. In a competitive market for credit card debt, consumers with medical debt will have to pay more for credit or have their credit reduced. This research shows that medical debt is predictive of expected losses in lending and that the industry has been managing this risk by managing credit lines. Additionally, though not shown in this work, this risk could be managed with the terms of lending.

**Table 17: The Effect of Medical Collection Reporting on Two-Year Credit Account Performance, Alternative Classifications[313]**

| | (1) Over $500, D30+ | (2) Over $500, D90+ alt. | (3) Over $500, Past due am. | (4) All, D30+ | (5) All, D90+ alt. | (6) All, Past due am. |
|---|---|---|---|---|---|---|
| Panel A: Credit cards | | | | | | |
| RD Estimate | 0.008 | -0.006 | -215.199** | 0.002 | -0.003 | -62.830* |
| | (0.013) | (0.011) | (86.597) | (0.006) | (0.005) | (29.197) |
| | [-0.017, 0.032] | [-0.027, 0.015] | [-384.926, -45.472] | [-0.010, 0.015] | [-0.013, 0.008] | [-120.055, -5.604] |
| Avg. dep. var. | 0.321 | 0.164 | 713.724 | 0.316 | 0.153 | 643.677 |
| Observations | 96297 | 96297 | 19945 | 565680 | 565680 | 111342 |

71.    The actual Loss Given Default (LGD) is complex and goes beyond the scope of this report. However, the CFPB's research indicates significant losses to the industry resulting from removing medical debt reporting. A more comprehensive LGD estimate would factor in the reduced recovery rates typically associated with medical debt collections. Additionally, I present survey results from ACA International members below, demonstrating an anticipated 8% decrease in expected liquidation rates of debts referred to collectors.[30] Combined with the primary losses highlighted by the CFPB, these findings suggest substantial, higher-than-estimated overall losses to the industry. This situation clarifies why credit limits are reduced even when credit decisions remain unchanged. The CFPB has effectively illustrated that medical debt strongly predicts expected losses for

---

[30] I am using industry nomenclature. To decrease by 10% means the value of accounts collectors are collecting, "liquidating", has fallen by 10%. I.e., Collectors receive less from accounts referred to them.

creditors. If this predictive factor is disregarded, losses may need to be mitigated by restricting credit access for all consumers or increasing the cost of credit.

## The effect of this rule on other industries

72.     The CFPB needs to study the effect a degradation in the quality of credit reports would have on the consumer finance lending industry. Currently, analysis has yet to be done on the end users of the credit reports and the potential consequences of removing the predictive information in the medical debt tradelines. Below are two case studies based on academic work.

### Case Study: Medical Bankruptcy

73.     A large part of the justification for eliminating medical tradelines is due to the work on medical bankruptcies by Elizabeth Warren and her co-authors.[31]  The study by Himmelstein et al. (2009) examines the prevalence and characteristics of medical bankruptcies in the United States in 2007, building on a previous study from 2001. The researchers surveyed 2,314 bankruptcy filers and interviewed 1,032 of these people, identifying "medical bankruptcies" based on the filers' stated reasons, income loss due to illness, and the magnitude of their medical debts. They found that 62.1% of bankruptcies in 2007 were due to medical reasons, a significant increase from the 46.2% reported in 2001. Notably, 92% of these medical debtors had medical debts exceeding $5,000 or 10% of their pretax family income. Additionally, some debtors had mortgaged their homes or lost significant income due to illness, qualifying them as medical bankruptcies. Less than a quarter

---

[31] Himmelstein, D. U., Thorne, D., Warren, E., & Woolhandler, S. (2009). Medical bankruptcy in the United States, 2007: results of a national study. *The American journal of medicine*, 122(8), 741-746.

of all debtors were uninsured when filing, but medical debtors more frequently experienced coverage lapses in the two years before filing.

74.     Hospital bills were the largest single out-of-pocket expense for nearly half of the patients, with prescription drugs and doctors' bills contributing significantly. The period between the 2001 and 2007 surveys saw the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act (BAPCPA), which introduced more stringent requirements and procedural barriers for filing bankruptcy. The study found that BAPCPA's effects were nonselective, impacting both medical and nonmedical bankruptcies equally. The increase in medical bankruptcies was attributed not to BAPCPA but to the rising financial burden of illness, as evidenced by the growing number of underinsured Americans, which rose from 15.6 million in 2003 to 25.2 million in 2007. Overall, this study had an outsized impact on the policy community. Senator Elizabeth Warren is one of the authors.

75.     However, Dobkin et al.'s (2018) critique of the widely held belief in "medical bankruptcies" challenges the existing evidence, primarily based on studies claiming that around 60% of U.S. bankruptcies were due to medical events. These studies relied on self-reported data from people who had declared bankruptcy, asking if they had experienced health-related financial stress. The critique argues that this method is flawed as it assumes a causal relationship between medical expenses and bankruptcy without considering the broader population who incur substantial medical debts but do not file for bankruptcy. The fundamental flaw in the logic can be illustrated by considering the example given by Dobson. Many tech billionaires are not college graduates, but it would be absurd to conclude that dropping out of college contributes to success in the tech industry. This analogy highlights the selection and causation problems in the previous literature on medical bankruptcies. Just as one cannot infer a causal

relationship between dropping out of college and becoming a billionaire based on a limited subsample of successful college dropouts, it is problematic to conclude that medical expenses cause most bankruptcies simply because a significant proportion of bankruptcy filers report having substantial medical debts.

