IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| ACA INTERNATIONAL<br><br>and<br><br>SPECIALIZED COLLECTION SYSTEMS, INC.,<br><br>           Plaintiffs,<br><br>v.<br><br>CONSUMER FINANCIAL PROTECTION BUREAU; and ROHIT CHOPRA, in his official capacity as Director of the Consumer Financial Protection Bureau,<br><br>           Defendants. | Case No. 4:25-cv-00094 |

**SWORN DECLARATION OF ANITA MANGHISI
IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**I.
INTRODUCTION**

1. I, Anita Manghisi, am the owner of Independent Recovery Resources, Inc. ("IRR"). I am the former President of the New York State Collectors Association, the former Legislative Chairwoman for the New York State Collectors Association, a former Board Member of ACA International, as well as a former member of ACA International's Federal Affairs Committee.

1

2. I am over 18 years old and have personal knowledge of the facts sworn to herein and if called to testify, I could and would competently so testify. I submit this Declaration in support of ACA International and Specialized Collection Systems Inc.'s ("SCS") (collectively "Plaintiffs") Motion for Preliminary Injunction.

3. If the CFPB's Final Rule regarding Prohibition on Creditors and Consumer Reporting Agencies Concerning Medical Information (Regulation V), published in the Federal Register at 90 FR 3276 (the "Rule") becomes effective on March 17, 2025, my business and my personal financial situation will be irreversibly harmed with no opportunity for recompense.

A. **Summary of Testimony that Supports Vacating the Final Rule**

4. The Rule must be enjoined from taking effect or my business and I will face losses that can never be recovered. My testimony provides the below facts in support of Plaintiffs:

- **Restricts Speech.** The Rule cuts off my firm's only means to communicate accurate information about the medical debts it collects to creditors via the credit reporting agencies ("CRAs"). It infringes upon my First Amendment right to convey and receive accurate information about facts that are important to my business.

- **Harm to Health Care Providers.** The Rule removes an incentive for people to pay my clients who are healthcare providers as well as my non-healthcare provider clients whose accounts I will also stop furnishing.

- **Medical Debts are Accurate.** The Rule is based on a fallacy that medical bills are "plagued with inaccuracies." In my experience, medical bills are seldomly invalid or incorrect. Rather, consumers need one-on-one conversations with my collections staff to better understand their bills and their payment obligations.

- **Consumers Already Have Protections.** The Rule is unnecessary because my policies and procedures under the Fair Debt Collection Practices Act ("FDCPA") and Fair Credit Reporting Act ("FCRA") provide consumers the right to understand the medical debts they owe, and dispute amounts they do not believe they owe. My firm is legally required to correct errors under the FDCPA and FCRA. The Rule is unnecessary because the No Suprises Billing Act helps alleviate the out of network expenses consumers have faced in the past.

- **Harm to the Healthcare System.** The Rule will cause medical providers to lose revenue, which causes a host of trouble. It will harm access to healthcare, especially in small and rural communities. It disincentivizes payment for healthcare services and may disincentive people from paying for health insurance.

2

- **Harm to Consumers**. When IRR stopped furnishing medical debt information in New York state, IRR's collections decreased significantly. Thus, IRR had to increase telephone contacts, mailing services, and litigation to ensure that healthcare clients were fairly paid for their services.

- **Harm to Access to Credit.** This Rule will diminish the accuracy and value of credit report information. Thus all the gains American consumers—especially low-income consumers—have received from the democratization of credit will be reversed.

- **Now Cash Up-Front will Be Required.** My healthcare clients will stop providing medical services prior to payment, thus more people will need to pay upfront for healthcare services.

- **Will Cause Bad Underwriting.** The Rule suppresses accurate information about accounts that help creditors make ability-to-repay assessments—thus it will contribute to the same faulty underwriting that led to the 2007 Financial Crisis.

