**EXHIBIT 4**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| ACA INTERNATIONAL and SPECIALIZED COLLECTION SYSTEMS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> CONSUMER FINANCIAL PROTECTION BUREAU; and ROHIT CHOPRA, in his official capacity as Director of the Consumer Financial Protection Bureau, <br><br> Defendants. | Case No. 4:25-CV-00094 |

**SWORN DECLARATION OF MEGAN HEBERT IN SUPPORT OF PLAINTIFFS' MOTION ON APPLICATION FOR PRELIMINARY INJUNCTION**

**I. INTRODUCTION**

1.  I, Megan Hebert, am the President and Chief Executive Officer of Specialized Collection Systems, Inc. ("SCS") based in Houston, Texas. SCS is a female-owned, 100% female-staffed small collection business specializing in the collection of medical debt. We at SCS believe medical debt collection is about informing patients of the existence of their account, providing account details, being a resource to answer questions, and offering them options to resolve their account. The Rule makes that work more burdensome and difficult.

1

2. I am over 18 years old and have personal knowledge of the facts sworn to herein and if called to testify, I could and would competently so testify. I submit this Declaration in support of ACA International and SCS's ("Plaintiffs") Complaint under the Administrative Procedure Act.

3. If the Consumer Financial Protection Bureau's ("CFPB") Final Rule regarding Prohibition on Creditors and Consumer Reporting Agencies Concerning Medical Information, published in the Federal Register at 90 FR 3276 (the "Rule") becomes effective on March 17, 2025, my business will be irrevocably harmed. Those harms will, unfortunately, pass on to my healthcare provider clients and the patients and consumers that we ultimately serve.

A. <u>Summary of Testimony that Supports Vacating the Final Rule</u>

4. The Rule must be enjoined from taking effect on my business or I will face financial and asset losses that can never be recovered. My testimony provided here establishes the following facts in support of ACA and SCS:

- **Harm to Healthcare Providers**. Some of SCS's harms are passed onto healthcare providers who do not receive full payment for services rendered. This will affect all medical providers, but is especially true for specialties who often to not have contact with the patient during their treatment, such radiology, pathology, and anesthesiology. This creates adverse implications for providers and the healthcare system.

- **Harm to the Healthcare System.** The Rule will increase the number of medical accounts that go unpaid. Medical providers will lose revenue, which will ultimately increase the cost of healthcare. Practices with tight margins may close down or consolidate due to an increase in outstanding accounts receivable that cannot be recovered. This would be especially harmful to rural areas where there are not multiple medical providers. If those providers are forced to close down, there will be geographical areas with no immediate access to healthcare.

- **Now Cash Up-Front will Be Required.** The Rule will require healthcare providers to make up for that lost revenue by creating and implementing new operating procedures such as new payment requirements on patients. My healthcare clients will stop providing medical services prior to payment. Thus require more people to pay upfront for healthcare services.

- **Harm to Consumers**. Our Patient Payment Advisors work with consumers to establish reasonable and practical payment plans. The Rule restricts our ability to effectively and efficiently communicate with consumers.

B.  **Overview of Specialized Collection Systems, Inc.**

5. SCS was founded in 1976 by Ken and Diane Akre, my parents. In founding SCS, my parents set out to provide collection services to often overlooked, smaller balance physician groups, such as radiology, pathology, and anesthesiology. My parents were committed to the idea of building a unique kind of collection service—one that empowers patients through respectful communication while addressing their experiences with understanding and care. That tradition continues today.

6. Our core healthcare specialties, radiology, pathology, and anesthesiology—continue to serve as the foundation of our client portfolio. Over time, we've expanded to support a wide range of specialties, including cardiology, medical centers, family practices, dermatology, and behavioral health, among others. From its founding, SCS has only ever been 100% medical collections—meaning we only collect on medical debt. Nothing else. We are a trusted resource for medical collections for hundreds of healthcare providers.

