**EXHIBIT 5**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| ACA INTERNATIONAL<br><br>and<br><br>SPECIALIZED COLLECTION<br>SYSTEMS, INC.,<br><br>                Plaintiffs,<br><br>v.<br><br>CONSUMER FINANCIAL PROTECTION<br>BUREAU; and ROHIT CHOPRA, in his<br>official capacity as Director of the Consumer<br>Financial Protection Bureau,<br><br>                Defendants. | Case No. 4:25-CV-00094 |

**SWORN DECLARATION OF SCOTT PURCELL
IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

      1.      I, Scott Purcell, am the CEO of ACA International ("ACA"). As CEO, I am responsible for ensuring that ACA serves the needs and interests of the membership pursuant to ACA's Bylaws and as directed by its Board of Directors, which is the primary policy-setting body of ACA. Additionally, I ensure that the programs, activities, and services of ACA directly benefit the members, the credit-and-collection industry, policymakers, and consumers.

      2.      I am over the age of 18 and have personal knowledge of the facts sworn to herein and if called to testify I could and would competently testify. I submit this Declaration in support

1

of ACA's and CBS's ("Plaintiffs") Motion for a Preliminary Injunction and Temporary Restraining Order.

3. If the CFPB's Final Rule regarding Prohibition on Creditors and Consumer Reporting Agencies Concerning Medical Information, published in the Federal Register at 90 Fed. Reg. 3276 (the "Rule") becomes effective on March 17, 2025, ACA and ACA's creditor members will be irreversibly harmed with no opportunity for recompense.

4. ACA is a Minnesota corporation with offices in Washington, D.C. and Minneapolis, Minnesota. Founded in 1939, ACA represents approximately 1,600 members, including creditors, third-party collection agencies, law firms, asset-buying or debt-buying companies, and vendor affiliates. ACA provides a wide variety of products, services, and publications, including educational and compliance-related information; and articulates the values of the credit-and-collection industry to businesses, policymakers, and consumers.

5. ACA's primary purpose is to promote and maintain the highest standards of professionalism in the credit-and-collection industry. To that end, ACA represents its members' interests in the legislative and regulatory processes and addresses regulatory issues that are critical to members' success.

6. As the CEO of ACA, I frequently consult with members, and I am aware of federal and state laws and regulations that affect their credit-and-collection businesses, as well as the products and services, and publications, including educational and compliance-related information, that ACA provides to its members. In my tenure as CEO of ACA I have personally spent hundreds of hours learning about the businesses of our members, how their companies operate, the concerns of our members, and the challenges posed by regulations such as the Rule at issue in the instant lawsuit.

7. ACA's creditor members include many of the nation's largest banks and credit unions, among many other members that issue their own business-specific lines of credit. A comprehensive list of ACA creditor members is at: https://www.acainternational.org/directory/?t=creditor

8. ACA's creditor members rely on consumer reports (also known as credit reports) created by credit reporting agencies ("CRAs") when underwriting loans and other extensions of credit. Underwriting is a critical component of the credit process. It allows creditors to determine whether an individual is capable of paying back the extended credit. A complete, accurate view of an individual's credit is thus essential to the financial health of ACA's creditor members.

9. The CFPB claims that creditors' underwriting models will be minimally impacted by the Rule. But I know that many of ACA's creditor members use proprietary underwriting models that they keep well-guarded. The types of products that ACA members offer range widely, for example: mortgages, auto loans, appliance and technology financing, credit cards, utilities and telecommunications. Every creditor's underwriting model varies for the product, loan term, prepayment life-cycle, consumer risk pool, and ability of the creditor to tolerate losses, among countless other variables. Given the virtually unlimited permutations in underwriting models used by U.S. creditors, it is a vast overgeneralization and lacks credibility for the CFPB to say it thinks all underwriting models will be unaffected by the loss of medical debt information from their underwriting.

10. Because the Rule obstructs the reporting of accurate, truthful information regarding consumer medical debt, ACA's creditor members are unable to receive that information and use it to make underwriting decisions. The unfortunate result is that ACA's members will no longer have a holistic view of an individual's credit before extending lines of credit. This is bad for creditors

and bad for consumers.

11. For creditors (ACA's creditor members included), the Rule's limitations on accurate financial information regarding medical debts will introduce unnecessary risk when extending lines of credit. In effect, the Rule muddies the waters; it does not eliminate medical debt, it merely hides it. Creditors who extend credit to consumers they believe can repay the debts (but in fact cannot due to hidden medical debts) will be harmed when payments go unmade. These creditors will react in predictable ways designed to protect their institution's financial well-being: they will restrict credit, raise interest rates, and more aggressively pursue deficient consumers through default litigation.

12. Many creditors, including ACA creditor members submitted comments objecting to the Rule that explain in more detail my statements above. E.g., Cmt. CFPB-2024-0023-0996 from Iowa Credit Union League (Creating a prohibition that prevents Iowa credit unions from accessing medical debt information is detrimental to their operations); Cmt. CFPB-2024-0023-0347 (Comment from Community Bankers Association of Illinois opposing the Rule); Cmt. CFPB-2024-0023-0742 (opposing the Rule due to concern about faulty underwriting); Cmt. CFPB-2024-0023-0752 (same); Cmt. CFPB-2024-0023-0868 (same).

13. Moreover, the underwriting models used by ACA's creditor members to make underwriting decisions are not simplistic formulas that can be modified without expense. These models are proprietary pieces of information—often, they are the most valuable propriety information a creditor possesses. The models require fine-tuning and careful monitoring in order to ensure offers of new credit can be afforded by the borrower. Requiring creditors to change these models, by eliminating medical debt altogether, in 60 days requires significant resources and money.

14. ACA's creditor members must begin now to expend resources and money to bring their operations into compliance by the Rule's fast-approaching implementation date. The harms this Rule inflicts on ACA's creditor members thus begins now.

15. For consumers, the Rule will mean individuals who may appear to be capable of repaying debts (with no medical debt listed on their credit reports), are actually over-extended and cannot make the payments. These consumers will face default and the devastating consequences that follow.

16. ACA's collector members will lose revenue from medical accounts that are no longer placed with them. For example, one commenter explained:

> 1) Since the 3 credit reporting agencies stopped credit reporting balances under $500, my smaller medical clients (dental offices, private practices) have seen a BIG deduction in collections
> 2) For one particular client, we calculated that collections went from 43% to 12% in one year. This dental office is looking to merge with a larger group as they cannot keep taking hits to their ability to get paid.
> 3) In NY, we now have no consequence for not paying your medical bills: we can get a judgment, but cannot get a lien or garnish wages. We have heard multiple times that there are no consequences for not paying their medical bill, so they do not pay. We actually know of people that are discontinuing their health insurance since there is no consequence! THIS IS PROBLEMATIC!!!
> 4) There are multiple sources on TikTok and Instagram advising consumers that in NY since they do not credit report, there is no consequence for not paying their medical bill. The more people get away with not paying a bill, the more they will just not pay. Cmt. CFPB-2024-0023-0404.

17. This Rule may put many ACA debt collector members out of business entirely, which has a direct effect on ACA's revenue.

18. None of this is inevitable; all of this is caused by the Rule.

19. The Rule endangers the financial health of ACA's members and infringes on their First Amendment right to receive accurate commercial speech. To alleviate the harms inflicted, the Rule must be enjoined from taking effect.

Pursuant to Local Rules, I declare under penalty of perjury that the foregoing is true and correct. Executed on January 24, 2025.

                                           */s/ Scott Purcell*

                                           Scott Purcell, CEO

                                           ACA International