76.    Previous studies assumed a direct causal link between medical expenses and bankruptcy without considering the broader context. They focused only on those who went bankrupt and had medical expenses, ignoring the many people with significant medical debts who did not file for bankruptcy. This selection bias leads to overestimating medical expenses' role in causing bankruptcies. A more accurate approach would involve examining a representative sample of the population, including those with substantial medical expenses who did not go bankrupt, to truly understand the impact of medical costs on financial distress. A 2014 CFPB report noted that while about 20% of Americans have significant medical debt, less than 1% file for bankruptcy annually, suggesting the previous assumption is problematic.

77.    To provide a more accurate estimate, they conducted a study using data from people hospitalized in California, tracking their credit reports and bankruptcy filings. The results showed an apparent but much smaller effect of hospital admission on bankruptcy. Hospitalizations were found to cause only 4% of bankruptcies among nonelderly U.S. adults, significantly lower than the previously reported 60% (Figure below shows the relationship). Even among the uninsured, hospitalizations accounted for only 6% of bankruptcies. This study excluded hospitalizations for children and the elderly and focused on non-childbirth-related conditions. It concluded that while hospitalization leads to some bankruptcies, the overall impact is much smaller than previously claimed, and overemphasizing medical bankruptcies could distract from understanding broader economic hardships.



**Figure 1. The Effect of Hospitalization on the Likelihood of Filing for Bankruptcy**
The x axis shows time relative to the index hospital admission. Each data point represents the proportion of people who filed for personal bankruptcy between the year before the start of our credit-report data and the indicated date, after adjustment for any patterns in bankruptcy rates by calendar year. The dotted line shows the estimates from fitting a flexible, nonlinear function quantifying the relationship between the timing of hospital admission and the bankruptcy rate, again controlling for calendar-year trends. (More detail on the sample and estimators can be found in Dobkin et al. (2018)[4])

78.    Contrasting with the 2009 study by Himmelstein et al., which asserted that 62.1% of bankruptcies were medically related, the new critique highlights methodological flaws in the earlier approach. Himmelstein's study surveyed bankruptcy filers and identified medical bankruptcies based on self-reported reasons, substantial medical bills, or income loss due to illness. They found that medical debtors often had lower incomes and experienced coverage lapses, with significant out-of-pocket expenses contributing to their financial distress. This study linked the increase in medical bankruptcies to rising healthcare costs and the growing number of underinsured Americans.  In contrast, the newer analysis used hospital admission data to track the direct impact on bankruptcy filings, providing a more precise measurement of the causal relationship. This approach revealed a much lower percentage of bankruptcies caused by medical issues, suggesting that

while medical expenses contribute to financial distress, they are not as predominant a cause of bankruptcy as previously thought. Further, the current law has changed since the studies were conducted. However, a key implication is that the insurance and charity care system drive medical debt – not debt collection.

## Case Study: Improved Credit Assessment

79.    Few studies document how improving credit scoring affected lenders and lending. The Bureau is proposing to reduce the information value of credit reports, i.e., degrading, by removing predictive information about risks faced by potential consumers when lending to consumers. Einev et al. (2013)[32] studied the effects on a car dealership with a few locations that provided auto financing in a low-income, high-risk market.[33] This firm operates in a high default population where profitability depends on identifying consumer risk quality. Furthermore, the firm matches cars (high or low value) to consumers and offers customized lending terms.  It is important to remember that computational, data-intensive, and readily available credit scores are a relatively modern phenomenon. Credit reports are ubiquitous today, but even 30 years ago, they were not commonly used. Credit reports' benefits to the financial markets are often taken for granted.

80.    This firm went from a low to a higher information environment. The lender adopted credit scoring by the end of June 2001. Before this, employees made judgments on credit based on information they elicited out of the sales process. This firm began using credit reports and inputting the information into its

---

[32] Einav, Liran, Mark Jenkins, and Jonathan Levin. "The impact of credit scoring on consumer lending." *The RAND Journal of Economics* 44.2 (2013): 249-274.

[33] The author has an extra reason to like the study as one author shared a desk with me, the other two were professors of mine at Stanford. Professor Einev taught me Industrial Organization and Professor Levin taught me Advanced Game Theory. Afterwards Professor Levin became the Dean of The Graduate School of Business at Stanford and now he is the President of the entire University.

proprietary algorithms to assess risk. This is a case study of using data to make more informed decisions.

81.     The effects of improved risk assessment are apparent. The firm was able to identify better risks and extend more credit to them to increase profitability. This was achieved by more accurately identifying customers as low or high risks.  The company closed deals with less than half the high-risk customers than before. However, the default rate fell as the firm was better at avoiding bad risks. Additionally, as higher risks, they were required to put higher down payments for purchases. Credit became tighter for this population. The applicants identified as low-risk were able to take out bigger loans.