B.  **Independent Recovery Resources Collects Medical Debt for Healthcare Clients**

5. I am the president and chief executive officer of IRR. I opened this small business in March of 1996. IRR, a certified Woman Owned Small Business ("WOSB") based in Patchogue, New York, operates as a full-service debt collection agency and employs a staff of five. IRR is a dues-paying member of ACA.

6. IRR's principal purpose is the collection of debts owed or due, or asserted to be owed or due, to another. It is a "debt collector" under the FDCPA and a "covered person" under the Consumer Financial Protection Act. As a debt collector, IRR relies on accurate credit reporting to assess the value of accounts, individuals' propensity to repay, and other important financial data.

7. Many of IRR's clients are healthcare providers who offer and deliver services to Americans prior to those individuals paying for services. This allows people to obtain medical care without paying the full price of the care upfront. IRR has accounts across the United States, and it's agents regularly communicate with consumers for those accounts, including through calls, emails, and text messages. In addition, IRR initiates lawsuits to collect on past due medical debts, which ensures that physicians and hospitals are fairly paid for their services.

8. IRR regularly seeks to recover unpaid past due amounts for services rendered—including for medical and hospital care. IRR's clients rely on my firm to help recover their outstanding debt so that they can continue operating and providing quality healthcare to the communities and consumers they serve. IRR works with its healthcare clients to answer consumer questions, resolve disputes, and arrive at achievable resolutions, including settlements and payment plans. Over the nearly thirty years that IRR has been in business, we've found that our clients appreciate our willingness to work with consumers and also our understanding that a consumer may need additional flexibility on a specific account.

## II.
## THE RULE IS UNNECESSARY, WILL DAMAGE THE ECONOMY, AND HARM PEOPLES' HEALTH

**A.     The Rule's Restriction of Speech Directly Harms Me and IRR**

9. Under the Rule, no creditor can get information about consumer medical debts.

*(1)     The Rule Restricts My Truthful Speech*

10. IRR will stop furnishing medical debt information to CRAs due to this Rule.

11. The Rule stops IRR from conveying truthful speech about past due medical accounts to creditors in the United States.

12. The Rule, as applied, also stymies speech about non-medical debt. Because my system of record cannot distinguish between healthcare and non-healthcare debt, IRR must stop credit reporting all types of accounts to avoid violating the Rule. Now, CRAs are considering IRR's inability to report accurate data on non-medical accounts as a breach of contract, exposing us to additional litigation risk. This has caused us to be at risk of losing the future ability to furnish accurate reporting about non-medical debt.

  (2) *<u>The Rule will have Direct Financial Costs to IRR</u>*

  13. In states with laws similar to the Rule, the inability to provide truthful information about past due debts to CRAs has severely damaged my business.

  14. When consumers do not experience any consequences for unpaid accounts, they are less likely to pay. This not only hurts my revenue, it means that healthcare providers are not being compensated for their services. Or, as discussed below, litigation is more likely to be used as a method to collect on accounts.

  15. IRR sends accounts to litigation. Because the prohibition on credit reporting in certain states removes a consequence for nonpayment, unpaid accounts in those states are moving to litigation more quickly and at higher volumes than in previous years.

  16. Because the Rule will increase collection through litigation, there are many negative consequences. Namely, collecting debt through litigation is the most expensive, most embarrassing, and least efficient method of collecting on past due obligations. It also burdens society at large, who must pay for the court system or have their own legal resolutions delayed because the courts are overburdened.

  17. The cost to IRR to collect a hypothetical $ 1,500 account in New York state courts is $500 in filing fees alone. That cost is included in the amount owed by the consumer, and therefore increases the total amount due from the consumer. The cost of collection increases as the amount of unpaid debt increases, as I must file in a different court with more expensive filing fees and may require the assistance of counsel.

  18. The recovery of the judgment also incurs costs. Once IRR receives a judgment, we may garnish wages or bank account funds. This is not a voluntary process for consumers. In contrast, if a consumer made a payment arrangement during a typical collections conversation,

that consumer would have several choices about payment timing and amounts. The Rule eliminates that option, which harms my business, the clients we serve, and the consumers they serve.