7. I am the sole owner of SCS after purchasing it from my father in 2017. I lead a wonderful team of 11—all of whom are women. My 100% female team is comprised of almost entirely working mothers. I am proud to share that my team has an average tenure of 15 years, demonstrating our deep expertise and unwavering commitment to excellence in our field.

8. SCS started offering credit reporting as part of our standard operating procedures in approximately 1989. In SCS's early years, letters in the mail and credit reporting were the only two outbound forms of communication SCS employed. This is different from most of the collection industry. At SCS, we do not make outbound calls. We never have.

9. As technology has advanced, we have added additional digital communication tools

to our operations while maintaining our weekly credit reporting updates. We strongly believe that it is our job to inform patients about their accounts and then allow the patient to select the communication channel that best fits their current need and situation. This allows patients to resolve their debt in a respectful nature. Our no-outbound-calling paired with credit reporting approach to collections has long been a distinguishing feature and a key factor in why providers select SCS as their trusted collection partner. Healthcare providers love knowing my team and my collection activity invites communication on the patient's schedule, yet still delivers positive results.

10.     SCS has never hired a "collector." We named our call center team "Patient Payment Advisors." When patients call SCS, most of the conversation is spent educating patients about their account. A number of SCS accounts are resolved before SCS furnishes any credit report information. In these instances, consumers review their mail and respond in a short timeframe to either resolve the account or exercise their validation rights under the Fair Debt Collection Practices Act. Typically, the debt remains unpaid because there is confusion about the debt including: the patient has never personally interacted with the provider listed on the statement, the patient's contact information has changed since services were rendered, the patient mistakenly believes insurance covered the entire cost of the services provided, or there was a disconnect in the patient data transfer.

11.     Our Patient Payment Advisors work to bridge any gaps in understanding between the patient and hospital billing or professional physician billing. Our Patient Payment Advisors inform patients about their responsibilities after third-party payors and other interventions (like charity assistance) occur and then work to settle the bill with the patient. Importantly, our Advisors are not compensated with a collection commission plan. In other words: what is collected does not

determine the financial success of any SCS employee. Our team's number one goal is to (1) provide information and then (2) resolve the account.

12. As my father would say: we prefer passive, yet effective, communication. But the Rule would eliminate that passive communication. The Rule will have devastating impacts on our business. First, we will lose the opportunity to directly and efficiently communicate with consumers through their credit reports and associated monitoring services. In many cases, the first meaningful and actionable interaction with a patient occurs when they proactively choose to review their credit report. Losing that vital communication channel will ultimately make the collection of the debt harder—which directly impacts our bottom line. Second, because we are losing such a major communication device, we will need to explore additional options to communicate with patients. This strikes at the heart of what makes SCS unique and will increase operational expenses. We pride ourselves on respecting a patient's autonomy by utilizing passive—rather than active—forms of communication. The Rule makes that much more difficult.

13. The Rule threatens SCS's bottom line and derails our business overnight. The economic impact is incalculable. Decades of standard operating procedures will need to be undone and retooled. This will require staff time and resources. The impact on our brand and reputation is even harder to predict. Our unique approach will be more difficult and more limited—and as a result, healthcare providers may choose to abandon the passive yet effective SCS method.

14. The impact on our business as a result will be irreparable. And it begins immediately. We will need to begin in earnest to make all of the changes I mentioned, expending money and resources immediately to attempt compliance with the Rule.

## II.
## THE RULE IS UNNECESSARY AND DIRECTLY HARMS SCS, PROVIDERS, AND CONSUMERS

**A.      The Rule's Restriction of Speech Directly Harms Me and SCS**

15.    In the simplest terms possible, the Rule will forbid SCS's longstanding practice of communicating about medical debt to consumers via the credit reporting channel. In addition, the Rule stops me and SCS from conveying truthful speech about past due medical accounts to creditors in the United States. The Rule thus violates my First Amendment right to convey truthful and accurate information both to consumers and other creditors. If this Rule is allowed to go into effect, the loss of my First Amendment rights will be both substantial and ongoing.