82.     The Bureau's proposed rule is to take this process of improving lending through predictive credit information backward. The proposed rule changes would result in credit reports being less accurate, and consequently, lenders in consumer finance will be less able to assess default risks. The low-risk borrowers will be less able to signal their lower risk level and have access to credit constrained.  Lenders will see a fall in profitability as they unwittingly take on risky borrowers.  This will result in more credit for the risky borrowers. But more defaults.

Case Study: Data Privacy

83.     There are few studies about how the restriction in the flow of data through privacy laws affects consumer financial markets. Kim and Wagman (2015) studied the effect of privacy on consumer finance at theoretical and empirical levels. They show that a firm's ability to sell consumer information can lead to lower prices, higher screening intensities, and increased social welfare. Empirically, they show their model is consistent with the fall in denial rates in home loans and refinancing in counties that adopted more stringent privacy regulations. Subsequently, these counties had higher foreclosure rates in the 2007-2008 financial crises.  This issue

of unstable mortgage origination and high foreclosure during this exact crisis was the raison d'etre for establishing the CFPB itself.

84.    The motivation for this academic work was the 1999 enactment of the Gramm-Leach-Bliley Act (GLBA), allowing a variety of financial institutions to sell, trade, share, or give out nonpublic personal information about their customers. In their model, financial institutions use data to reduce customer service costs. Market competition results in cost savings passed to consumers via price cuts or better financing terms. For this to be profitable, firms use the newly available information more heavily to screen applicants, and as a result, potentially high-risk borrowers are denied credit. Thus, the industry and borrowers accept applicants who would not have defaulted[34], benefit as consumer information increases.

85.    The test for this theory was when three out of five counties in the San Francisco-Oakland-Fremont Metropolitan Statistical Area (MSA) adopted a privacy ordinance on January 1, 2003, requiring consumers to opt-in to releasing information under GLBA.  Given most people's status quo bias, this effectively reduced the amount of private personal information lenders could access. By studying loan data of conventional home purchases at the census tract levels in these counties from 2001 to 2006, the study authors established market behavior before and after the enactment of the privacy ordinance.

86.    The theoretical results are consistent with their empirical findings. The theory predicts that these stronger privacy laws that reduced access to borrower payment behavior information would result in less screening of mortgage applicants. This would result in a fall in loan denial rates because less information means less reason to deny a loan. The theory finally posits that as loan approvals

---

[34] Rejected applicants who would have defaulted would have benefited if the costs of default, e.g., foreclosure, is high.

rise based on incomplete information, foreclosure rates eventually also rise as less qualified borrowers are more likely to default.

87.    Indeed, reality comports with the theory. When looking at the data, the census tracts with higher shares of 2003-04 originated loans in the counties that enacted the privacy opt-in had a higher foreclosure rate. As the authors put it:

> "The results in this paper give rise to the conjecture that privacy acts may have played some role in the subprime mortgage crisis by weakening lenders' incentives to screen loan applications."[35]

88.    The Bureau's rule is essentially a privacy rule against medical debt tradelines. The Bureau has presented no evidence that suppression of medical tradelines would be any different from the suppression of data in the California counties discussed above. Like those California counties, the result of the proposed rule is a move to a lower information environment. Only if consumers voluntarily disclose their medical collections history will lenders have a complete picture. This will result in more credit being available to unqualified borrowers. Like the 2008-09 financial crisis, increases in improvident lending hurt not only lenders but society as a whole.

## The impact of this rule on debt collection

89.    To quantify the impact of these proposed changes on debt collectors, I have utilized a dataset provided by collection agency members of ACA International (ACA) in two waves. The first wave was conducted from November to December 2023, and the second wave was conducted in May 2024.

90.    The first wave of data contains 1,615 client accounts (not consumers, but 1,615 creditor organizations) from 19 self-reported debt collection agencies. The

---

[35] Kim, Jin-Hyuk, and Liad Wagman. "Screening incentives and privacy protection in financial markets: A theoretical and empirical analysis." *The RAND Journal of Economics* 46.1 (2015): Pg. 7

second wave also has 19 self-reported debt collection agencies but with 935 client accounts. These data include the number of referrals, collections, and the estimated impact of the rule change on liquidation rates of referred debts to collectors (or writing off debt) due to the changes. This data reflected the restrictions on reporting medical debts under $500.[36] The Bureau proposes to restrict the consideration of all medical debt balances, which is a more drastic rule with more drastic consequences. This preliminary analysis focuses on one key market component—the debt collection process. However, this is more evidence of the proposed rule change's effects on the industry than the Bureau has conducted.

91.    The data is disproportionately weighted toward California. California makes up 60.3% of the first wave sample.  The second wave has 24.3% of the data being from California. Overall, California is 46.7% of the data, which is still over-weighted to California, but the second wave is more balanced. This is not a representative sample of the U.S.  However, I split the data into the four regions defined by the Census Bureau: North-East, Mid-West, South, and West.  Despite this aggregation, the general results will reflect the West and California.