B.      **IRR Collects Accurate Medical Debt in Compliance with the FDCPA and FCRA**

19.     IRR collects medical debts that are accurate and fairly owed. It has policies and procedures to ensure that medical debt accounts are accurate, consumers are receiving accurate statements, that agents on calls are providing accurate information, and credit reporting is accurate.

20.     In my experience, when a patient disputes a medical debt, they usually are incorrect and merely need a better understanding of their records. In my 36 years of experience in the account receivables industry, less than 1% percent of the consumers disputes that IRR receives are valid disputes about inaccurate medical debt. In most cases, consumers simply need guidance understanding the bills and how they work under their policies.

21.     Relatedly, the CFPB cannot rely upon a mere count of "disputes" or "complaints" about medical debt to assess whether medical collection accounts have errors. Disputes and complaints do not indicate actual inaccuracies. The CFPB should only base policy on proven instances of inaccurate data.

C.      **Consumers Already Have Adequate Protections**

22.     I have studied, received training, and provided training on Confidentiality, Health Insurance Portability and Accountability Act ("HIPAA"), 501(r), the FDCPA, the Gramm-Leach-Bliley Act ("GLBA"), the Fair Credit Reporting Act ("FCRA"), Regulation F, Identity Theft, Red Flags, Accuracy & Integrity, Bankruptcy, and other regulatory requirements that impact my agency. IRR complies with all these laws. The FDCPA, FCRA, GLBA, HIPAA, Regulation F, several other privacy laws, and many state laws already address the CFPB's concerns related to reporting of inaccurate information and protecting consumer privacy.

23. The FCRA already requires furnishers to report only complete and accurate data to the CRAs. The Rule's supposed rationale in combatting "inaccurate" medical debt tradelines is thus already addressed by existing law. Similarly, the FCRA requires IRR to reinvestigate disputed information about medical debt. When IRR receives a medical debt dispute, IRR's process is as follows: upon receiving a consumer dispute, IRR immediately suspends the account from further collections. Then we seek validation and supporting documentation from the original healthcare provider. If we obtain that validation, we send the appropriate documents to the consumer and restart the collection process. If IRR is unsuccessful in obtaining validation from the original provider, IRR closes the consumer account and returns it to the client. IRR then removes the tradeline from the consumer's credit report, and advises the consumer that it has been removed and that we could not validate the debt.

24. Relatedly, the No Surprises Billing Act ("NSBA") went into effect on January 1, 2022, which has already, and will continue to, reduce the level of emergency services costs and out-of-network insurance bills. This law further protects consumers from unexpected expenses and provides a consumer friendly appeal process if a consumer receives a bill for which they believe they should not be responsible. Thus, the NSBA provides a two-fold protection system for consumers, making the CFPB's Rule here unnecessary.

25. Regulation F also prevents inaccurate information from being furnished to CRAs, and states a debt collector must not furnish to a CRA information about a debt before the debt collector: (i) Speaks to the consumer about the debt; or (ii) Places a letter in the mail or sends an electronic message to the consumer about the debt and waits a reasonable period of time to receive a notice of undeliverability. 12 CFR § 1006.30(a)(1). Consumers may dispute the accuracy of an account with the debt collector before account information is furnished to a CRA. This provision

became effective January 19, 2021. The Rule, which relies on studies that predate this period, does not account for changes in practices that address this accuracy concern and already prevent inaccurate medical debt credit reporting.

26.     IRR complies with the requirements of the FCRA and Regulation F. If IRR is unable to obtain debt validation and verify the account, it deletes the tradeline. Even if IRR was delayed in responding to a consumer's FCRA dispute, the CRAs themselves automatically delete the tradeline without further inquiry if they don't receive prompt verification from IRR.