16.    In every instance, SCS communicates with patients by email or letter (collectively "mail") before it furnishes information about medical debt to credit reporting agencies. But many consumers are unmotivated by mail for a variety of reasons, which may include:

   a. Patients receive by mail a deluge of confusing information with multiple pages and fine print from providers and insurance companies, thus become trained to not view such mail as important or informative;

   b. Patients often ignore (or do not open) bills and letters that explain their payment responsibility;

   c. Providers and insurance companies may address correspondence to a patient instead of the responsible party;

   d. Patients may not recognize the name of the provider because it is not their primary caregiver (e.g., radiologists or pathologists);

   e. Patients may simply procrastinate until there is a clear consequence for non-payment.

17.    For the subgroup of consumers who do not respond to mail, reporting the

6

outstanding debt to the credit reporting agency is a powerful, efficient, and passive tool to motivate a consumers' communication with SCS. When the debt is reported, the consumer is able to see—with their own eyes—the debt amount and understand quickly that it must be repaid. The reporting does not require SCS to make numerous calls to patients; nor does it require SCS to contact patients at work or at home. Instead, we are able to efficiently pass information from us to the patient in an established and regulated channel: the credit report.

18.     Once patients see their debt, they can quickly and easily contact an SCS Patient Payment Advisor who can explain to them what the bill is and how the bill can be resolved. As I have explained, during patient calls, most of the call time is spent explaining the patient's responsibility and how insurance and other benefits were applied. Once we have established that information, our Advisors then guide the consumer through the process of settling the account.

19.     If the Rule takes effect, SCS can no longer communicate with patients through credit reports. That avenue of communication will be entirely foreclosed. We will have fewer communication options, most of which may be more burdensome on the patient. Patients will be less likely to pay on debts that never hit their credit reports—meaning SCS is less likely to collect.

20.     This impacts our bottom line. As of now, 63% of SCS's active clients—in other words, a majority of our business—rely on credit reports to communicate with consumers. For a rough estimate (and acknowledging that more work must be done to understand the Rule's impact on our business), I believe the Rule will result in a 20% decrease in collections, with greater decreases in certain specialties.

**B.     SCS Collects Accurate Medical Debt in Compliance with the FDCPA and FCRA and All Other Statutes and Regulations**

21.     The CFPB's primary rationale for the Rule is based on unsubstantiated information about patient complaints and disputes. Complaints and disputes do not prove that medical debt is

7

plagued with inaccuracy. For example, the Rule states that "43 percent of all adults and 53 percent of adults with medical debt in a nationally representative survey believed they had received a medical or dental bill that included an error." Even if the data from the survey is reliable, the CFPB's conclusions from the survey do not take into consideration that many patients' belief that there is an error does not mean there is actually an error on their bill. This is especially true when patients receive a bill from a provider that works independently within a hospital system and the patient has no personal interaction with the provider.

22. SCS collects medical debts that are accurate and fairly owed. We have policies and procedures to ensure that medical debt accounts are accurate. Additionally, we have further policies to ensure that all patient communications reflect accurate account information, that our Patient Payment Advisors who communicate with consumers do so with accurate information, and that the information reported to credit bureaus is also accurate.

23. In my experience, when a patient disputes a medical debt, they usually need a better understanding. That is why our Advisors play such an important role. Common conversations between my Patient Payment Advisor and the consumer includes:

    a. "This charge is separate from the hospital. The hospital charges for the use of the facility and the taking of the test. Your account with us is for the professional interpretation of the test."

    b. "Your CT Scan has to be read by a board-certified Radiologist. Your primary care doctor cannot read results of your CT Scan; they are not trained or certified to do so."

    c. "This account is from <doctors/provider group name>, they bill separately for their professional services."

      d. "This account was not part of the bill you received from the Hospital, this is separate."

      e. "Your insurance has already reviewed the charges, determined them to be valid, and paid their portion. The remaining balance is patient responsibility."

      f. "It looks like the insurance has processed this, BCBS was $X, they paid $X and adjusted $X which left a patient responsibility of $X."

      g. "I see that your insurance was billed and did process the claim but the balance of $X was applied towards your deductible or coinsurance."