Table 1: Data by Region

| region | Wave 1 | | Wave 2 | | Total | |
|---|---|---|---|---|---|---|
| | Freq. | Percent | Freq. | Percent | Freq. | Percent |
| Mid-West | 193 | 14.89 | 363 | 46.42 | 556 | 26.76 |
| North-East | 30 | 2.31 | 41 | 5.24 | 71 | 3.42 |
| South | 113 | 8.72 | 136 | 17.39 | 249 | 11.98 |
| West | 960 | 74.07 | 242 | 30.95 | 1202 | 57.84 |
| | | | | | | |
| Total | 1,296 | 100 | 782 | 100 | 2078 | 100.00 |

The remaining observations did not have an identified State and, thus, region.

---

[36] This change went into effect April 1, 2023. The credit reporting agencies also took two other actions prior to that (removing paid medical debt, and delaying credit reporting for a year), none of which has been empirically studied for potential degradation of the lending environment.

92.    The data includes referrals (amounts to be collected) and gross collections.  I used the 2nd Quarter of waves 1 and 2 data for 2022 and 2023 and added the fourth quarter of 2023 data. Debts might not be collected in the quarter they are referred so this approach is an approximation.  Figure 1 shows the referrals and collections for Q2 2022 and 2023 for the data collected by ACA.  This data will be skewed by who submitted the data. Referrals to collect in the U.S. increased in 2023 compared with 2022.  The cause of the increase in these referrals is unknown. However, this could result from providers receiving fewer payments for their medical services and consequently making more debt collection referrals. Gross collections remained stable from 2022 to 2023.



93.    The geographic distribution of the data does not reflect the data overall. The West constitutes about 59% of the data, but most collections originate in the Mid-West.

94.    The number of collections determines the size of the market, but the collection rate indicates whether payments are occurring. I find the collection rates by dividing gross collections by referrals for 2022 and 2023. The results by region are in Figure 2. Collection rates are between 18% and 5%, with the Mid-West in 2022 as a high outlier and the South as a low outlier. Due to outliers skewing the results, I use the median value. It is clear that across the U.S., collection rates are falling.



Figure 2: Collection Rates are Falling Across Regions Over Time (median)

95.    The data was collected after new rules limiting the ability to report medical debts came into effect. Thus, the fall in collection rates in Figure 2 may already reflect the reduction in creditors' rights these last few years and the evolving decrease of creditor's rights. The change in the collection rates by region suggests that the message behind the message is that medical debts do not need to be paid.

96.    For the U.S., in Figure 3, the collection rate fell by 5.6%. However, this obscures meaningful differences within the U.S.  In the regions where obstructions to the reporting of medical debt have spread, the North-East and West (mainly California), we see a slight increase in collections or no change in Q1 2023, and then it starts to fall again.  However, overall, the trend is clear: there have been large reductions in the collections of medical debts. This could be an anticipatory effect of the belief that debts would not have to be paid.  These amounts are large and could be a harbinger of future reduced collections for medical service providers created by the proposed rule change. A good metric would be to see the decrease in expected liquidation rates of referred debts to collectors that could be attributed to limits to credit reporting.



97.    Other relevant data are estimates from industry professionals concerning the impact on liquidation rates from ceased, unreported, or non-consequential credit reporting. The ACA, therefore, has provided data that estimates if the rate of

liquidation of referred debts to collectors is caused by ceasing credit reporting. The data indicates that it will decrease.[37] The data submitted by the ACA members show the expectations of a decrease in liquidation of referred debts due to the proposed rule, see Table 2.

Table 2: Estimate of Change in Liquidation Percentage due to not Credit Reporting

|  | Wave 1 | | Wave 2 | | Total | |
|---|---|---|---|---|---|---|
|  | Mean | Median | Mean | Median | Mean | Median |
| **U.S.** | -9.6% | -3.9% | -6.3% | -2.0% | -8.0% | -3.0% |
| **U.S. less California** | -10.8% | -4.0% | -5.5% | -2.0% | -7.6% | -2.5% |
| **Mid-West** | -12.6% | -7.5% | -4.8% | -2.0% | -6.1% | -3.0% |
| **North-East** | -7.3% | -3.5% | -5.7% | -2.0% | -5.9% | -2.0% |
| **South** | -9.6% | -3.5% | -5.1% | -1.0% | -6.8% | -2.0% |
| **West** | -8.9% | -3.0% | -8.5% | -5.0% | -8.7% | -4.0% |

I present two sets of numbers, the mean and median response for each wave, and combine them. The mean/average is the best estimate for the actual value, but extreme values may skew it. The median is a more conservative number.

98.    The effect of ending credit reporting on liquidation rates of referred debts to collectors varies by region. The overall amount decreases by 9.6% on average or a median of -3.9% in wave 1,- 6.3% mean, and -2.0% median for wave 2.  Because the data is so heavily California-centric, I calculated the difference for the rest of the U.S. I get a rise in the average, the same median for wave 1, and a drop in the mean for wave 2.  Wave 2 was surveyed in May 2024, when many of the changes were brought in by the consent of the credit scoring agencies.  The lower response could result from changes already assumed by respondents. By region, the West will be most affected by the proposed rule changes—a shockingly high average

---

[37] I am using industry nomenclature. To decrease by 10% means the value of accounts collectors are collecting, "liquidating", has fallen by 10%. I.e., Collectors receive less from accounts referred to them.

decrease of 8.9% on average in wave 1 with a drop of 8.7% in wave 2. Even the more conservative median value is a 4% decrease.