**D.      The Rule will Hurt the Medical Care System in Multiple Ways**

   *(1)     Harm to Healthcare Creditors and Collectors Who Are Not Paid*

27.     The Rule creates a direct disincentive for consumers to not pay their medical debts. People want to pay their debts so that they are attractive to lenders and qualify for superior credit offers. Many consumers believe that if a debt is not reflected on their report, it is not owed. And even for those that do understand they have an obligation to repay, there is no incentive to pay their medical debts if it will not go on their consumer report and impact their future eligibility for and access to credit. After recent credit reporting maneuvers by the CFPB and some states, many consumers have started questioning or refusing to pay medical debts because there is little consequence to that course of action. The Rule will exacerbate this trend.

28.     I have personally observed decreased collections of medical accounts in states that have banned medical debt reporting. Specifically, when the New York restriction came into effect, my collections dropped 40% percent, and I expect this number to increase over time.

29.     Relatedly, many healthcare providers with whom I do business are now choosing not to send accounts to collections at all. They are writing the unpaid accounts off as bad debt and taking the loss on their balance sheets instead. The lost business has forced IRR to try and evolve into other areas of business in a very short timeframe, which has been challenging.

      (2)      *<u>The Rule Will Cause Consolidation in Healthcare Providers</u>*

30. When healthcare providers lose revenue due to this Rule, it will hurt the availability of medical care as fewer physicians are attracted to the profession and fewer hospitals and clinics open for business. My healthcare clients, including physicians, have consolidated with other firms when they are not earning sufficient revenue. It is not uncommon for small towns to only be served by a few medical providers. If small providers cannot get paid, these businesses must close or merge with a large company, leading to further market consolidation. In rural parts of America, there is a dearth of healthcare access already. This Rule will make it harder for patients in rural areas to receive medical care.

31. Where a consumer might have previously had better access to care, they are now dependent on large companies that may not have a meaningful presence in their community. Even for those who still have physical access to care, reduced market competition drives up consumer pricing, preventing some from accessing care because of increasing consumer costs.

      (3)      *<u>The Rule may Disincentive People from Obtaining Health Insurance</u>*

32. Consumers who see no negative consequences for skirting medical debts may stop paying for health insurance. People who pay an out-of-pocket premium on health insurance may choose to no longer carry health insurance if medical debt is no longer credit-reported. Even individuals who qualify for Medicaid may not see the value of taking time to apply if there is no impact of nonpayment on their credit score. The unintended consequence may be a large reduction in insurance dollars to hospital systems, leading to a reduction in services or staff available to patients (including those who do pay their medical debts).

E.  **Harm to Consumers**

(1)  *Reduced Access to Credit and Health Care Services*

33. While my healthcare clients currently allow patients to receive services prior to payment, this option will be eliminated in favor of pre-payment. If doctors and other healthcare workers are unable to collect payment after services have been rendered, they will stop offering services in advance and will only provide services to those who can pay for them beforehand. I have personally observed this with my clients who provide elective services, and anticipate that this practice will likely spread to non-elective services as a consequence of this Rule.

34. Prepayment requirements could create dire consequences: (a) People may not seek and receive preventative care; (b) People who cannot afford out-of-pocket costs for care will be forced to use high-cost financing methods like credit cards, or worst case, forgo medical treatment altogether; and (c) People who cannot pay for a procedure upfront will be denied access to care. What may have been a small or preventable issue could grow into a life-threatening emergency. Not only are these peoples' health more at risk, but the cost of care will increase.

35. Because hospitals are not able to turn away life threatening emergencies, those providers are forced to absorb even higher costs of care (which otherwise could have been prevented) which will be passed onto society in the form of higher healthcare costs generally.

(2)  *Reduced Access to Information about Obligations*

36. Consumers are also harmed by incomplete and inaccurate credit reports. Consumers often leave mail unopened or are unsure if an initial written collection notice accounts for insurance payments. It often takes the straightforward communication of seeing an item on a credit report to incentivize a patient to address an issue with their insurance company, act to avoid future litigation, or act before a provider drops them as a patient in their practice.