24. Patient confusion is a common theme during calls across all healthcare specialty accounts. However, we see an increase in these instances when collecting for providers who, due to the nature of their field of medicine, may not have direct interactions with the patients they are treating and contributing to their care plans. For example, when a biopsy is conducted and a pathology report is run, the patient's surgeon or primary care provider may go over the results with the patient. But it is a pathologist who studies the disease and makes a diagnosis. Patients, though, may never know their pathologist's name. There is natural confusion when a bill comes from a physician that the patient is not familiar with, and that bill is often tossed aside. That's where SCS comes in. When the bill is not paid, we are brought in to help inform the patient of their obligations—even to doctors they may not know. Often, this simple act of education is enough to resolve the account.

25. In fact, less than 1% of SCS's disputed medical debts are actually inaccurate after an investigation following a patient dispute or inquiry.

26. Due to this experience, I do not find the CFPB's reliance upon counts of disputes

9

or complaints to be informative about accuracy problems in medical debt. Most consumers who complain are simply confused or misunderstand their accurate bill.

C. **The Medical Debt Reporting Rule is Unnecessary**

27. The FCRA already requires furnishers to report only complete and accurate data to the consumer reporting agencies. The FCRA also requires SCS to reinvestigate disputed information about medical debt. In addition, the credit reporting agencies also impose their own requirements and monitor credit furnishers for trends in the inaccuracy of reporting such as valid disputes. SCS has policies and procedures implementing these requirements that are laid out in an internal document made available to staff. The instructions include: "If an item is determined to be inaccurate, incomplete, or unverifiable, modify or delete the item in the consumer report or permanently block the reporting of that item."

28. Relatedly, the No Surprises Billing Act went into effect on January 1, 2022, which has already, and will continue to, reduce the level of emergency services costs and out-of-network insurance bills. This law further protects consumers from unexpected expenses and provides a consumer friendly appeal process in the event a consumer does receive a bill for which they believe they should not be responsible. Thus, the No Suprises Billing Act provides a two-fold protection system for consumers, making the CFPB's Rule here unnecessary.

29. Regulation F—which implements the FDCPA—also prevents inaccurate information from being furnished to CRAs. Regulation F says a debt collector must not furnish to a CRA information about a debt before the debt collector: (i) Speaks to the consumer about the debt; or (ii) Places a letter in the mail or sends an electronic message to the consumer about the debt and waits a reasonable period of time to receive a notice of undeliverability. 12 CFR § 1006.30(a)(1). Thus consumers may dispute the accuracy of an account with the debt collector before account information is furnished to a credit reporting agency.

30. This provision became effective January 19, 2021. Therefore the Rule, which relies on studies that predate this period, does not account for changes in practices that address this accuracy concern and that already prevent inaccurate medical debt credit reporting.

31. SCS complies with the requirements of Regulation F, and therefore consumers have adequate existing protection, making the Rule unnecessary.

32. Even if a consumer does not open mail or act to validate a debt prior to reporting, consumers have protections against inaccurate reporting under the FCRA. If SCS is unable to obtain debt validation and verify the account, it deletes the tradeline. And even if SCS was delayed in responding to a consumer's FCRA direct dispute, the CRAs themselves automatically delete the tradeline without further inquiry if they don't receive prompt verification from SCS.

**D.    SCS's Harm Will Be Passed On to Healthcare Providers**

33. The credit system is a cohesive ecosystem—meaning few actions impacting one part of that ecosystem remain siloed. Instead, actions that impact collection will also impact healthcare providers. Unfortunately, this means that the harms the Rule imposes on SCS will eventually be passed onto our healthcare provider clients.

34. Patient billing begins with their insurance provider. If patients are unaware that their insurance company has already reviewed and processed the bill, they may overlook or delay payment to the healthcare provider. Many conversations between our Patient Payment Advisors and patients start with the common statement, "I thought my insurance covered this." This Rule would significantly limit our ability to educate patients and effectively resolve accounts on behalf of our clients. As previously mentioned, due to the complexities of healthcare, patient information may be incomplete or outdated. In such cases, utilizing an established and regulated channel like the credit report becomes a valuable tool for effective communication and account resolution.