99.    **T**he median values align with what has been seen elsewhere. In an amicus brief filed by the Nevada Hospital Association (NHA), the NHA estimated that an increase of a "cooling off" period on reporting medical debts to 60 days would result in an expected loss of 1.5% to 5% for 2022[38]. This proposed rule differs because the "cooling off" period is permanent.  Thus, the losses should be higher and align with the mean values reported in Table 2 (-8.7% in Western States). This is not proof but evidence that my estimates are reasonable.

100.    I repeat the exercise of observing the estimated liquidation rates of referred debts to collectors by medical specialty in Figure 4. I graph the mean of the estimated rate over waves 1 and 2 and the total combined.



---

[38] Brief for the Nevada Hospital Association as Amicus Curiae, *Aargon Agency, Inc. v. O'Laughlin*, 70 F.4th 1224 (9th Cir. 2023).

The biggest change is in the ER – Emergency Room. These are primarily family physicians and general practitioners. The fall in expected liquidations of referred debts is 16.0%. The largest category in terms of volume is GMD – General Medicine, which has a decline over the whole data of 9.4%. Thus, industry is expecting a large decline in the local physicians' ability to collect revenue. Additionally, we see a considerable reduction in CLN, clinical services, TST, testing and diagnostic services, HOS, hospital services, DDS, dental services, SPC, specialty medicine, and MSC, miscellaneous (for difficult-to-categorize services). The Bureau has not considered how the impact will vary by medical practice. However, few businesses operating under market principles can sustain such sudden drops in revenue by collectors that will pass them on to medical practices.

101.   The impact on small businesses is substantial. Table 3 shows the data's decrease in expected liquidations of referred debts from small business clients[39]. The small business rate is slightly higher than the average for the U.S. The key takeaway is that this proposed rule change will drastically affect the ability of small business physician practices to collect revenue via collections.

Table 3: Small Businesses and Metro Area
Estimate of Change in Liquidation of
Referred Debts Percentage

|  | Mean |
|---|---|
| **Small Business** | -8.92% |
| **Non-Metro** | -8.16% |
| **Metro** | -7.98% |

---

[39] I am using industry nomenclature. To decrease by 10% means the value of accounts collectors are collecting, "liquidating", has fallen by 10%. I.e., Collectors receive less from accounts referred to them.

102.   The proposed rule will have a disproportionate impact on smaller practices. As can be seen in Figure 5, the largest fall in the estimated liquidation rates is with solo practitioners at 10.5%. The next largest fall is for practices with 2 to 5 doctors or dentists.  Even large practices with over 11 medical practitioners face a drop in the estimated liquidation rates of 5.8%. Combined with Table 3, it is clear that the data shows the impact of this rule will fall heaviest on small businesses with small practices. This is potentially a bigger issue in rural areas, which rely more heavily on the small practice of a family doctor.



103.   The impact disproportionately hurts rural physicians.  The data was matched via zip codes to the Rural-Urban Commuting Area (RUCA) defined by the U.S. Census Bureau. These codes measure census tracts and zip codes and the flow of people living in that area into a primary metropolitan area. For example, Hoboken, N.J., is part of New York City. The code I used for a business to be included in a metro is 10% commuting or higher. This captures most suburban communities that use a metro area's medical facilities. Thus, my definition of non-metro is towns

sufficiently far away from metro areas, so commuting is uncommon. Physicians in non-metro zip codes have a more considerable decrease in expected liquidations of referred debts. 8.2% of these accounts represent a substantial loss of revenue to collections on behalf of rural physicians.

104.    The impact on expected liquidation of referred debts in the data depends on whether a firm was already credit reporting delinquent accounts.  Table 4 shows the fall in the expected liquidations of referred debts for non-credit reporting collection agencies, which is 3.3%, and 9.3% for credit reporters. This could be due to credit reporters being in States that severely limit their ability to report or collect debts, or it could be due to the type of medical debt collected. In the data, 75.2% of accounts are credit reporters; thus, the impact will be substantial if the proposed rule changes are implemented. This is consistent with the deterrent effect of credit reports. The removal of credit reporting causes a large decrease in liquidations. Firms that don't report to credit reporting agencies have already adjusted to this policy. However, non-credit reporters expect a fall of almost 3.3% since the message that medical debts need not be paid will be clear and well-known amongst borrowers.