37. By removing the option of credit reporting for learning about financial obligations: (a) Patients may miss important insurance deadlines and be forced to pay out-of-pocket for medical care that could have been covered by insurance or charity care and (b) Patients will be surprised about more serious and expensive consequences of unpaid debt, such as a lawsuit.

**F.     The Rule Will Cause Bad Underwriting Because the Credit and Debt Collection Industries Rely on Accurate and Complete Credit Reporting Information**

38. By prohibiting my use of medical debt information, I am unable to fully evaluate accounts from my clients, assess propensity to pay, and otherwise understand the consumer's financial profile in a way that allows IRR to successfully recover unpaid debts for my clients.

   (1)     *Inaccurate Assessment of Ability to Repay Will Harm Everyone*

39. A Rule that prevents agencies from accurately reporting the amount of debt owed by a consumer and prevents lenders from issuing credit based on an accurate assessment of a consumer's finances fails to meet the needs of commerce for consumer credit and results in a system that is unfair and inequitable to consumers. In my experience, when creditors do not accurately assess the default risk of consumers, the result will be: (a) consumers take out more credit than they can repay; (b) consumers default on obligations; (c) this results in collection, litigation, or bankruptcy. When this happens on a large scale, it disrupts the economy—as it did for years after the 2007 financial crisis.

   (2)     *Inability to Predict Defaults Restricts Credit for Consumers*

40. Imagine a consumer with an "Excellent" credit score who secretly owes $ 50,000 in medical debt. That person may take out loans for cars or get a new credit card based on that excellent credit score, but soon after file for bankruptcy protection due to the invisible medical debt. This type of repeated pattern will decrease the efficacy and reliability of credit reports and credit scores for all borrowers in America.

41. When creditors are unable to effectively predict a consumer's propensity to pay or risk of default, the creditor is less likely to offer credit. If they do offer credit, it is on more expensive terms to offset the unknown default risk. The inability of creditors to predict the risk of default results in restricted credit access for consumers.

42. This leads to the exclusion of certain groups and people that can no longer set themselves apart through their historically positive payment behaviors, further harming those consumers who do honor their payment obligations. The financial penalties imposed by creditors to offset the unknown risk of default will be assessed against *all* consumers – even those with high credit scores and no outstanding medical debt. Thus, the Rule penalizes responsible hardworking consumers for no fault of their own. It also increases the risk that lenders and creditors are forced to rely on statistical information that may further promote systemic biases in the financial markets, further excluding individuals who would otherwise have been offered credit.

43. Finally, not only does this reality harm consumers who have been financially responsible; it also creates a direct disincentive for consumers to pay their medical debts. If all the money poured towards paying off their medical debt is invisible to lenders, consumers may reason that there is no point to making payments at all. A reasonable consumer would elect to spend that money elsewhere, paying down other debts, or putting it in savings.

### III.
### THE RULE WILL CAUSE IRREPARABLE HARM TO IRR AND MY RIGHTS

44. If the Rule is not enjoined, IRR will face substantial and irreparable harm. To comply with the Rule by March 17, 2025, IRR must expend significant money and time to make compliance changes, including rewriting policies and procedures, re-negotiating contracts with medical clients, employee training, and system updates. There will also be the cost of hiring legal

counsel if it becomes more difficult to collect, and there is a need for increased litigation. Hiring in-house or outside law firms, and the cost of litigation will likely exceed $10,000 dollars a year.

45. We may need to update computer programs and software, invest in different technologies, and renegotiate contracts with vendors and third parties to accommodate the changing nature of each and how they are covered by the FCRA. These all incur additional costs.

46. The Rule is set to take effect on March 17, 2025. The Rule represents a massive change, so small entities will need as much time as possible to take necessary measures to comply. It will be impossible for many small businesses, including my agency, to achieve full compliance with the Rule by that deadline and we will be at risk of fines, penalties, and enforcement action.