35. SCS works with these physicians to explain to patients who these doctors are, what

services they provide, and how the patients can pay the debt. Because the Rule makes communicating with patients—or motivating their communication with SCS—harder for SCS, it follows that our clients will also suffer. These physicians who rely on SCS to explain who they are and what they do will be negatively impacted when SCS has its communications avenues blocked and collections curtailed.

36.     The results may be far-reaching. If there is no recourse to unpaid debt, my medical provider clients will suffer—and so will their ability to provide lifesaving services. Take one of my (oncology) radiology providers. It costs over one million dollars to maintain, update, and replace an MRI scanner. Not having the operational funds to maintain and upgrade healthcare equipment could make the difference in a proper vs improper diagnosis. I have personally discussed with my clients how they spend the money they receive from SCS's services. These funds directly affect the quality of services that patients receive.

37.     Moreover, if patients know there are no credit-based repercussions to not paying for healthcare services rendered, then providers will not have the revenue to staff their teams accordingly. This will cause delays in patient care because providers will not have sufficient staffing. That will impact office staff, nurses, and eventually physicians.

E.     **The Rule Will Hurt the Same Consumers the Rule Seeks to Protect**

38.     Ultimately, the harms from the Rule that start with SCS will wind up at the feet of patients. These harms will manifest in (1) reduced access to credit and healthcare services and (2) reduced access to information regarding patient obligations.

39.     SCS has previously lost healthcare clients who determined they would rather charge upfront than collect payment after services are performed. This is a rational, market-based reaction to reduced revenues arising from patients' failure to pay.

40.     I expect that many healthcare providers who currently allow their patients to receive

services prior to payment will change their policies in favor of pre-payment. If doctors and other healthcare workers are unable to collect payment after services have been rendered (or have their efforts substantially impaired or costs to collect increased), they will stop offering services in advance and will only provide services to those who can pay for them beforehand.

41. Prepayment requirements could create dire consequences:

   a. People may not seek and receive preventative care;

   b. People who cannot afford the out-of-pocket costs for care will be forced to use high-cost financing methods like credit cards, or worst case, forgo medical treatment altogether;

   c. People who cannot pay for a procedure upfront will be denied access to care. What may have been a small or preventable issue could grow into a life-threatening emergency.

42. Not only are these people's health more at risk, but the cost of care will increase:

   a. Because hospitals are not able to turn away life threatening emergencies, those providers are forced to absorb even higher costs of care (which otherwise could have been prevented);

   b. These costs are passed onto society in the form of higher healthcare costs generally.

43. Contrary to the Rule's stated goal of reducing some of the healthcare burdens, the result of the Rule will exacerbate the issues that already exist in the healthcare industry.

44. Additionally, patients will be injured when a previously open avenue of communication about their payment obligations is foreclosed. We at SCS understand that no one wants to be in the position of owing medical debt. But our experience tells us that in most cases,

medical debts can be cleared through an informative conversation and a payment strategy. Credit reporting prompts those conversations and advances that strategy.

45.     Patients may also see their settlement options dissipate. Due to increased costs of collection and reduction in remedies under the Rule, healthcare clients and agencies will likely reduce offerings for discounts and settlements.

### III.
### THE RULE WILL CAUSE IRREPARABLE HARM TO MY BUSINESS AND MY RIGHTS

46.     If the Rule is not enjoined, SCS will face substantial and irreparable harm. To comply with the Rule by the implementation date, SCS must expend significant money and time to make compliance changes and communicate the nature and impact of these changes to our medical clients.

47.     The Rule disrupts SCS's ability to conduct collections efficiently, in alignment with our core values, business model, and the expectations of our clients. Providers choose SCS for our unique service offerings, commitment to excellence, and proven collection processes and results. By removing a key communication and collection tool essential to healthcare collections, the Rule could result in up to a 20% decrease in collection activity across all active providers, with certain specialties experiencing even greater impact.