Table 4: Credit Reporting and Usage of Legal
System Estimate of Change of Liquidation of
Referred Debts Percentage

|  | Mean |
|---|---|
| **No Credit Reporting** | -3.30% |
| **Credit Reporting** | -9.28% |
| **Does not use legal collections** | -8.48% |
| **Uses legal collections** | -5.88% |

105.    Using the legal system to enforce collections is an essential differentiator amongst collection firms, and consequently, the expected liquidation rate of

referred debts decreases due to non-credit reporting.  In the deterrence section, I emphasized there were three levels of consequences for non-payment of debt. The first was not to have the debt reported or no consequence. The second was to report delinquency to the credit bureaus – the medium step. The third was to use legal collections. The data shows that 75.2% are credit reporters, but only 17.5% use legal collections.[40] Table 4 shows that collectors who do not use legal collections expect a fall of 8.5%, but firms that use legal collections expect only a 5.9% decrease. This difference cannot be known from this data, but presumably, this may be due to legal collectors planning to use the legal system to enforce their rights to receive payment.  If some debts could be collected via credit reporting but now require legal action, this would entail a net social loss due to the costs of the legal system.

## The impact of this rule on debt collectors

106.    The implications of this rule on the debt collection industry are significant. Debt collection plays a vital role in financial markets, as it enforces the payment of contracts. This service, however, comes at a cost. The industry operates in a competitive environment, with fees aligning with costs. Therefore, any reduction in the effectiveness of collectors, as proposed in the regulation, will likely lead to an increase in collection costs or a decrease in collectible amounts. These changes will ultimately be passed on to the consumers of these services – the companies providing financing.

107.    To provide a rough estimate of the potential impact of the proposed regulation on the Provider community, I have employed a specific calculation method. While this approach may not be precise, it should still offer an

---

[40] There is no limit to using credit reporting and legal collections. Given legal collections are more costly to initiate than a credit report, I assume legal collectors are credit reporters and that legal collections are an escalation in the collections process.

approximate estimate. I have taken a conservative stance to establish a lower bound for the proposed rule's cost, as detailed in Table 5 below. The health spending industry is valued at $4.4 trillion, with out-of-pocket spending accounting for 12.7% or $588.8 billion annually. The analysis considers two primary factors: the existing inventory of debt and the new debt entering collections each year. Given the rule's lack of a sunset clause or expiration date, it is assumed to continue indefinitely.

108.    The Kaiser Family Foundation (KFF) estimated the inventory of medical debt to be $220 billion in 2021.[41] In contrast, the Consumer Financial Protection Bureau (CFPB) estimated the inventory of debt on credit reports to be $88 billion[42] in 2022. However, the CFPB's measurement only accounts for debt reported on credit reports.[43] According to the ACA survey, 75.22% of agencies report to credit bureaus. By adjusting the CFPB's number upward to account for this, we get $116.99 billion from the original $88 billion. The CFPB estimate thus represents only 53% of the KFF's estimate. Given that the KFF specializes in health economics research, I will use their estimate for a more accurate analysis.

109.    Estimating the flow of debt is more challenging. Drawing from the results of Kluender et al. (2021),[44] which are based on survey data from 2020, 13% of the adult population incurs debt entering collections each year, with a mean value of $2,396. With 258.3 million adults in the U.S., new medical debt accrues at a rate of $80.46 billion per year. While this figure might seem surprisingly high, it is

---

[41] United States Census Bureau, U.S. Adult Population Grew Faster Than Nation's Total Population From 2010 to 2020, (August 12, 2021, available at https://www.census.gov/library/stories/2021/08/united-states-adult-population-grew-faster-than-nations-total-population-from-2010-to-2020.html/ , last accessed on June 17th 2024).

[42] I am not adjusting for the 2 years since these numbers are back of the envelope calculations.

[43] The CFPB only records the data from one credit reporting agency.

[44] Kluender, R., Mahoney, N., Wong, F., & Yin, W. (2021). Medical debt in the US, 2009-2020. *Jama*, 326(3), 250-256.

reasonable. First, new debt accounts for 36.6% of the inventory of debt, which aligns with the continuous cycle of debt creation and retirement (through payment or write-off). Additionally, new medical debt represents 14.4% of total out-of-pocket expenditures.

110.    To get the direct cost of this rule, I apply the decrease in the expected liquidation rates of 8% to the inventory and flow of medical debts. The proposed rule's cost due to the inventory of medical debt lost is expected to be $17.6 billion. The loss will be $6.44 billion when the rule comes into force. However, the annual loss will continue indefinitely. The actual loss to the industry will be the discounted sum of losses over time. I apply a standard discounting formula to the data. First, I choose a discount rate of the 1-year US treasury rate of 5.11%[45]. I also assume that medical debts grow with the growth of the healthcare industry at 4.1%.[46] This results in a total loss to the industry of **$637.27 billion plus** the loss of the sock of debt of **$17.6 billion** for a total cost of **$654.87 billion**. Second, I recalculate the values under the assumption that medical debts do not grow at all -- but stay constant at $6.44 billion per year. This assumption implicitly assumes a world where policy intervention, charity care, etc., allow health care to grow without the growth of medical debts by consumers. This produces a flow of losses of **$125.96 billion** and a total cost of **$143.56 billion**.