47. The Rule interferes with our ability to conduct efficient collections at the same volume as IRR currently collects, and therefore will also result in a reduction of revenue. IRR experienced a 40 % revenue drop when medical debt credit reporting was banned in New York State. To offset the limitations imposed by the Rule, I anticipate increased call campaigns. Under CFPB's Regulation F, it is possible to make seven calls in seven days. Many agencies, like mine, are currently under that limitation because we use a variety of tools to connect with consumers.

48. The Rule's limitation on options that have proven successful in delivering information to consumers will result in a focus on only calling or litigating. I anticipate hiring additional staff to make more phone calls and send more letters. In an environment where employment hiring is extremely challenging, it will be difficult to increase my staff within two months. I am concerned about attrition in current staff, by having limited resources due to loss of ability to collect. I need ample time to prepare my company and clients for such a large change.

49. All of the outlined compliance and costs burdens are exacerbated for small businesses, like mine, who have fewer staff and less in-house legal counsel. In some instances,

very specific client bases will be disproportionally impacted, and fewer resources will be available to devote to duplicative compliance requirements. As the CFPB has acknowledged, nearly 93% of companies in the debt collection industry fall within the definition of a "small business." It cannot be overstated that the Rule will have extremely detrimental effects for the debt collection industry and those they serve, including doctors and other healthcare providers.

50. For many small businesses, the Rule will result in their reduction or elimination. When compliance costs or revenue reduction become too burdensome, small businesses pay the highest price. They are often forced to reduce offerings or cut entire business lines and products. In the worst-case scenarios, they either go out of business completely, or are acquired by a larger company that can absorb the compliance burdens. This causes market and industry consolidation, where only the biggest companies, who already utilize vertical integration, can survive. Small businesses that operate using many vendors and third parties will simply be unable to compete.

51. Even for those small businesses and providers that survive, they may have insufficient staff or funding to be open full time. Consumers are the ultimate losers in this situation.

52. Finally, consumers will also be hurt by a system that allows them to overleverage themselves. When any type of creditor evaluates the creditworthiness of a potential borrower, they don't only observe repayment history and spending behaviors. They also look to understand the totality of a consumer's financial liabilities. If a payment obligation is not reflected in a consumer report, the debt-to-income ratio will be artificially deflated.

53. If there is no litigation over medical debts, the Rule would make medical debt payment voluntary. Given that litigation is expensive for all parties (including debt collectors), if litigation is never used as a substitute for the loss of credit reporting, the result would be a voluntary

payment system. Some consumers will pay their debts, as there are strong cultural norms for honoring debts. But lack of good consequences would quickly unravel the medical debt market.

54. If health providers cannot expect to be paid for their services, they will react to protect themselves by raising prices to account for losses due to uncollectable medical debt or refusing to seeing patients who require financing. They may require collateral or reject financing for patients whose credit scores are below a certain threshold. It's realistic to expect some mixture of these options to unfold in the market. Each scenario is inefficient and bad for consumers.

55. To reduce the risks and offset the costs created by the Rule, many small businesses, including IRR will likely reduce or restrict product and service offerings. For example, IRR has taken steps to reduce its collection of accounts that it receives after default, and is considering removing its offering of those services altogether. Given the regulation in this area, including the Rule, IRR is only able to meaningfully service first party accounts that it receives prior to default or that otherwise do not fall within the purview of the FDCPA.

56. Finally, my First Amendment rights will be irrevocably denied if this Rule is allowed to go into effect. I have a protected right to communicate truthful and accurate information. This Rule denies me that right.

57. The Rule's departure from existing standards creates significant hardship for IRR. It will both cost time and money when implemented, and will cost money to maintain, draining the finite resource of IRR staff time and funds.

Pursuant to Local Rules, I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 17, 2025

 /s/ Anita Manghisi
Anita Manghisi, President & CEO
Independent Recovery Resources, Inc.