48.     SCS will need to adjust its strategies to address this loss in revenue. Currently, the majority (63%) of SCS clients rely on credit reporting as an effective tool to communicate with and collect from their patients. The implementation of this Rule would cause an immediate decline in patient account resolutions, potentially even before its effective date. SCS has already started to field questions from patients who are now even more confused about what is happening with their account and what their responsibilities are to their provider. Patients who were previously motivated to fulfill their financial obligations may disengage, and SCS will lose a critical, safe,

and effective communication channel. As a result, I would be forced to make immediate reductions in payroll expenses, including potential layoffs or furloughs. My team is invaluable, demonstrating immense dedication to SCS, our clients, and the healthcare industry as a whole. Such measures would be devastating for the entire SCS team. I would also need to pursue significant reductions in operational expenses, including scaling back the use of key collection tools, removing certain patient communication channels from our collection portfolio, and downgrading to less effective technology—all in an effort to remain profitable. However, these measures would limit my ability to serve both providers and patients at the high level of effectiveness and quality we deliver today. Over the long term, this would hinder my ability to invest in technology upgrades and advanced collection tools, reduce opportunities for educational training for both myself and my team, and limit my capacity to hire highly qualified employees.

49. These harms begin now and do not wait for the implementation of the Rule. As I have said, immediate changes are necessary to comply with the Rule's short implementation timeline. This includes programming changes, payroll reductions, and procedural adjustments.

50. At a minimum, SCS would incur costs of $105,000 to implement procedures to comply with the Rule by March 17, 2025. These costs would include:

   a. Programming to identify, sequester, and remove accounts from current credit reporting agencies.

   b. Custom programming to ensure ongoing compliance of this Rule for all future accounts placed with SCS.

   c. Removal of all refences to credit reporting from all patient communications; this includes all letter templates, text, emails, Chat Bot scripts, and patient payment portal notices.

   d. Attorney approval of all outbound communication updates, and renegotiation to account for increase in E&O insurance cost and coverage.

   e. Strategy meetings with third-party consultants and attorneys on how to try to maintain performance and service to clients, as well as exploration of collection

   litigation as a credit reporting replacement strategy.

 f. Third-party strategy meetings with collection law firms in various states to potentially contract with for clients that are forced to move to litigation as a collection tool.

 g. Meet and contract with third-party telephone platform systems in anticipation of the need to start making outbound patient calls.

 h. Modify and create new marketing materials removing Credit Reporting as a service offering.

 i. Restructure and rewrite our entire policies and procedures to adapt collection strategies to remove credit reporting as a tool. Attorney approval of updated policies and procedures.

 j. Create new training materials and training the entire SCS staff on SCS's new collection practices, new internal and external rules, policies and procedures.

 k. Web design time to remove all mentions of credit reporting as a Patient communication tool and service available for SCS Clients and Prospects.

 l. Formal communication to all clients, including travel expenses to Client to discuss the ramification of the new rule and consult on new collection strategies to assess loss of revenue and other potential strategies.

 m. Training for SCS's billing partners and other revenue cycle teams that SCS partners with.

 n. Time spent on the implementation of compliance with this Rule by myself, outside counsel, and compliance consultants.

51. Making matters worse, the Rule's implementation timeline is impossibly short. The Rule is set to take effect on March 17, 2025. The Rule represents a complete overhaul of collection strategies, so small entities like SCS will need as much time as possible to take necessary measures to comply.

52. Finally, my First Amendment rights will be irrevocably denied if this Rule is allowed to go into effect. I have a protected right to communicate truthful and accurate information. This Rule effectively limits my ability to do so. I also have a right to receive truthful and accurate communications (in the form of credit reports). This Rule denies me both of those

rights.

Pursuant to Local Rules, I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 23, 2025.

                                                   */s/ Megan Hebert*
                                                   Megan Hebert, President & CEO
                                                   Specialized Collection Systems, Inc.