111.    One might argue that using the 1-year US Treasury yield as a discount rate is inappropriate. To address this concern, I have recalculated using a discount rate of 10%, which is a reasonable approximation of the weighted average cost of capital (WACC). The WACC represents the average rate a business pays to finance its

---

[45] As of June 17th, 2024

[46] Centers for Medicare & Medicaid Services, National Health Expenditures 2022, (December 13th, 2023, available at https://www.cms.gov/data-research/statistics-trends-and-reports/national-health-expenditure-data/historical/ , last accessed on June 17th 2024).

assets, which reflects the cost of financing the lost medical debt. In this revised calculation, I have applied the 10% discount rate and a 4.1% growth rate in health spending. Under these assumptions, the flow of medical debt loss increases to **$109.09 billion**, resulting in a total cost of **$126.69 billion**. Further, assuming no growth in medical debt per annum over the years reduces the value to **$64.36 billion** and a total cost of **$81.96 billion**.

Table 5: Cost of Proposed Medical Debt Rule for Providers

| | Parameters | | Billions | |
|---|---|---|---|---|
| Health Spending | | | $ | 4,400.00 |
| Private spending | | 12.7% | $ | 558.80 |
| US population (Millions) | | 258.3 | | |
| Decrease in expected liquidation rates of referred debts | | 8% | | |
| Growth in US health spending | | 4.1% | | |
| US 1-year treasury yield | | 5.11% | | |
| **Outstanding Medical Debt** | | | | |
| KFF Outstanding Medical Debt | | | $ | 220.00 |
| CFPB Outstanding Medical Debt on Credit Reports | | | $ | 88.00 |
| Credit reporting from the survey | | 75.22% | | |
| CFPB Outstanding Medical Debt - Adjusted | | | $ | 116.99 |
| **Flow of Medical Debt** | | | | |
| Annual Percentage of Population with Medical Debt in Collections | | 13% | | |
| Mean Medical Debt Conditional on Being in Collections | $ | 2,396.00 | | |
| Annual Medical Debt | | | $ | 80.46 |
| **Cost of Proposal** | | | | |
| Loss to Inventory of Medical Debt | | | $ | 17.60 |
| Loss to flow of Medical Debt in the first year | | | $ | 6.44 |
| **Total Cost in the First Year (Backlog of debt plus one-year new debt)** | | | **$** | **24.04** |
| Value of loss flow of Medical Debt (Treasury Rate and Growth) | | | $ | 637.27 |
| Value of loss flow of Medical Debt (Treasury Rate and No Growth) | | | $ | 125.96 |
| Value of loss flow of Medical Debt (10% Discount Rate with Medical Debt Growth) | | | $ | 109.09 |
| Value of loss flow of Medical Debt (10% discount rate with No Medical Debt Growth) | | | $ | 64.36 |

| | | | |
|---|---|---|---|
| **Total Cost of Regulation** | | **$** | **654.87** |
| **Total Cost of Regulation (No Growth)** | | **$** | **143.56** |
| **Total Cost of Regulation (10% Discount Rate with Medical Debt Growth)** | | **$** | **126.69** |
| **Total Cost of Regulation (10% Discount rate with No Medical Debt Growth)** | | **$** | **81.96** |

112.    An additional objection might be that the KFF and Kluender et al. (2021)
have overestimated the amount of medical debt outstanding and the flow. The
CFPB's estimate of the inventory of medical debt was only 53% of the KFF's
estimate. By deflating the inventory and flow of medical debt accordingly, the loss
in the inventory of debt is **$9.3 billion,** and the flow is **$34.1 billion**, resulting in a
total cost of **$43.4 billion**. Even according to the CFPB's numbers, this is a highly
costly rule. I believe a conservative, lower-bound estimate of the rule's cost should
use a 10% discount rate and assume no growth in medical debt. Under these
assumptions, the debt inventory is expected to fall by **$17.6 billion** and the flow of
medical debt by **$64.36 billion**, leading to a total cost of **$81.96 billion**.
I believe these estimates are too low. First, the influence of social media will likely
spread the message that debt payment is voluntary, which could result in an 8%
decrease in the expected liquidation rate. Additionally, the inventory of debt and
expected losses were estimated during 2020 and later—a period characterized by
various debt payment moratoriums, direct consumer payments from the
government, and robust economic growth. Consequently, these estimates reflect
lower inventories and flows of medical debt and higher payment rates. However, if
the economy worsens, consumer distress will increase, and refusal to pay,
especially without the use of medical trade lines data, will also rise. These factors
will increase the cost of implementing this proposed rule. With industry revenues
declining by **$81.96 billion**, some firms will leave the market, reducing

competition, employment, and options for collection companies and, by extension, healthcare providers.

## The impact of this rule on medical providers

113.   The struggles of debt collectors will be passed on to companies financing medical procedures and, ultimately, medical providers. Without efficient debt collection, medical providers would have to raise the cost of financing or cut consumers off from medical services. America has a market-based healthcare system, and with competitive pressures, systematically losing revenue cannot be written off. The data shows net losses in collections can be over 5-10% and concentrated in rural areas and general medicine.  Given the competitive nature of this industry, much of these losses will be passed on to medical providers and subsequently – their patients. Further, this will be a systematic issue across the entire country. Unfortunately, there is no data documenting the losses to providers from the reduction in the ability to collect medical debts. Given that Americans pay co-pays, deductibles, and out-of-pocket expenses in market-based healthcare, this amounts to a large portion of provider's incomes being put at risk by the proposed Bureau rule change.  However, in Figure 1, I have shown how referrals of debts for collections have increased. It is consistent with the data to hypothesize that the message consumers are getting is that they do not need to pay their medical debts. If true, this would result in providers receiving less compensation. This hypothesis should be studied before any new rules are promulgated because, ultimately, medical providers will need to protect themselves and deny care. This could result in heavier government or non-profit care usage or people going without medical treatments, goods, or services.

## The impact of this rule on medical consumers

114.    The final stakeholder who will ultimately lose is the consumer of medical services.  Consumers who gain by having their medical debt records removed or never reported will potentially suffer from worse financing terms or the inability to access health care and, ultimately, debt financing. Consumers who diligently pay their medical debts will not get credit for doing so but potentially lose access to medical access. A market-based health system without financing would be a terrible equilibrium.

115.    The health insurance industry relies on cross-subsidization to function effectively. When the Affordable Care Act (ACA) was passed, there was significant concern about the possibility of the industry entering a "death spiral." This concept, grounded in the asymmetric information theory of insurance economics, revolves around the uncertainty of whether young and generally healthy individuals would purchase insurance.

116.    Young and healthy people are less likely to need medical services, but there is always a chance they might. They may opt not to buy insurance if they can receive treatment without paying or facing negative credit repercussions. The likelihood of a healthy person in their 20s needing medical care is low. Without these low-risk consumers in the health insurance pool, costs would rise for everyone else. This cost increase would lead to more people exiting the health insurance market, thereby making the pool of insured individuals riskier and driving costs even higher, perpetuating a cycle of exits and escalating costs. In extreme cases, this can lead to the unraveling of the health insurance market. This possibility of unraveling health insurance markets underscores that the proposed rule has significant and explicit consequences.

## Ensuring Research and Transparency: The CFPB's Mandate

117.    In 2024, the Research, Monitoring & Regulations budget amounts to $79.7 million[47], supporting the employment of numerous PhD economists. Despite these substantial resources, there has been a notable absence of a comprehensive cost-benefit analysis regarding the proposed rules. Such an analysis is crucial for estimating and modeling the potential costs incurred by American consumers, taxpayers, and the consumer finance industry. Given the considerable expertise and resources at its disposal, the agency should prioritize conducting thorough cost-benefit analyses before implementing sweeping changes that could significantly impact a $4.5 trillion industry. Further, according to the CFPB:

> "At the CFPB, we leverage the full potential of data to meet our mission. This means proactively and securely acquiring, analyzing, and publishing high quality data and research to keep pace with statutory mandates and an evolving data-driven economy. Data is a fundamental driver of our mission to ensure people have access to fair, transparent, and competitive markets for consumer financial products and services. The CFPB is committed to improving transparency and accessibility by providing the public with timely and reliable data that will enable them to make informed decisions."[48]

118.    The CFPB has yet to release any data or conduct a comprehensive analysis regarding the impact of medical debts, which account for approximately 50% of debt tradelines, on consumers and industries. Transparency and data-driven decision-making are paramount, considering the significant implications of medical debts on financial lives. The absence of peer-reviewed research and the lack of transparency regarding data and codes raise concerns about the credibility of the CFPB's findings. To make evidence-based decisions, the CFPB should

---

[47] CFPB, *Annual Performance Plan and Report, and Budget Overview,* (February 2023, available at https://files.consumerfinance.gov/f/documents/cfpb_performance-plan-and-report_fy23.pdf, last accessed on June 17th 2024).

[48] https://www.consumerfinance.gov/data/

subject its research to public scrutiny and provide industry stakeholders access to all relevant data and codes for verification. Furthermore, there is a pressing need for studies examining the implications of the proposed rule on consumer financial markets. If the proposed rule, costing a conservative estimate of **$81.96 billion,** were passed by legislation, the Congressional Budget Office would have to address the estimated impact on the US economy. The CFPB, a self-purported 21st-century agency, has failed to meet the rigorous standards of the CBO. Specifically, investigations should assess the impact on medical debt payment behaviors, the response of medical providers to changes in collections, and the broader ramifications for industries reliant on consumer credit reports for risk assessment. In the CFPB's proposed rule,[49] the phrase "CFPB requests data" occurs eight times, the phrase "The CFPB requests further information" appears six times, "CFPB does not have data" occurs 15 times, and "CFPB does not have information" occurs five times, despite the CFPB's budget and legal authority to collect data.  The Bureau's research falls short of addressing these critical concerns in a comprehensive and evidence-based manner. By fostering transparency and accountability, the CFPB can ensure that its regulatory decisions are based on sound evidence and serve the best interests of consumers and industry stakeholders.

---

[49] CONSUMER FINANCIAL PROTECTION BUREAU
12 CFR Part 1022
[Docket No. CFPB-2024-0023]
RIN 3170-AA54
Prohibition on Creditors and Consumer Reporting Agencies Concerning Medical Information (Regulation V)

_Andrew Nigrinis_

Andrew Nigrinis, Ph.D.

July 8th, 2024